# EXHIBIT 28

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO

| | |
|---|---|
| TRACY HOWARD, ADINA RINGLER, and TRECEE ARTIS on behalf of themselves and those similarly situated,<br><br>                   Plaintiffs,<br><br>     v.<br><br>HAIN CELESTIAL GROUP, INC. d/b/a EARTH'S BEST,<br><br>                   Defendant. | Case No.: 3:22-cv-527-VC |

**Expert Report of Ronald T. Wilcox, Ph.D.**

November 1, 2023

# Table of Contents

I.    Qualifications ......................................................................................................... 1

II.    Background ............................................................................................................. 3

III.    Assignment ............................................................................................................ 4

IV.    Summary of Opinions ............................................................................................ 5

V.    Dr. Dennis's Consumer Perception Survey Is Flawed and Unreliable ............................ 10

    A.    Dr. Dennis's Use of a Yellow Border Around the "Excellent Source" Claim in His Survey Design Biased His Results ..................................................................... 11

    B.    A Slight Modification of Dr. Dennis's Consumer Perception Survey Illustrates the Bias in Dr. Dennis's Survey Design ................................................................... 16

        1.    Survey programming, survey participant recruitment, and data collection 17

        2.    Survey screening .................................................................................. 18

        3.    Survey main questionnaire ................................................................... 18

        4.    Survey results ....................................................................................... 22

    C.    Dr. Dennis's Consumer Perception Survey is Not Applicable to Purchases of At-Issue Products Made for Anyone Other Than Children Under Two Years Old ............. 23

VI.    Labeling Survey .................................................................................................... 24

    A.    Principles of Survey Design ............................................................................ 24

    B.    Survey Design ................................................................................................ 26

        1.    Survey Population and Survey Sample .................................................. 26

        2.    Survey Screener ................................................................................... 27

        3.    Main Questionnaire ............................................................................. 28

    C.    Survey Implementation ................................................................................... 31

    D.    Survey Results ............................................................................................... 32

VII.    Consumption Behavior Survey ............................................................................... 35

    A.    Survey Design ................................................................................................ 36

        1.    Survey Population and Survey Sample .................................................. 36

        2.    Survey Screener ................................................................................... 37

        3.    Main Questionnaire ............................................................................. 37

    B.    Survey Implementation ................................................................................... 38

    C.    Survey Results ............................................................................................... 39

VIII.   Mr. Gaskin's Conjoint Survey and Mr. Weir's Damages Methodology Are Not Applicable to Many Putative Class Members .................................................................. 40

     A.    Mr. Gaskin's and Mr. Weir's Methodologies Are Not Applicable to Any Non-Pouch At-Issue Products ................................................................................... 40

     B.    Mr. Gaskin's and Mr. Weir's Methodologies Are Not Applicable to Any Purchases of At-Issue Products Made for Anyone Other than Children Under Two Years Old    42

     C.    Many Purchases of the At-Issue Products Were Made for Children Two Years and Older   42

IX.    Mr. Gaskin's Conjoint Survey and Mr. Weir's Damages Methodology Cannot Be Used to Estimate Market Prices or Price Premia .............................................................. 44

     A.    Mr. Gaskin's Conjoint Survey Can at Best Estimate Willingness to Pay and Cannot Be Used to Estimate Market Prices or Price Premia ............................................. 44

     B.    Mr. Gaskin's and Mr. Weir's Claims That Their Methodology Accounts for Supply-Side Factors Are Incorrect................................................................. 45

X.     Mr. Gaskin's Conjoint Survey Is Flawed Because It Does Not Distinguish Between Consumers' Willingness to Pay for Nutrient Content Claims and Consumers' Willingness to Pay for the Associated Nutrients ........................................................................... 46

XI.    Mr. Gaskin's Conjoint Survey Methodology Is Flawed Because It Produces Unrealistic and Illogical Results............................................................................................ 48

     A.    Mr. Gaskin's Conjoint Survey Is Flawed Because It Makes Unrealistic Predictions About Distractor Label Claims ...................................................... 48

     B.    Respondents to Mr. Gaskin's Conjoint Survey Exhibit Irrational Preferences, Illustrating the Flaws in Mr. Gaskin's Survey Design...................................... 51

     C.    Analysis of Individual Respondents' WTP Demonstrates that Mr. Gaskin's Results and Conclusions are Unreliable .......................................................... 52

XII.    Mr. Gaskin's Conjoint Survey Design Does Not Reflect Marketplace Realities ............. 54

     A.    Mr. Gaskin's Conjoint Survey Design Is Flawed, Presenting Respondents with Unrealistic and Confusing Product Options ................................................... 54

     B.    Mr. Gaskin's Surveys Fails to Account for the Fact that Many Consumers Likely Purchase the At-Issue Pouch Products Out of Habit and Therefore His Results Are Unlikely to Reflect Their Behavior in the Marketplace..................................... 56

XIII.   Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies a Single "Price Premium" To All Purchases of a Given At-Issue Pouch Product, Despite Differences Between Products and Putative Class Members............................................................ 56

     A.    Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies the Same "Price Premium" to All Purchases of a Given At-Issue Pouch Product, Irrespective of the Price Paid for that Product ............................................................................. 57

B.      Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies the Same "Price Premium" to All Purchases of At-Issue Pouch Products, Irrespective of Whether and To What Extent the Consumer Values the At-Issue Claim......................................... 58

## I.      Qualifications

1.      I am the NewMarket Corporation Professor of Business Administration at Darden Graduate School of Business Administration at the University of Virginia, where I conduct research and teach classes related to marketing. I am also the Academic Director of the MSBA Program at Darden, and until recently, I was the Senior Associate Dean for Degree Programs. I received an Honors Bachelor of Arts degree in Classics and Economics from Xavier University and a Ph.D. in Business Administration from Washington University in St. Louis. I have been at Darden since 2001. Prior to that, I was an Assistant Professor of Industrial Administration at the Graduate School of Industrial Administration (now Tepper School of Business) at Carnegie Mellon University. I also served as an economist at the U.S. Securities and Exchange Commission from 1999 to 2000.

2.      Marketing is a discipline that focuses on the study of organizations' marketing practices based on conceptual foundations of consumer behavior. My general areas of expertise within marketing are branding, consumer behavior, surveys, statistical modeling of consumer choice, and the public policy implications of marketing. I have published several articles on these marketing phenomena in leading marketing journals such as the *Journal of Marketing Research*, *Marketing Science*, *Management Science*, and the *Journal of Business*. For example, I wrote a paper that employed a survey technique called conjoint analysis to explore how consumers make choices in the market for mutual funds.[1] For another of my papers I constructed a consumer survey to determine the willingness of individual consumers to purchase private-label products rather than national brands.[2]

3.      I have also authored or supervised numerous cases and technical notes, published by Darden Business Publishing and used at other leading business schools, which focus on practical business problems faced by companies, and frameworks and techniques for solving these problems. For instance, I supervised a case focused on consumers' responses to packaging and

---

[1] Wilcox, R. T. (2003), "Bargain Hunting or Star Gazing? Investors' Preferences for Stock Mutual Funds," *The Journal of Business*, 76, 4, 645–663.

[2] Narasimhan, C. and R. T. Wilcox (1998), "Private Labels and the Channel Relationship: A Cross-Category Analysis," *The Journal of Business*, 71, 4, 573–600.

promotions for Heinz Ketchup.[3] I also authored a technical note that describes conjoint analysis, which is used for measuring consumer preferences for multi-attribute products and services.[4] Another one of my cases used a survey to determine how much different people are willing to pay for tickets to a National Basketball Association game.[5] At Darden, I have taught MBA-level courses in marketing research and marketing intelligence. Survey design and analysis were important components of the courses. I currently teach the required marketing course in the MBA and Executive MBA programs as well as the elective course on pricing.

4.      Outside of academic journals, my research and writing have appeared in the *Wall Street Journal*, the *Washington Post*, *BusinessWeek*, *Fortune*, *Forbes*, and the *Weekly Standard*. I have also co-authored a book, *Cutting-Edge Marketing Analytics: Real World Cases and Data Sets for Hands on Learning*, published by Pearson FT Press in 2014, on the use of customer data to improve marketing decisions. In Chapter 15, we describe how best to set up experiments to test consumer response to advertisements in order to determine which advertisements are effective and which are not. Chapter 16 is a case study about the advertising experiments conducted at a particular company (Ohio Art). Another one of my books, *Whatever Happened to Thrift? Why Americans Don't Save and What to Do About It*, published by Yale University Press in 2008, was named a "Top 5 Business Book of the Year" by Kiplinger. A copy of my curriculum vitae that provides a full list of my publications is attached as **Appendix A**.

5.      I have served as a marketing consultant to a number of organizations such as Sikorsky, Pratt and Whitney, Johnson and Johnson, Visa, Talbots, Logistics Management International, and Illinois Tool Works.

6.      I have also served as an expert witness in cases where I opined on issues relating to marketing and consumer surveys, including conjoint surveys. A list of my testimony in the past four years is attached as **Appendix B**.

---

[3] Wilcox, R. T. and R. Goldberg (2009), "Heinz Ketchup: Pricing the Product Line," *Darden Business Publishing, University of Virginia*, UVA-M-0777, 1–10.
[4] Wilcox, R. T. (2016), "A Practical Guide to Conjoint Analysis," *Darden Business Publishing, University of Virginia*, UVA-M-0675, 1–8.
[5] Wilcox, R. T. (2009), "Portland Trail Blazers," *Darden Business Publishing, University of Virginia*, UVA-M-0773, 1–10.

## II.    Background

7.    I understand that Hain Celestial Group, Inc. ("Hain Celestial") manufactures and sells certain food products intended for children.[6]

8.    Plaintiffs in this case claim that Hain makes certain "nutrient content claims" (the "Challenged Claims") on the packaging of certain food products (the "At-Issue Products"[7]). Plaintiffs claim that these products are "intended specifically for use by children under the age of two."[8] Plaintiffs claim that the Food and Drug Administration ("FDA") prohibits making such "nutrient content claims" on food products that are "intended specifically for use by infants and children less than 2 years of age"[9] and that the Challenged Claims are therefore "unlawful."[10]

9.    Plaintiffs also claim that the Challenged Claims are "misleading" on the grounds that, according to Plaintiffs, the claims "deceive reasonable consumers into believing [the At-Issue Products] are a healthful and appropriate source of nutrients for their children under the age of two."[11]

10.    Plaintiffs further claim that they paid a "price premium" for the At-Issue Products as a result of the Challenged Claims, *i.e.*, that the prices they paid for the At-Issue Products would have been lower in the absence of the Challenged Claims.[12]

---

[6] "Earth's Best Organic," *Earth's Best Organic*, https://www.earthsbest.com/.
[7] Plaintiffs define the At-Issue Products as "all Earth's Best products that were intended for children under two and made a nutrient content claim during the class period." Plaintiffs provide a "non-exhaustive list" as Exhibit A to the Second Amended Complaint. For the remainder of this report, I use the term "At-Issue Products" to refer to the products listed in Exhibit A to the Second Amended Class Action Complaint for Violation of The California Unfair Competition Law; False Advertising; and Consumers Legal Remedies Act; False Advertising; Fraud, Deceit; and/or Misrepresentation; Unfair Business Practices; and Unjust Enrichment, *Tracy Howard et al. v. The Hain Celestial Group, Inc. d/b/a Earth's Best*, November 2, 2022, with Exhibits ("Second Amended Complaint"):
Earth's Best Organic Veggie Red Lentil Bake with Oliver Oil Protein Puree Pouch,
Earth's Best Organic Four Bean Feast with Vegetables Protein Puree Pouch,
Earth's Best Organic Beef Medley with Vegetables Puree Pouch,
Earth's Best Organic Chicken Casserole with Vegetables & Rice Puree Pouch,
Earth's Best Organic Fruit Yogurt Smoothie Pouch (various flavors),
Earth's Best Organic Crunchin' Crackers Wholesome Snacks (Original flavor),
Earth's Best Organic Letter of the Day Cookies (Oatmeal Cinnamon flavor and Vanilla flavor),
Earth's Best Organic Peanut Butter Baked Corn Puffs (Peanut Butter flavor).
[8] Second Amended Complaint, ¶ 17.
[9] Second Amended Complaint, ¶ 2.
[10] Second Amended Complaint, ¶ 6.
[11] Second Amended Complaint, ¶ 6.
[12] Second Amended Complaint, ¶ 175.

11.     Plaintiffs seek to certify a class defined as: "All persons in the State of California who purchased the [At-Issue] Products between January 26, 2018 and the present."[13]

### III.    Assignment

12.     Plaintiffs' experts Mr. Colin Weir and Mr. Steven Gaskin have submitted expert reports on behalf of Plaintiffs.[14] Mr. Gaskin has executed a conjoint survey which, he claims, enables him to "assess the market price premia... that would result from [the Challenged Claims] in the labeling and marketing of the [At-Issue] Products..."[15] Mr. Weir has submitted a report in which he "provide[s] a framework for the calculation of damages suffered by the proposed class of consumers,"[16] which relies on the results of Mr. Gaskin's conjoint survey as an input.[17]

13.     Plaintiffs' expert Dr. J. Michael Dennis has also submitted an expert report on behalf of Plaintiffs.[18] Dr. Dennis has executed a "consumer perception survey" with the articulated goal of assessing whether "[Hain's] use of the [Challenged Claims] led reasonable consumers purchasing the [At-Issue] Products for children under two to perceive that the [At-Issue] Products were healthy."[19]

14.     I have been asked by counsel to evaluate the opinions of Mr. Weir, Mr. Gaskin, and Dr. Dennis.

15.     In performing my analyses, I reviewed Mr. Weir's, Mr. Gaskin's, and Dr. Dennis's reports, the materials provided by them, documents produced in this litigation, as well as academic literature. I also relied upon my knowledge and expertise in marketing research and econometric techniques that I have developed as an academic researcher. A complete list of materials I considered in forming my opinions is shown in **Appendix C** to this report.

16.     I am being compensated at my hourly rate of $1,000. I was assisted in my work by staff at Cornerstone Research who performed research and other support work for me in this matter. I

---

[13] Plaintiffs' Notice of Motion for Class Certification, *Tracy Howard et al. v. The Hain Celestial Group, Inc. d/b/a Earth's Best*, Case No. 3:22-cv-00527-VC, September 5, 2023 ("Notice of Motion and Motion for Class Certification"), p. i.
[14] Expert Report of Colin B. Weir, September 5, 2023 ("Weir Report"); Expert Report of Steven P. Gaskin, September 5, 2023 ("Gaskin Report").
[15] Gaskin Report, ¶ 10.
[16] Weir Report, ¶ 6.
[17] Weir Report, ¶¶ 6, 62–63.
[18] Expert Report of J. Michael Dennis, Ph.D., September 5, 2023, and backup material ("Dennis Report").
[19] Dennis Report, ¶ 20.

receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither Cornerstone Research's compensation nor mine is contingent upon the conclusions I reach or on the outcome of this matter.

## IV.      Summary of Opinions

17.      The design of Dr. Dennis's Consumer Perception Survey is flawed, leading to results that are biased in favor of finding that the Challenged Claim he tests ("Excellent source of Calcium, Vitamins C & D," henceforth the "Excellent Source Claim") had an effect on consumer perceptions. Dr. Dennis's Consumer Perception Survey showed respondents images of the product packaging for an Earth's Best Organic Fruit Yogurt Smoothie and asked respondents whether a statement on the packaging communicated to them that the product was "healthy," when "shopping for a child under the age of two years." Respondents in the test group were shown a version of the original packaging while respondents in the control group were shown the packaging with the Excellent Source Claim replaced by an alternative "control" claim ("Packaging made with 100% recycled content," henceforth the "Control Claim"). However, in a deviation from accepted survey design practices, Dr. Dennis's survey placed a yellow border around the Excellent Source and Control Claim on his survey stimuli, thereby artificially drawing respondents' attention to the language within the border and biasing the results of his survey. In addition to the bright yellow border, the wording of Dr. Dennis's survey questions artificially drew respondents' attention to the at-issue language.

18.      A small modification survey of Dr. Dennis's survey illustrates the bias inherent in Dr. Dennis's version of the survey. I conducted a modified version of Dr. Dennis's survey without the yellow border around the Excellent Source and Control Claims on the survey packaging and with modified question wording. My modified version of Dr. Dennis's survey found that, contrary to Dr. Dennis's biased results, there was no statistically significant difference between the test group and a control group in the percentage of consumers who found that the packaging communicated that the product was "healthy," when "shopping for a child under the age of two years."

19.      I also conducted a Labeling Survey, which assessed the perceptions of consumers in the market for the At-Issue Products regarding the ages of the children for whom the At-Issue

Products were intended. My Labeling Survey employed a between-subjects experimental design, where half of respondents (the test group) were shown the *front* packaging of several At-Issue Products and the other half (the control group) were shown the *front and back* packaging (and side packaging, where applicable) of the same At-Issue Products. All respondents were asked, for each product they viewed, whether the packaging told them something about the "age or ages of the children the product is intended for"; respondents answering "Yes, this packaging tells me something about the age or ages of the children the product is intended for" were then asked to select which of several statements best described what the packaging told them. My Labeling Survey found that the front packaging of the five At-Issue Products does not ambiguously communicate a single message to all consumers about the ages of the children the products are intended for: for all products, a majority of respondents indicated that the packaging did not tell them anything about the age of the children the products are intended for. The survey also found that when consumers are shown the front and back packaging (and side packaging, where applicable), most consumers believe that the packaging communicates to them that the products are intended specifically for children 2 years and over.

20.     I also conducted a Consumption Behavior Survey, which assessed the ages of the children who consumed the At-Issue Products purchased in the past 12 months. My Consumption Behavior Survey screened for consumers who purchased any of the At-Issue Products in the past 12 months and then asked respondents to indicate, for each category of At-Issue Product (Organic Fruit Yogurt Smoothies, Organic Homestyle Protein Puree Pouches, Organic Crunchin' Crackers, Organic Letter of the Day Cookies, and Organic Peanut Butter Baked Corn Puffs), the age or ages of the child or children who consumed the products. My Consumption Behavior Survey found that for all five product categories, a majority of respondents indicated that the products they purchased were consumed *only* by children 2 years or older (61 to 70 percent, depending on the product). Only a small number of respondents (15 percent to 25 percent, depending on the product) indicated that the products were consumed only by children under 2 years. The remaining 13 to 17 percent indicated that the products were consumed both by children under 2 years and children 2 years and over. These results, taken together with the results of the Labeling Survey, indicate that the At-Issue Products were not targeted primarily at children under 2 years.

6

21.     Plaintiffs' expert Mr. Gaskin conducted a conjoint survey intended to assess consumers' willingness to pay ("WTP") for three of the Challenged Claims (the Excellent Source Claim, "4g protein per serving," and "3g plant protein," collectively the "At-Issue Pouch Claims") as they appear on "baby/toddler food pouches," which Mr. Gaskin claims to use to establish the price premium for the At-Issue Products (i.e., the difference in price between what putative Class Members paid for the At-Issue Products and what they would have paid absent the At-Issue Pouch Claims). The results of Mr. Gaskin's conjoint survey were used as an input into the damages methodology put forward by Mr. Weir. However, Mr. Gaskin's conjoint survey and Mr. Weir's damages methodology are flawed for several reasons.

22.     First, Mr. Gaskin's conjoint survey and Mr. Weir's damages methodologies apply only to a subset of the putative Class—consumers who purchased the at-issue "pouch" products ("At-Issue Pouch Products") for children under 2 years old. Mr. Gaskin's survey sample includes only consumers who purchased the At-Issue Products for children under 2 years old and his survey instructs respondents to assume they are shopping for children under 2 years old as they respond to the survey. As my Consumption Behavior Survey shows, a majority of putative Class Members purchased the At-Issue Products for children 2 years and over and only a minority of purchasers (15 to 25 percent, depending on the product) indicated that the products were consumed *only* by children under 2 years old. Additionally, Mr. Gaskin's survey instructs survey respondents to assume they are shopping for "pouch" products and thus Mr. Gaskin has no basis for applying the results of his survey to purchases of non-pouch products.

23.     Second, Mr. Gaskin's conjoint survey, like all conjoint surveys, can—at best—be used to determine consumers' willingness to pay and cannot, on its own, provide a reliable estimate of prices or price premia. This is because conjoint surveys model only the *demand* side of a market (i.e., consumers' demand for the products) and do not account for the *supply* side of the market (i.e., the quantities producers supply at different price points and how producers react to different demand conditions). Market prices (and therefore, price premia) are determined by the interaction of demand *and* supply, so conjoint analysis on its own cannot be used to reliably estimate price premia.

24.     Third, Mr. Gaskin's conjoint survey is flawed because it fails to distinguish between consumers' WTP for *claims* about nutrient content and consumers' WTP for the nutrients

themselves. Because of the format of Mr. Gaskin's conjoint survey—which presents hypothetical products with and without a given claim side by side—survey respondents are likely to believe that if a product in the conjoint survey does not have a given label claim ("4g protein per serving," for example), then the product *also* does not have the associated nutrients (i.e., the four grams of protein, in this example). However, the appropriate comparison is not between a product with and without *nutrients* but between a product with an At-Issue Pouch Claim and a product *without* that claim, but which *may or may not* contain the relevant nutrients.

25.     Fourth, design flaws in Mr. Gaskin's conjoint survey mean that it cannot even provide a reliable estimate of consumers' willingness to pay for the At-Issue Pouch Products. Mr. Gaskin's conjoint survey generates several unrealistic and illogical results, reflecting design flaws in the survey:

     a.  Mr. Gaskin's survey makes unrealistic predictions about "distractor" claims included in his survey. Specifically, Mr. Gaskin's conjoint survey includes the claim "USDA Organic" as a product attribute. Therefore, Mr. Gaskin's own methodology can be used to generate an estimated price premium for the presence of the "USDA Organic" label claim. In the context of real-world toddler food pouches, there is a difference of $0.20 (or 11.8 percent) between pouches with the "USDA Organic" label claim and equivalent pouches without. However, Mr. Gaskin's methodology implies that there would be a difference in WTP (or as Mr. Gaskin frames it, a "price premium") of $0.51 or 30 percent for the "USDA Organic" label claim.

     b.  A substantial proportion of respondents to Mr. Gaskin's conjoint survey exhibit irrational preference, preferring higher prices to lower prices, which reflects flaws in his survey design. Mr. Gaskin's survey data produces estimates of consumers' preferences for different price points in the survey. Rational consumers would be expected to prefer lower prices to higher prices. However, my analysis of Mr. Gaskin's survey data shows that 242 of Mr. Gaskin's 910 survey respondents (or 26.6 percent) exhibit statistically significant *violations* of rationality, i.e., they prefer higher prices to lower prices. This illogical result reflects flaws in Mr. Gaskin's survey design.

      c. Mr. Gaskin's survey data and methodology generate estimates of each individual respondents' willingness to pay for the Challenged Claims. My analysis of this data shows that survey respondents exhibit a wide range of values for willingness to pay, including extremely high and extremely negative willingness to pay. For example, taken at face value, Mr. Gaskin's results indicate that respondents' willingness to pay for the "4g protein per Serving" claim ranges from -$461.76 to $7,263.86; the results reflect similarly wide ranges for the "3g plaint protein" and "Excellent source of claims, vitamins C & D" claims.

26.     Fifth, the design of Mr. Gaskin's conjoint survey does not reflect marketplace realities in several critical ways:

      a. Mr. Gaskin's conjoint survey presents respondents with products that do not exist or are illogical, likely leading to confusion among survey respondents. Mr. Gaskin's conjoint survey presents respondents with non-Organic baby/toddler food pouches sold by the brands Earth's Best, Plum Organics, and Happy Tot Organics, despite the fact that these brands sell only organic products and market themselves as organic brands. Similarly, Mr. Gaskin's conjoint survey presents respondents with meat-based baby/toddler food pouches with a "3g plant protein" label, which is potentially confusing when applied to a meat-based pouch such as Earth's Best Organic Chicken Casserole puree pouch.

      b. Mr. Gaskin's conjoint survey does not account for the fact that many purchasers of the At-Issue Products are likely to purchase the products out of habit. Many habitual or repeat purchasers of the At-Issue Products are likely to make their purchasers without paying specific attention to the packaging or to claims that appear on the packaging. However, Mr. Gaskin's conjoint survey forces survey respondents to attend to the attributes included in his survey (including label claims). Mr. Gaskin's conjoint survey is therefore likely to inflate the importance of, and therefore willingness to pay for, the Challenged Claims.

27.     Sixth, Mr. Gaskin and Mr. Weir's methodology is flawed because it applies a single "price premium" estimate to all purchases of a given At-Issue Pouch Product, regardless of the

9

price paid by consumers for the product, and irrespective of whether and to what extent consumers value the relevant At-Issue Claim.

    a.  The same At-Issue Pouch Claim appears on several different At-Issue Pouch Products, and even a single At-Issue Pouch Product retails at a range of different prices. Mr. Gaskin's own conjoint analysis, if taken at face value, implies that the "price premium" associated with a given At-Issue Pouch Claim depends on the price of the product. However, despite this, Mr. Gaskin and Mr. Weir apply a single price premium to all At-Issue Pouch Products sharing the same At-Issue Pouch Claim.

    b.  Mr. Gaskin's own conjoint survey results, if taken at face value, demonstrate that consumers differ drastically in their valuation of the At-Issue Pouch Claims. Additionally, Mr. Gaskin presents evidence that, according to his interpretation, California consumers paid a higher "price premium" for the At-Issue Pouch Claims than consumers in the rest of the United States. However, despite these findings, Mr. Gaskin and Mr. Weir apply a single "price premium" estimate to all purchases of At-Issue Pouch Products sharing the same At-Issue Pouch Claim.

## V.    Dr. Dennis's Consumer Perception Survey Is Flawed and Unreliable

28.    Dr. Dennis conducted a "consumer perception survey" to determine whether "'Defendant's use of [a Challenged Claim] led reasonable consumers purchasing the Products for children under two to perceive that the Products were healthy.'"[20] Specifically, Dr. Dennis's survey allegedly aimed to assess how the presence of the Excellent Source Claim ("Excellent source of calcium, vitamins C & D") on the packaging of an Earth's Best Organic Fruit Yogurt Smoothie product (the "Fruit Yogurt Smoothie") affected consumers' perceptions of the Fruit Yogurt Smoothie as "healthy" for children under 2 years.[21]

---

[20] Dennis Report, ¶ 20–21.

[21] Dennis Report, ¶¶ 26, 47–53. At deposition, Dr. Dennis acknowledged that his survey does not test any Challenged Claims other than the Excellent Source Claim. Deposition of J. Michael Dennis, October 16, 2023, ("Dennis Deposition"), 116:19–117:10. ("Q. And why do you believe that your survey results are generalizable to the products that do not have an 'excellent source' claim, that have some other claim on them? A. Essentially because of the -- the content, the -- I think we're looking at protein-type claims that are outside the 'excellent source' paradigm, if you will; so looking at Products 1 and 2 and 3 that involve the protein per -- per serving -- and even though I don't have the benefit of a survey that tests these specific claims, it's my expert opinion that consumers that would look at the 'excellent source' claims and consider them to be communicating a health message are likely to consider a

29.     However, Dr. Dennis's survey design artificially focused respondents' attention on the Excellent Source Claim, by adding a bright "yellow border" around the claim on the product packaging and by explicitly asking respondents to focus on the Excellent Source Claim, which biased the results of his survey towards finding an effect of the Excellent Source Claim on consumer perceptions. Dr. Dennis's survey was especially biasing because the packaging of the Fruit Yogurt Smoothie contains several other elements that might contribute to consumers viewing the product as healthy, but Dr. Dennis's survey design forced respondents to ignore these elements.

30.     I conducted a modified version of Dr. Dennis's consumer perception survey (the "Modified Dennis Survey"), which removed the bright yellow border and therefore assessed consumer perceptions in a less biased, less leading way. The results of the Modified Dennis Survey show that, contrary to Dr. Dennis's biased findings, the presence of the Excellent Source Claim has no statistically significant effect on consumer perceptions of the Fruit Yogurt Smoothie as being healthy for children under 2 years.

### A.     Dr. Dennis's Use of a Yellow Border Around the "Excellent Source" Claim in His Survey Design Biased His Results

31.     Dr. Dennis's use of a yellow border in his consumer perception survey was flawed because it artificially drew respondents' attention to the test and control claims only and artificially led respondents to ignore the rest of the packaging, therefore biasing survey responses towards finding an effect.[22]  Dr. Dennis's use of the yellow border is inconsistent with good survey practices when trying to assess the incremental effect of a packaging element on consumer perceptions.

32.     In his survey, Dr. Dennis presented respondents with images of the packaging of a Fruit Yogurt Smoothie. The test group saw an image of the packaging with the Excellent Source

---

protein claim as communicating a health message. So clearly I don't have a survey to support that.  It's -- it's my expert opinion at this point.")

[22] At deposition, Dr. Dennis confirmed that he is not aware of textbooks on experimental design that use borders or similar methods around at-issue and control statements. Dennis Deposition, 77: 9–20. ("Q. All right. So of the dozens of textbooks on experimental design, sitting here today, you can't think of any that specifically discuss the use of a yellow border or similar – or similar around the at-issue and control statements in a testing control survey? A. Again, I'm not surprised by that. No, of course not. I can't think of a --  a specific treatise or -- or survey manual that goes to that level of detail.")

Claim while the control group saw an image of the packaging with the Excellent Source Claim removed and a different claim ("Packaging made with 100% recycled content," henceforth the "Control Claim") in its place. Both test and control groups were first shown a screen with images of the packaging and were then shown a second screen with the same images but with a bright yellow box drawn around the Excellent Source Claim (for the test group) and the Control Claim (for the control group).

**Exhibit 1**
**Dr. Dennis Survey Image with Yellow Border on Test and Control Stimuli**

 

Source: Dennis Survey

33.     The bright yellow border that Dr. Dennis added to the packaging images artificially drew respondents' attention to the claims only and forced respondents to pay more attention to the claims than they otherwise would have, rather than allowing respondents to evaluate the claims in the context of the complete packaging, as they would naturally do in a store or shopping

setting. As Dr. Dennis acknowledged at deposition, the yellow border ensured that respondents would "notice the content" therein.[23]

34.     Because of its biasing effects, the use of a yellow border or other elements that draw respondents' attention to particular aspects the survey stimulus is improper when designing a test and control survey to assess the incremental effect of an element of the packaging on consumer perceptions.[24] Prof. Diamond, cited by Dr. Dennis as an authority on survey research, explains that in order to test the effect on consumer perceptions of a particular characteristic, it is necessary *only* to use a control stimulus "that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[25] The procedure outlined by Prof. Diamond does not include adding additional elements to the test and control stimuli to draw respondents' attention to specific parts of the stimuli, for two reasons. First, it is not necessary to add additional elements to identify the effect of the relevant characteristic. As Prof. Diamond explains, if the test and control stimuli differ *only* with respect to the characteristic of interest (in this case, the Excellent Source Claim), then any difference in response between the test and control group can be attributed to the characteristic of interest—it is not necessary to add any additional elements to draw respondents' attention to the characteristic of interest.[26] Second, it is improper to include an additional element that draws an attention to specific parts of the stimulus because doing biases the responses. As I discuss below, Dr. Dennis's addition of the yellow border *biases* responses because it forces respondents to focus on the Excellent Source and Control Claims and to ignore other elements of the product packaging. Dr. Dennis acknowledged at deposition that he was not aware of any "treatise... or survey manual" that advises adding such an element to a test and control survey.[27] Mr. Gaskin also stated at deposition that it would be "unusual" to direct respondents' attention to the Excellent Source Claim "by bolding it or putting an arrow next to it..."[28] Mr. Gaskin

---

[23] Dennis Deposition, 70:8–9. ("I, obviously, used the yellow border so that respondents would notice the content").
[24] See Dennis Deposition, 77:9–20.
[25] Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, Third Edition*, Washington, DC: The National Academies Press ("Diamond (2011)"), p. 399.
[26] Diamond (2011), pp. 398–399.
[27] Dennis Deposition, 77:9–20. ("So of the dozens of textbooks on experimental design, sitting here today, you can't think of any that specifically discuss the use of a yellow border or similar – or similar around the at-issue and control statements in a testing control survey? ... THE WITNESS: Again, I'm not surprised by that. No, of course not. I can't think of a – a specific treatise or – or survey manual that goes to that level of detail.")
[28] Deposition of Steven Gaskin, October 10, 2023, with Exhibits and Appendices ("Gaskin Deposition"), 114:1–15. ("Q. So, if you were trying to assess a consumer's willingness to purchase the product as a whole with the -- that contained the nutrient content claim at issue or one that contained a different -- a distractor claim, right, a control

suggested that drawing respondents' attention to the claim might be appropriate "if the claim of interest gets lost in the clutter"[29] but acknowledged that the Excellent Source Claim is "relatively prominent" on the Fruit Yogurt Smoothie packaging.[30] Third, Dr. Dennis's addition of the yellow border to the survey stimuli means that the packaging seen by the test group is not the version of the labeling that consumers would have seen in the real-world marketplace. As Prof. Diamond explains, for test and control surveys, respondents in the test group should view the actual stimulus of interest.[31]

35.      The wording of the question in Dr. Dennis's survey further exacerbated the focus on the Excellent Source and Control Claims by specifically asking respondents about the statement inside the yellow border and not about the packaging as a whole. Dr. Dennis acknowledged at deposition that his survey did not measure whether the product packaging as a whole (with or without the Excellent Source Claim) communicated that the product is healthy.[32] The survey question was worded as follows: "When shopping for a child under the age of two years, the statement inside the **yellow border** ..." and the possible response options were "Does communicate that this product is healthy," "Does not communicate that this product is healthy," and "Don't know or not sure." This phenomenon, where the researcher draws undue attention to certain elements of the survey stimulus, thereby inflating the importance of these elements for survey respondents, is commonly referred to as "focalism."[33]

36.      Because of the addition of the yellow border and the resulting focus on the Excellent Source and Control Claims, Dr. Dennis's survey did not evaluate in an unbiased manner the hypothesis he was asked to test—that the use of the Excellent Source Claim on the packaging led

---

claim, in that scenario, where you're trying to assess willingness to buy the product, is that a scenario where you think it would be appropriate to direct somebody's attention to the nutrient content claim, for example, by -- by bolding it or putting an arrow next to it? A. I guess I would have to see the survey and the stimuli to really answer you. It would be unusual, but, you know, there's times when the -- the label claim of interest gets lost in the clutter for that sort of survey. So, I would have to look.")

[29] Gaskin Deposition, 114:1–15.

[30] Gaskin Deposition, 124:12–20. ("Q. Okay. And in the package that we're looking at in the Second Amended Complaint, would you agree that the excellent source of calcium, vitamin C and D nutrient content claim is relatively prominent on the package? A. I would say so, compared to some other claims I've seen. But that doesn't mean that everyone will notice it on -- in a survey. So, you have to think about things like that and make the tradeoff.")

[31] Diamond (2011), p. 398.

[32] Dennis Deposition, 104:9–105:1 ("Q. Your survey doesn't measure whether the product packaging as a whole with or without the at-issue claim communicates that the product is healthy, does it? A. No. I -- I reference again my survey questionnaire, Page 30. The question wording is (as read): 'When shopping for a child under the age of 2 years,' comma, 'the statement inside the yellow border,' ellipsis, 'does communicate the product is healthy, does not communicate that the product is healthy, don't know, not sure.' So the survey question is specific to the statement inside the yellow border.")

[33] See Daniel Kahneman et al., "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science* 312, no. 5782, 2006, pp. 1908–1910 for examples of the focusing illusion influencing survey results.

consumers to perceive the product as heathy for children under two.[34] The use of the improper yellow border design and question wording meant that the survey measured—at best—whether the Excellent Source Claim, devoid of context, communicates that the product it is associated with is healthy. That is a different question from what Dr. Dennis was attempting to measure, which is whether the Excellent Source Claim communicates healthiness *in the context of the product packaging* (i.e., whether "Defendant's use of the Challenged Representation led reasonable consumers... to perceive that the Products were healthy.")[35]

37.     Dr. Dennis's use of the yellow border to artificially draw respondents' attention to the Excellent Source and Control Claims is especially biasing because the Fruit Yogurt Smoothie packaging contains several *other* indicators that might lead consumers purchasing the Fruit Yogurt Smoothie for children under 2 years to perceive that the product is healthy. For example, the front packaging of the Fruit Yogurt Smoothie contains the following:

   a.   A "USDA Organic" logo;

   b.   The "Earth's Best Organic" logo, which many consumers may associate with healthy products;[36]

   c.   Pictures of fresh fruit (a peach and a banana, in the case of the "Peach Banana" product used by Dr. Dennis in his survey).

38.     Additionally, the back packaging contains additional elements and statements that might lead consumers to believe the product is healthy:[37]

   a.   The "Earth's Best Organic" logo

   b.   "Certified USDA Organic"

   c.   "Made with Real Yogurt"

   d.   "No Artificial Flavors or Colors"

   e.   "Non-BPA Package"

   f.   "No GMO's"

39.     Given these *other* elements that might contribute to a consumer believing the product is healthy, it is reasonable to think that the Excellent Source Claim may have minimal *incremental* effect on whether consumers believe the product is healthy. In other words, many consumers

---

[34] Dennis Report, ¶ 20.
[35] Dennis Report, ¶ 20.
[36] "Our Promise," *Earth's Best Organic*, https://www.earthsbest.com/why-earths-best/our-promise/.
[37] Dennis Report, ¶ 64.

may be just as likely to view the product as healthy whether the product packaging features the Excellent Source Claim or not, and in fact, my Modified Dennis Survey found precisely that, as I discuss in Section V.B below.

40.    However, Dr. Dennis's flawed survey design prevented him from collecting valid survey responses from this kind of consumer, because rather than asking an unbiased neutral question, Dr. Dennis's survey, through the bright yellow border and the question wording, specifically directed respondents' attention to the Excellent Source and Control Claims and asked respondents whether *the Excellent Source Claim* (or, in the case of the control group, the Control Claim) led them to believe the product is healthy. Even consumers for whom the Excellent Source Claim has little incremental effect on their perception of the product as healthy are likely to respond that the Excellent Source Claim does communicate to them that the product is healthy when their attention is explicitly *focused* on this claim (which Dr. Dennis does with the yellow border and question wording). On the other hand, the Control Claim does not pertain to the food contents of the product in any way, so consumers in the control group—when explicitly asked about the Control Claim and when their attention is focused on this claim—are unlikely to respond that the Control Claim communicates to them that the product is healthy.

41.    In addition to the bright yellow border, Dr. Dennis's survey design also limited respondents' assessment of the product by initially showing respondents only the front of the packaging. Dr. Dennis's survey showed survey respondents a large image of the front packaging and a small "thumbnail" image of the back packaging. To view a full-size version of the back packaging, respondents were required to click on the thumbnail image. Just as with his use of the yellow border, by shifting focus away from the back packaging, Dr. Dennis's survey removed additional context when asking respondents whether the claims communicate that the product is healthy.

### B.    A Slight Modification of Dr. Dennis's Consumer Perception Survey Illustrates the Bias in Dr. Dennis's Survey Design

42.    To illustrate the bias in Dr. Dennis's consumer perception survey, I conducted the Modified Dennis Survey, a modified version of Dr. Dennis's survey that addressed two of the flaws in Dr. Dennis's survey, keeping all other aspects of his flawed survey design intact. I modified Dr. Dennis's survey design as follows:

a. I removed the screen that showed respondents a bright yellow border around the Excellent Source Claim ("EXCELLENT SOURCE OF CALCIUM, VITAMINS C & D") and around the Control Claim ("PACKAGING MADE WITH 100% RECYCLED MATERIAL"). Instead, my version of Dr. Dennis's survey showed respondents only an image of the packaging *without* the added bright yellow border around the Excellent Source and Control Claims. I also made corresponding changes to the survey instructions and question wording for consistency with this modification. For example, Dr. Dennis's survey asked respondents whether or not the "statement on the packaging" communicated that the product was healthy;[38] since the modification no longer highlighted any one statement, my modification of Dr. Dennis's survey asked respondents whether or not the "packaging" communicated that the product was healthy.[39]

b. I altered the survey design to show respondents both front and back packaging at full size, rather than requiring respondents to click on a thumbnail image to view a full-size image of the back packaging.

43. As I explain in more detail below, the results of the Modified Dennis Survey show that the presence of the Excellent Source Claim on the product packaging does not have a statistically significant effect on consumers' perception of the Fruit Yogurt Smoothie as healthy for children under 2 years.

### 1. Survey programming, survey participant recruitment, and data collection

44. To identify potential survey respondents and to administer the Modified Dennis Survey, I engaged the survey research company, GBK.[40] GBK, under my direction, programmed the survey questionnaire and fielded the survey online.[41]

45. Following the same methodology used by Dr. Dennis, GBK used "click-balancing" to ensure that respondents starting the survey were representative of the California population with

---

[38] Dennis Report, ¶ 72; Attachment C, p. 25.
[39] See Appendix D.
[40] "GBK Collective," *GBK Collective,* https://www.gbkcollective.com. I have previously worked with GBK Collective, and I have been satisfied with the company's experience with online surveys, technical capabilities, and data integrity process.
[41] GBK used panelists from the Dynata panel. Information about the Dynata consumer panel is included in Appendix M.

respect to age, gender, and region.[42] Following Dr. Dennis's methodology, GBK implemented a process whereby respondents were terminated from the survey if the age and gender reported by a respondent did not match the information that was on file for that respondent.

### 2. Survey screening

46.    For the Modified Dennis Survey, I used the same screening protocol as Dr. Dennis used for his version of the consumer perception survey,[43] screening for adults residing in the state of California who purchased a food or beverage product for children under the age of 2 years from 2018 to the present. For the screening portion of the survey, I used the screener questionnaire provided by Dr. Dennis in his Attachment C.[44]

47.    I obtained a final sample of 630 respondents. Following Dr. Dennis's approach, I excluded from the final analysis survey respondents who took more than 33 seconds to answer the consumer perception question or who did not confirm that they examined the images in the survey or who did not confirm that they based their answers on the information provided in the survey,[45] resulting in a final sample for analysis of 552 respondents, 271 in the control group and 281 in the test group. A sample size of 552 is sufficient from a statistical perspective to illustrate the flaw in Dr. Dennis's survey design.[46]

### 3. Survey main questionnaire

48.    I made modifications to the main questionnaire in Dr. Dennis's Consumer Perception survey only where necessary to remove the yellow border and to show the front and back packaging of the product.

49.    Eligible respondents were assigned randomly to either a test group or a control group (without their knowledge). Respondents were then shown the front and back of the product

---

[42]  I found that the gender and age breakdown of Dr. Dennis's inbound sample does not match the Census data for California: Dr. Dennis's sample is 58 percent female, while the 2020 Census data indicates that California is 51 percent female. See Workpaper 1. According to the 2020 Census, California had 19,989,220 females out of a total population of 39,538,223. "Age and Sex Composition: 2020," *2020 Census Briefs*, May, 2023, https://www2.census.gov/library/publications/decennial/2020/census-briefs/c2020br-06.pdf.
[43] Dennis Report, Attachment C.
[44] Dennis Report, Attachment C.
[45] Dennis Report, ¶ 87, footnote 26.
[46] Diamond, S. S. and J. B. Swann (2022), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Chicago, IL: American Bar Association ("Diamond and Swann (2022)"), p.90.

packaging side by side. Respondents in the test group were shown images of the front and back packaging of the Fruit Yogurt Smoothie with the Excellent Source Claim on the front packaging. Respondents in the control group were shown images of the front and back packaging of the Fruit Yogurt Smoothie without the Excellent Source Claim and with the Control Claim on the front packaging. In both cases, I did not enclose the statements inside a yellow border. The control group packaging also removed the Excellent Source Claim from a list of claims shown on the back packaging. The images shown to the test group showed the packaging as actual consumers would have seen the packaging in the marketplace.

50.     After viewing the packaging, respondents were asked, consistent with Dr. Dennis's survey, "When shopping for a child under the age of two years, the product packaging…" and were presented with the same options as in the Dennis consumer perception survey:

      a.  "Does communicate that this product is healthy"

      b.  "Does not communicate that this product is healthy"

      c.  "Don't know/not sure."

51.     An example of the choice screen presented to respondents in the test and control groups is given in Exhibits 2 and 3 below.

*Exhibit 2*
**Screenshot of Modified Dennis Survey (Test Group)**



**Exhibit 3**
**Screenshot of Modified Dennis Survey (Control Group)**



52.     After answering the consumer perception question, consistent with Dr. Dennis's survey, I also asked respondents a small number of "final questions" concerning whether they answered the question based on the packaging shown in the survey, urban/rural community density (RUCA), and purchase history for Earth's Best products.

53.     My complete survey questionnaire is provided in **Appendix D** and a full set of survey screenshots for respondents selected for test and control groups are provided in **Appendix E**.

### 4. Survey results

54.     The results of the Modified Dennis Survey indicate that the Excellent Source Claim has no statistically significant impact on consumers' perception of the product as "healthy," when shopping for children under the age of 2 years.

55.     Exhibit 4 shows respondents' perception of the product packaging as healthy among the test group (with the Excellent Source Claim on the packaging) and the control group (with the Control Claim on the packaging). Exhibit 4 shows that 92 percent of respondents in the control group perceived the product packaging communicate that the product is healthy and that 93 percent of respondents in the test group perceived the product packaging to communicate that the product is healthy. The difference between test and control groups is not statistically significant.

*Exhibit 4*
*Modified Dennis Survey Results*

| Responses to "When shopping for a child under the age of two years, the product packaging…" | Control (Packaging with Control Statement)[1] | | Test (Packaging with Challenged Statement)[2] | |
| --- | --- | --- | --- | --- |
| | Number of Respondents | Percentage of Respondents | Number of Respondents | Percentage of Respondents |
| Does communicate that this product is healthy | 249 | 92% | 260 | 93% |
| Does not communicate that this product is healthy | 21 | 8% | 21 | 7% |
| Don't know / not sure | 1 | 0% | 0 | 0% |
| **Total** | **271** | **100%** | **281** | **100%** |

Source: Modified Dennis Survey
Note:
[1] The control group was shown a product with the statement "Packaging made with 100% recycled content" on the front packaging.
[2] The test group was shown a product with the statement "Excellent source of calcium, vitamins C & D" on the front packaging.
[3] Following Dr. Dennis's methodology, the target population was adults residing in the state of California who do some grocery shopping for their household and have purchased food or beverages for children under age 2 since 2018 from the following brands: Earth's Best, Happy Family Organics, Plum Organics, Gerber, Beech-Nut, Sprout, Annie's Organics, GoGo Squeez, Gogurt, Danimals, HappyTot, Peter Rabbit Organics, Once Upon a Farm, Bamba, or store brand/private label products.
[4] Following Dr. Dennis's methodology, my analysis excludes respondents who took more than 33 seconds to answer the consumer perception question or who did not confirm that they examined the images in the survey or did not confirm that they based their answers on the information provided in the survey.
[5] I conducted a two-proportion z-test to determine the statistical significance of the difference in the proportion of respondents who answered "Does communicate that this product is healthy" across the two groups, which resulted in a p-value of 0.90. I also conducted two-proportion z-tests of the differences in proportions when including respondents who took more than 33 seconds to answer the consumer perception question and find a p-value of 0.79. None of these tests yielded statistically significant differences between test and control groups. *See* Workpaper 2.
[6] I also conducted a Chi-Square test between the distribution of responses to "Does communicate that this product is healthy" and "Does not communicate that this product is healthy" for the control and test groups which resulted in a p-value of 0.999. When conducting the tests including respondents who took more than 33 seconds to answer the consumer perception questions, I also find a p-value of 0.999. None of these tests yielded statistically significant differences between test and control groups. *See* Workpaper 3.

56.     Thus, when Dr. Dennis's survey was modified to remove the yellow border around the statements, as well as to show respondents the front and back packaging at full size, respondents indicated that they were no more likely to perceive the product with the Excellent Source Claim

as healthy than the product with the Control Claim. This finding is in stark contrast to the results from Dr. Dennis's original version of the survey, in which he reported that respondents in the test group were 1.9 times more likely than those shown the control group product to perceive that the product is healthy.[47] This finding therefore illustrates that Dr. Dennis's use of the yellow border in his survey design biased his survey results and Dr. Dennis's results cannot be used to conclude that the Excellent Source Claim had a material impact on consumer perceptions of the Fruit Yogurt Smoothie as healthy.

57.     Mr. Gaskin's conjoint survey includes the Excellent Source Claim as an attribute in his conjoint survey. As I discuss below in Section VIII, a reliable conjoint survey is one that includes attributes that are deemed important in consumers' choices. However, as the Modified Dennis Survey shows, there is no evidence that the Excellent Source Claim is material to consumer perceptions of the Fruit Yogurt Smoothie as "healthy" when shopping for children under 2 years and therefore no evidence that the Excellent Source Claim is a driver of consumer choice. This suggests that a conjoint survey like Mr. Gaskin's may not be appropriate for assessing a "price premium" associated with the Excellent Source Claim, since there is no evidence that this claim is a driver of consumer choice.

### C.     Dr. Dennis's Consumer Perception Survey is Not Applicable to Purchases of At-Issue Products Made for Anyone Other Than Children Under Two Years Old

58.     While the proposed class is defined as "[a]ll persons in the State of California who purchased the [At-Issue] Products between January 26, 2018 and the present,"[48] Dr. Dennis's consumer perception survey is applicable, at best, only to people who purchased At-Issue Products *for children under the age of 2 years* during this time period.

59.     First, Dr. Dennis's survey sample includes only consumers who purchased food products from Earth's Best or competitors for children under the age of 2 years since 2018.[49] Therefore Dr. Dennis's sample does not reflect the behavior of consumers who purchased any At-Issue Products for children *aged two years and over.* Second, Dr. Dennis's survey instructed respondents to "suppose [they are] considering purchases for a child or children under the age of

---

[47] Dennis Report, ¶ 84.
[48] Notice of Motion and Motion for Class Certification, p. i.
[49] Dennis Report, ¶ 36.

2 years (less than 24 months)" while answering the survey's questions.[50] For both of these reasons, the results of Dr. Dennis's survey cannot be applied to any purchases of At-Issue Products made for anyone other than children under 2 years old.

## VI.    Labeling Survey

60.    In this section, I describe a survey I conducted (the "Labeling Survey") to assess what the packaging of the At-Issue Products communicates to consumers about the age or ages of the children the products are intended for.

61.    For the Labeling Survey, I used a between-subjects experimental design, similar to the between-subjects experimental design used by Dr. Dennis.[51] Survey respondents were randomly assigned to the test group or the control group. Respondents in the test group were shown images of the front and back packaging (and side packaging, where applicable) of five At-Issue Products. Respondents in the control group were shown images of the front packaging only of the same At-Issue Products. After viewing the packaging images for a given product, survey respondents were asked questions (detailed below) about what the product packaging told them about the age or ages of the children the product was intended for.

### A.    Principles of Survey Design

62.    In designing the Labeling Survey, I relied on the following generally accepted guidelines set out in the "Reference Guide on Survey Research," as well as my own experience:[52]

    a.    A scientifically sound survey is based on the survey's research objectives and is not designed in a way that would be biased toward finding evidence supporting a particular hypothesis.[53]

---

[50] Dennis Report, ¶ 60.
[51] Dennis Report, ¶ 47.
[52] Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, *Third Edition*, Washington, DC: The National Academies Press ("Diamond (2011)"), 359–423. Note that there are unique considerations in designing each survey and thus, as the "Reference Guide on Survey Research" indicates, the appropriate survey design will depend on the specific objectives and circumstances.
[53] Diamond (2011), p. 373.

24

b. The survey should address an appropriately defined population and the sampling frame should approximate the population "whose characteristics or perceptions the survey is intended to represent."[54]

c. The survey sample should be representative of the survey population, so that the survey results allow inferences about the population.[55] This can be achieved by including screening questions that ensure that only qualified respondents from the sample population are surveyed.[56]

d. The survey instrument (including instructions, questions, and answer responses) should be clear, precise, and unbiased. The questions should avoid unexpected meanings and ambiguities and should be non-leading.[57]

e. The data should be analyzed in accordance with accepted statistical principles.[58]

63.    I took into account each of these guidelines in designing and implementing the survey and in analyzing the survey data. In the following sections, I describe the survey instruments in more detail and explain how the survey design and analyses meet the guidelines set out above.

64.    All of the survey instructions, questions, and answer choices in the main questionnaire were framed in a manner that did not reveal the sponsor or purpose of the survey. This was to avoid any potential biases in responses such as "demand effect" or "acquiescence bias," often called "yea-saying," where respondents demonstrate a tendency to provide certain answers to the survey questions because they believe these answers are expected, in their own interest, or because they have a tendency to endorse any assertion made in a question, respectively.[59]

65.    Additionally, in order to confirm that the survey questionnaires were clear, I performed pretests for both surveys.[60] Pretests are typically conducted to verify that respondents are familiar with the diction of the survey and have no problems understanding the questions and

---

[54] Diamond (2011), pp. 376–377.
[55] Diamond (2011), p. 380
[56] Diamond (2011), pp. 386–387
[57] Diamond (2011), pp. 386–388, 394.
[58] Diamond (2011), p. 364
[59] Diamond (2011), pp. 394, 410–411; Diamond and Swann (2012), pp. 204, 243–246. In my pretests, respondents were asked about what they thought the purpose of the survey was and no one mentioned litigation or legal investigation as a potential purpose.
[60] Pretests should continue until survey respondents are able to answer the survey questions easily and do not feel that questions are difficult to understand. Eight pretest interviews were sufficient for this purpose as it was clear from the interviews that nothing in the survey was confusing to respondents.

response options.[61] During the pretests, "the same type of respondents who would be eligible to participate in the full-scale survey"[62] took the survey in real time, and after completing the survey, they were probed on whether they found any questions or answer options confusing.[63] **Appendix J** includes the Pretest Moderator Instructions used for both the Labeling Survey and the Consumption Behavior Surveys. The pretests indicated that respondents did not have any difficulties and that the survey questionnaires were clear to respondents.

### B.     Survey Design

#### 1.     Survey Population and Survey Sample

66.     The target population for this survey consisted of U.S. adults who had purchased (in the past 12 months) or would consider purchasing (in the next 12 months) At-Issue Products for a child or children under age 10 living in their household. I targeted both purchasers and potential purchasers of the At-Issue Products to understand how consumers in the market for these products interpreted their packaging.

67.     To identify potential survey respondents and to administer the Labeling Survey, I engaged the survey research company, GBK, who programmed the survey questionnaire and fielded the survey online under my direction.[64] GBK used "click-balancing" to ensure that the inbound sample (respondents who started the survey) were representative of the over-18 US population. I collected data from a sample of 604 respondents. This sample is sufficiently large to reach statistically valid conclusions.[65]

68.     **Appendix F** provides a copy of the full questionnaire used, and **Appendix G** includes example screenshots of the internet questionnaire as it appeared to respondents.

69.     As discussed above, I pretested the Labeling Survey questionnaire before conducting the survey. The pretests indicated that respondents did not have any difficulties and that the survey questionnaires were clear to respondents.

---

[61] Payne, S. L. B. (1951), "What's the Good Word?" in *The Art of Asking Questions: Studies in Public Opinion, 3,* Princeton, NJ: Princeton University Press, pp. 147–148; Diamond (2011), p. 388.

[62] Diamond (2011), pp. 388–389.

[63] Diamond (2011), pp. 388–389. Experienced interviewers from GBK Collective questioned respondents at my direction.

[64] GBK used panelists from the Dynata panel. Information about the Dynata consumer panel is included in Appendix M.

[65] Diamond and Swann (2022), p.90.

## 2. Survey Screener

70.     A screener preceded the main survey questionnaire to identify respondents who were members of the target population.[66]

71.     Screener questions S80 – S110 ensured that the final sample would only include respondents who (i) had purchased At-Issue Products for a child or children under the age of 10 in the past 12 months or (ii) would consider purchasing At-Issue Products for a child or children under the age of 10 in the next 12 months.[67]

72.     In addition, the survey screener excluded:

    a.   Anyone under the age of 18 years;

    b.   Anyone who was not a resident of the United States;

    c.   Anyone who used a device other than a tablet, laptop computer, desktop computer, or smartphone to access the survey;[68]

    d.   Anyone with a household member (including the respondent) who worked in a company that makes or sells food or beverages, or a company that provides marketing or market research services;[69] and

    e.   Anyone who indicated that they preferred not to provide the requested demographic information.

73.     Finally, as a quality control measure, the screener also included an "attention check" question (screener question S120) which is a tool used to identify and eliminate respondents who do not carefully read the survey questions and randomly or carelessly select responses. I used the same attention check question used by Mr. Gaskin for his survey.[70] Respondents who did not pass all of these screening questions were terminated from the survey.[71]

---

[66] Diamond (2011), pp. 386–387.
[67] Appendix F.
[68] This restriction ensured that respondents would have access to a properly displayed version of the survey.
[69] This restriction ensured that respondents who may have specialized information concerning surveys of this nature—through their or a household member's job—would not participate in the survey. See Diamond and Swann (2012), pp. 48–49.
[70] Gaskin Report, Exhibit E, p. E-4.
[71] Including attention check questions is a survey best practice used to ensure data integrity. See Curran, P. G. (2016), "Methods for the Detection of Carelessly Invalid Responses in Survey Data," *Journal of Experimental Social Psychology*, 66, 4–19 at pp. 4, 13–14.

### 3. Main Questionnaire

74.     The main questionnaire assigned respondents to examine five Earth's Best products with the Challenged Claims: Organic Four Bean Feast Protein Puree, Organic Fruit Yogurt Smoothie (Mixed Berry), Organic Crunchin' Crackers (Original), Organic Letter of the Day Cookies (Oatmeal Cinnamon), and Organic Peanut Butter Baked Corn Puffs.

75.     For the main questionnaire, I used a between-subjects experimental design, where respondents who passed the screening questionnaire were randomly assigned to one of two conditions – the test group or the control group. The two groups were shown the same products, and the only difference between the two conditions was that respondents in the control group were shown images of the front packaging only, while respondents in the test group were shown images of the front and back packaging (and side packaging, where applicable).

76.     The test and control survey design, which was also used by Dennis for his consumer perception survey,[72] allows me to isolate the effect, if any, of showing the back and side packaging of the products as the front packaging was identical for both groups. As Professor Diamond explains in the "Reference Guide on Survey Research," "[b]y adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus."[73] The test-and-control design is widely regarded as a reliable way to assess the causal effect of a message or label and is used in many fields.[74]

77.     Respondents were first provided the following instructions:

> "We will now show you the packaging for some food products for children. We want to know whether the product packaging tells you anything about the age or ages of the children these products are intended for. For each question, if you don't know or if you don't have an answer, please don't guess."

---

[72] Dennis Report, ¶ 47.

[73] Diamond (2011), p. 398.

[74] See, e.g., Diamond (2011), p. 401 ("Control groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question."); Manski, C. F. (1996), "Learning about Treatment Effects from Experiments with Random Assignment of Treatments," *The Journal of Human Resources*, 31, 4, 709–733 at p. 710 ("It is often said that random assignment of treatments minimizes the need for assumptions in evaluations of social programs and, hence, maximizes the credibility of evaluations."); Kendall, J. M. (2003), "Designing a Research Project: Randomised Controlled Trials and Their Principles," *Emergency Medicine Journal*, 20, 2, 164–168 at p. 164 ("RCTs are the most stringent way of determining whether a cause-effect relation exists between the intervention and the outcome.").

78.    Respondents were then asked to observe the product packaging (front only for the control group and front, back, and sides for the test group) and were presented with a sequence of questions about each of the five products.

79.    First, respondents were asked "Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?" Possible response options were:

     a.    "Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>."

     b.    "No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>."

     c.    "Don't know / Unsure."

80.    The order of the first two response options was randomized across respondents to avoid potential order effects. Randomization of response options is consistent with survey best practices, as described in Professor Shari Diamond's "Reference Guide on Survey Research," to account for the fact that survey respondents may be more likely to choose the first alternative shown to them when presented with response options visually.[75]

81.    Exhibit 5 shows a sample screenshot of this question as respondents in the test group survey saw it:

---

[75] Diamond (2011) at pp. 395–396.

*Exhibit 5*



Source: Labeling Survey

82.     Respondents who selected "Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>," were then asked a follow-up question: "Which of the following statements, if any, describes what the packaging tells you about the age or ages of the children the product is intended for?" The possible response options were:

   a.   "The product is intended **specifically** for children <u>under 2 years</u>"

   b.   "The product is intended **specifically** for children <u>2 years and over</u>"

   c.   "Neither of the above"

   d.   "Don't know / Unsure"

83.     The order of the first two response options was randomized across respondents to avoid order effects.[76] An example of the choice screen presented to respondents is given in Exhibit 6 below.

---

[76] Diamond (2011), pp. 395–396.

*Exhibit 6  Labeling Survey Example Choice Screen (Test Group)*



Source: Labeling Survey

## C.  Survey Implementation

84.  The survey was administered by GBK.[77] GBK, under my direction, programmed the questionnaire and fielded the survey online.[78]

85.  Survey respondents were recruited to participate in the survey via panel member dashboards. GBK used "click-balancing" to ensure that the inbound sample (respondents who started the survey) were representative of the over-18 US population. A total of 5,320 respondents entered the survey. Of the 5,320 respondents who entered the survey, 604 qualified and completed the survey. 4,407 respondents were screened out based on responses provided to

---

[77] "GBK Collective," *GBK Collective,* https://www.gbkcollective.com/. I have previously worked with GBK Collective, and I have been satisfied with the company's experience with online surveys, technical capabilities, and data integrity process.
[78] GBK used panelists from the Dynata panel. Information about the Dynata consumer panels is included in Appendix M.

the survey screener (not including those who failed the attention check), 165 respondents left the survey before completing it, and 144 respondents were excluded from the final survey sample because they failed the CAPTCHA question at the start of the survey, failed an attention check question, or were over quota (i.e., indicated they were part of a demographic category for which the maximum sample had already been reached).[79]

### D. Survey Results

86.   Exhibits 7a and 7b summarize the results of the Labeling Survey. Exhibits 7a and 7b show, for each of the five products, the percentage of respondents who answered each of the following combinations:

a.   "No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>" in the first question.

b.   "Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>" in the first question and "The product is intended **specifically** for children <u>under 2 years</u>" in the second question.

c.   "Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>" in the first question and "The product is intended **specifically** for children <u>2 years and over</u>" in the second question.

d.   Any other response (including "Don't know / Unsure" in either question, or "Neither of the above" in the second question).

87.   The "Difference" column indicates whether the difference between test and control groups is statistically significant, with an asterisk representing a significant difference. I tested the differences in responses across groups by conducting two-proportion z-tests of the differences in proportions across individual response categories between the test and control groups.[80]

---

[79] See Appendix N.

[80] I also conducted a Chi-Squared test of the entire distribution of responses across the control and test groups and the difference between distributions was statistically significant. This test is used to determine whether the responses to the survey question are independent of test or control group status. If they were to be independent, showing the back and sides of the packaging would have no association with whether consumers perceive the packaging to communicate that the product is healthy or the age of the children that the product is intended for. Instead, I find a p-value of 0, suggesting it would be virtually impossible to obtain the results of the survey if the variables were independent. I therefore conclude that showing the back and front of the packaging influenced consumer responses. *See* Workpaper 4.

88.     As Exhibits 7a and 7b show, a large proportion (ranging from 54 percent to 67 percent, depending on the product) of respondents in the control group (i.e., those who were shown only the front packaging) indicated that the product packaging did "not tell [them] anything about the age or ages of the children the product is intended for."

89.     Exhibits 7a and 7b also show that, when consumers are shown the front and back packaging (and side packaging, where applicable), they are more likely to perceive that the packaging tells them that the "product is intended specifically for children 2 years and over." For example, for the protein puree pouch, the percentage of all respondents indicating that the packaging tells them that the "product is intended specifically for children 2 years and over" increases from 11 percent in the control group to 47 percent in the test, a statistically significant difference. This pattern holds across all five product types, with statistically significant differences for each product type.

90.     Exhibits 7a and 7b also shows that only between 10 percent and 21 percent of respondents (across both test and control groups) indicated that the packaging told them that the product was "intended specifically for children under 2 years." Among respondents who were shown the front packaging only, the percentage of respondents indicating that the packaging told them that the product was "intended specifically for children under 2 years" ranged from 12 percent (for the Organic Peanut Butter Baked Corn Puffs) to 21 percent (for the Fruit Yogurt Smoothies). Among respondents who were shown front and back packaging (and side packaging, where applicable), the percentage of respondents indicating that the packaging told them that the product was "intended specifically for children under 2 years" ranged from 10 percent (for the Organic Peanut Butter Baked Corn Puffs) to 15 percent (for the Protein Puree Pouches and the Organic Fruit Yogurt Smoothies).

91.     In conclusion, these results indicate that:

> a.  The front packaging for all five products does not unambiguously communicate a single message to all consumers about the age or ages of the children the product is intended for. Indeed, the modal consumer perceives that the front packaging does not tell him or her anything about the age or ages of the children the product is intended for.

b. When consumers are shown front, back, and side packaging, the packaging communicates to a majority (plurality in the case of Protein Puree Pouches) of consumers that all five products are intended specifically for children 2 years and over.

92. From a marketing perspective, these results suggest that the labeling and packaging of the At-Issue Products is not targeted specifically for children under 2 years because if they were, one would expect to see a greater proportion of consumers viewing them as intended specifically for children under 2 years. Rather, the front packaging does not communicate an unambiguous message to consumers about the intended ages of the At-Issue Products, while the front, back, and side packaging taken together, communicate to a majority of consumers that the At-Issue Products are intended for children 2 years and over.

### Exhibit 7a Labeling Survey Results

| | Protein Puree Pouch | | |
| --- | --- | --- | --- |
| | Control (Front packaging only) | Test (Front and back packaging) | Statistically Significant Difference |
| Packaging does not tell me anything about the age or ages of the children the product is intended for | 67% | 29% | ✔ |
| Packaging tells me something about the age or ages of the children the product is intended for | | | |
| The product is intended **specifically** for children under 2 years | 15% | 15% | |
| The product is intended **specifically** for children 2 years and over | 11% | 47% | ✔ |
| Other [2] | 8% | 9% | |
| **Total** | **100%** | **100%** | |
| **Number of respondents** | **301** | **303** | |

| | Organic Fruit Yogurt Smoothie | | |
| --- | --- | --- | --- |
| | Control (Front packaging only) | Test (Front and back packaging) | Statistically Significant Difference |
| Packaging does not tell me anything about the age or ages of the children the product is intended for | 54% | 22% | ✔ |
| Packaging tells me something about the age or ages of the children the product is intended for | | | |
| The product is intended **specifically** for children under 2 years | 21% | 15% | |
| The product is intended **specifically** for children 2 years and over | 15% | 53% | ✔ |
| Other [2] | 10% | 10% | |
| **Total** | **100%** | **100%** | |
| **Number of respondents** | **301** | **303** | |

Source: Labeling Survey
Notes:
[1] Respondents were shown product packacking images and intially asked "Does this product packaging tell you anything about the age or ages the product is intended for?" Response options included "Yes, this packaging tells me something about the age or ages the product is intended for," "No, this packaging does not tell me anything about the age or ages the product is intended for," and "Don't know / Unsure." If respondents selected "Yes...," they were asked a follow-up question: "You indicated that this packaging tells you something about the age or ages the product is intended for. Which of the following statements, if any, describe what the packaging tells you about the age or ages the product is intended for?" Response options included "The product is intended specifically for children under 2 years," "The product is intended specifically for children 2 years and over," "Neither of the above," and "Don't know / Unsure."
[2] The "Other" category includes respondents who selected "Don't know / Unsure" to the initial question, "Don't know / Unsure" to the follow-up question, or "Neither of the above" to the follow-up question.
[3] The "Statistically significant difference" column shows the results of a two-proportion z-test of the differences in proportions across individual response categories between the test and control groups. Rows marked with a checkmark indicate that the percentages are different across both groups with a 5 percent significance level.

34

*Exhibit 7b Labeling Survey Results*

| | Organic Crunchin' Crackers | | |
|---|---|---|---|
| | Control (Front packaging only) | Test (Front and back packaging) | Statistically Significant Difference |
| Packaging does not tell me anything about the age or ages of the children the product is intended for | 54% | 19% | ✔ |
| Packaging tells me something about the age or ages of the children the product is intended for | | | |
| The product is intended specifically for children under 2 years | 17% | 11% | ✔ |
| The product is intended specifically for children 2 years and over | 20% | 56% | ✔ |
| Other [2] | 9% | 14% | |
| Total | 100% | 100% | |
| Number of respondents | 301 | 303 | |

| | Organic Letter of the Day Cookies | | |
|---|---|---|---|
| | Control (Front packaging only) | Test (Front and back packaging) | Statistically Significant Difference |
| Packaging does not tell me anything about the age or ages of the children the product is intended for | 55% | 16% | ✔ |
| Packaging tells me something about the age or ages of the children the product is intended for | | | |
| The product is intended specifically for children under 2 years | 14% | 10% | |
| The product is intended specifically for children 2 years and over | 21% | 65% | ✔ |
| Other [2] | 10% | 9% | |
| Total | 100% | 100% | |
| Number of respondents | 301 | 303 | |

| | Organic Peanut Butter Baked Corn Puffs | | |
|---|---|---|---|
| | Control (Front packaging only) | Test (Front and back packaging) | Statistically Significant Difference |
| Packaging does not tell me anything about the age or ages of the children the product is intended for | 57% | 24% | ✔ |
| Packaging tells me something about the age or ages of the children the product is intended for | | | |
| The product is intended specifically for children under 2 years | 12% | 10% | |
| The product is intended specifically for children 2 years and over | 19% | 58% | ✔ |
| Other [2] | 12% | 8% | |
| Total | 100% | 100% | |
| Number of respondents | 301 | 303 | |

Source: Labeling Survey
Notes:
[1] Respondents were shown product packacking images and intially asked "Does this product packaging tell you anything about the age or ages the product is intended for?" Response options included "Yes, this packaging tells me something about the age or ages the product is intended for," "No, this packaging does not tell me anything about the age or ages the product is intended for," and "Don't know / Unsure." If respondents selected "Yes...," they were asked a follow-up question: "You indicated that this packaging tells you something about the age or ages the product is intended for. Which of the following statements, if any, describe what the packaging tells you about the age or ages the product is intended for?" Response options included "The product is intended specifically for children under 2 years," "The product is intended specifically for children 2 years and over," "Neither of the above," and "Don't know / Unsure."
[2] The "Other" category includes respondents who selected "Don't know / Unsure" to the initial question, "Don't know / Unsure" to the follow-up question, or "Neither of the above" to the follow-up question.
[3] The "Statistically significant difference" column shows the results of a two-proportion z-test of the differences in proportions across individual response categories between the test and control groups. Rows marked with a checkmark indicate that the percentages are different across both groups with a 5 percent significance level.

## VII.   Consumption Behavior Survey

93.    In addition to the Modified Dennis Survey and the Labeling Survey, I also conducted a "Consumption Behavior Survey," designed to assess the ages of the children who consumed the At-Issue Products. The "Consumption Behavior Survey" asked survey respondents, who were

purchasers of At-Issue Products in the past 12 months, to specify—for each type of At-Issue Product purchased—the age or ages of the children who consumed that product.

94.     In designing and conducting the Consumption Behavior Survey, I relied on the generally accepted guidelines set out in the "Reference Guide on Survey Research," as described in Section VI.A above.

### A.     Survey Design

#### 1.     Survey Population and Survey Sample

95.     The target population for this survey consisted of U.S. adults who had purchased (in the past 12 months) At-Issue Products for a child or children under age 10 living in their household. I restricted the target population to actual purchasers of the At-Issue Products because the goal of the survey was to test the consumption behavior of actual purchasers and their children.

96.     To identify potential survey respondents and to administer the Consumption Behavior Survey, I engaged the survey research company, GBK, which programmed the survey questionnaire and fielded the survey online under my direction.[81] I collected data until I had reached a sample of at least 188 respondents for each At-Issue Product, resulting in a final sample of 560 respondents.[82]

97.     **Appendix H** provides a copy of the full questionnaire used, and **Appendix I** includes exemplar screenshots of the internet questionnaire as it appeared to respondents.

98.     As discussed above, I pretested the Consumption Behavior Survey questionnaire before fielding the survey. The pretests indicated that respondents did not have any difficulties and that the survey questionnaires were clear to respondents.

---

[81] GBK used panelists from the Dynata panel. Information about the Dynata consumer panel is included in Appendix M.

[82] The same respondent could have purchased multiple At-Issue Products. This sample is sufficiently large to reach statistically valid conclusions. Out of the total number of respondents, 439 had purchased Organic Fruit Yogurt Smoothies, 254 had purchased Organic Homestyle Protein Puree pouches, 188 had purchased Organic Crunchin' Crackers, 283 had purchased Organic Letter of the Day Cookies, and 216 had purchased Organic Peanut Butter Baked Corn Puffs.

### 2. Survey Screener

99.    A screener preceded the main survey questionnaire to identify respondents who were members of the target population.

100.   Screener questions S80 and S90 ensured that the final sample would only include respondents who have purchased At-Issue Products for a child or children under the age of 10 in the past 12 months. In addition, the survey screened respondents according to the same quality checks and criteria used for the Labeling Survey, as I discuss in Section VI.B above.

### 3. Main Questionnaire

101.   The main questionnaire asked respondents to indicate the age of the child or children who consumed each of the At-Issue Product types purchased.

102.   The five At-Issue Product types considered were: Earth's Best Organic Fruit Yogurt Smoothie, Earth's Best Organic Homestyle Protein Puree, Earth's Best Organic Crunchin' Crackers, Earth's Best Organic Letter of the Day Cookies, and Earth's Best Organic Peanut Butter Baked Corn Puffs.[83] Respondents were asked about the age of the child or children who consumed the product for each of the products they had selected in the screening question.

103.   Respondents were presented with the question "Please indicate the age(s) of the child or all the children who ate the product you purchased." For example, respondents who purchased a Fruit Yogurt Smoothie were shown images of the Fruit Yogurt Smoothie package and asked: "Please indicate the age(s) of the child or children who ate or drank the Earth's Best Organic Fruit Yogurt Smoothies you purchased." Possible response options were:

     a.   "Less than 2 years;"

     b.   "2–4 years;"

     c.   "5+ years;"

     d.   "Don't know / Unsure."

104.   Respondents were instructed to select all responses that applied.

---

[83] The Organic Homestyle Protein Puree products includes the products from Earth's Best current "Homestyle Protein Puree" line: the "Four Bean Feast with Vegetables Puree" and the "Veggie Red Lentil Bake Organic With Olive Oil Protein Pouch." These products are intended for children 2 years and over and include protein claims in the front packaging. See "Four Bean Feast Protein Pouch," *Earth's Best Organic*, https://www.earthsbest.com/product/four-bean-feast-organic-protein-pouch/; "Veggie Red Lentil Bake Organic Protein Pouch," *Earth's Best Organic*, https://www.earthsbest.com/product/veggie-red-lentil-bake-organic-protein-pouch/.

105.     Exhibit 8 shows a sample screenshot of the consumption behavior question as it was seen in the survey by respondents who purchased the Organic Fruit Yogurt Smoothie:

**Exhibit 8  Consumption Behavior Survey Example Choice Screen (Earth's Best Organic Fruit Yogurt Smoothies)**



Source: Consumption Behavior Survey

## B.     Survey Implementation

106.     The survey was administered by GBK.[84] GBK, under my direction, programmed the questionnaire and fielded the survey online.[85]

---

[84] "GBK Collective," *GBK Collective,* https://www.gbkcollective.com/. I have previously worked with GBK Collective, and I have been satisfied with the company's experience with online surveys, technical capabilities, and data integrity process.
[85] GBK used panelists from the Dynata panel. Information about the Dynata consumer panels is included in Appendix M.

107.    Survey respondents were recruited to participate in the survey via panel member dashboards. GBK used "click-balancing" to ensure that age and gender of the inbound sample matched the distribution in the over-18 US population. A total of 7,207 respondents entered the survey. Of the 7,207 respondents who entered the survey, 560 qualified and completed the survey. 6,318 respondents were screened out based on responses provided to the survey screener (not including those who failed the attention check or the CAPTCHA question), 189 respondents left the survey before completing it, and 140 respondents were excluded from the final survey sample because they failed the CAPTCHA question at the start of the survey, or they failed an attention check question.[86]

## C.    Survey Results

108.    The results of the Consumption Behavior Survey are shown in Exhibit 9 below. Exhibit 9 shows that (i) a majority of purchasers of the At-Issue Products indicated that the product was consumed exclusively by children two years and older, and (ii) only 15 percent to 25 percent of purchasers of At-Issue Products indicated that the product was *only* consumed by children under two years. These findings are robust and hold for all product types of At-Issue Products.

**Exhibit 9  Consumption Behavior Survey**
**Responses to "Please indicate the age of the children who consumed the product"**

|  | Organic Fruit Yogurt Smoothies | Organic Homestyle Protein Puree Pouches | Organic Crunchin' Crackers | Organic Letter of the Day Cookies | Organic Peanut Butter Baked Corn Puffs |
|---|---|---|---|---|---|
| Less than 2 years | 36% | 39% | 30% | 32% | 31% |
| 2-4 years | 51% | 54% | 54% | 58% | 56% |
| 5+ years | 41% | 38% | 46% | 43% | 39% |
| Don't know / Unsure | 0% | 0% | 0% | 0% | 0% |
| Respondents who only selected less than 2 years | 22% | 25% | 15% | 15% | 19% |
| Respondents who selected both less than 2 years and 2+ years | 13% | 14% | 15% | 17% | 13% |
| Respondents who only selected 2+ years | 64% | 61% | 70% | 68% | 69% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Number of respondents** | **439** | **254** | **188** | **283** | **216** |

Source: Consumption Behavior Survey
Note: The target population for the survey was US adults with a child or children under age 10 living in their household, who have purchased Earth's Best food products for the child or children in the past 12 months. The table shows the number of respondents who purchased the Earth's Best product for a child or children in each age group. Respondents were allowed to select multiple age groups. Response options included "less than 2 years," "2-4 years," "5+ years," and "Don't know / Unsure." The first panel shows the percentage of respondents that selected each response option. The second panel categorizes the respondents depending on whether they purchased the product for at least one child under 2. The total row corresponds to the sum of percentages in the second panel. The number of respondents shows the count of those who purchased the product for a child or children of at least one age group.

---

[86] See Appendix N.

109.    As Exhibit 9 shows, for all five categories of the At-Issue Products, a majority of purchasers responded that the product was consumed by children two years or older. Specifically, the percentage of respondents responding that the product was consumed by children two years or older ranged from 61 percent (for the protein puree pouches) to 70 percent (for the Organic Crunchin' Crackers).

110.    Exhibit 9 also shows that a minority of consumers purchased the At-Issue Products *only* for children under two years. The percentage of survey respondents indicating that an At-Issue Product they purchased was consumed *only* by children under two years ranges from 15 percent (for Organic Crunchin' Crackers and Organic Letter of the Day Cookies) to 25 percent (for protein puree pouches), with the other two product categories all lying in that range. As Exhibit 9 shows, an additional 13 to 17 percent of respondents (depending on the product) indicated that the At-Issue Products they purchased were consumed both by children under 2 years and children 2 years and older.

111.    From a marketing perspective, the fact that a majority of purchasers of the At-Issue Products indicated that the products were consumed by children 2 years and older, taken together with the results of the Labeling Survey, suggests that the products were not targeted primarily at children under 2 years.

## VIII.  Mr. Gaskin's Conjoint Survey and Mr. Weir's Damages Methodology Are Not Applicable to Many Putative Class Members

### A.  Mr. Gaskin's and Mr. Weir's Methodologies Are Not Applicable to Any Non-Pouch At-Issue Products

112.    Mr. Gaskin conducted a conjoint survey intended to assess consumers' willingness to pay ("WTP") for certain Challenged Claims.[87] Specifically, the product assessed by Mr. Gaskin's conjoint survey was (as Mr. Gaskin defined it for survey participants) a "baby/toddler food pouch"[88] and the three label claims assessed by Mr. Gaskin's conjoint survey were the At-Issue Pouch Claims ("4g protein per serving," "3g plant protein," and "Excellent source of Calcium, Vitamins C & D").[89]

---

[87] Gaskin Report, ¶¶ 13–18.
[88] Gaskin Report, p. 8, Figure 1.
[89] Gaskin Report, p. 22.

113.    Mr. Gaskin and Mr. Weir apply the results of Mr. Gaskin's conjoint survey to five categories of At-Issue Products:

    a.  Earth's Best Organic Beef Medley pouches;

    b.  Earth's Best Organic Chicken Casserole pouches;

    c.  Earth's Best Organic Veggie Red Lentil Bake pouches;

    d.  Earth's Best Organic Four Bean Feast pouches;

    e.  Earth's Best Organic Fruit Yogurt Smoothies (including all flavors).[90]

114.    Because Mr. Gaskin and Mr. Weir's results are based on a conjoint survey that assessed consumer preferences for "baby/toddler food pouch" products, Mr. Gaskin and Mr. Weir's results can, at best, be applied to At-Issue Pouch Products only. For a conjoint survey to be reliable, it is important that the "menu of products" in the survey "realistically mimic a market experience..."[91] and Mr. Gaskin's survey cannot mimic a "market experience" for products not included in the survey. Therefore, the results of Mr. Gaskin's conjoint survey cannot be applied to any other At-Issue Products, including any of:

    a.  Earth's Best Organic Crunchin' Crackers Wholesome Snacks;

    b.  Earth's Best Organic Letter of the Day Cookies (Oatmeal Cinnamon flavor and Vanilla flavor)

    c.  Organic Peanut Butter Baked Corn Puffs.[92]

115.    According to IRI sales data for the state of California, I find that in 2022, Earth's Best pouch products accounted for over $1.2 million in sales, while Earth's Best non-pouch products accounted for over $790 thousand in sales.[93]

116.    Additionally, the usage behavior of the different At-Issue Product categories (pouches vs. cookies vs. crackers vs. corn puffs) is likely to be different. For example, Jason Ginsberg, an Earth's Best employee, testified the Earth's Best "snack" products are often used in "environments... where mom or dad are actually asked to send a snack with their child to school," which may not apply across all At-Issue Products.[94]

---

[90] Weir Report, ¶ 59.
[91] Ben-Akiva, M. et al. (2019), "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-Based Conjoint Analysis," *Foundations and Trends® in Econometrics*, 10, 1–2, 1–144 at 8.
[92] Second Amended Complaint, Exhibit A.
[93] See Workpaper 5.
[94] Deposition of Jason Ginsberg, April 4, 2023, 162:23–163:2. ("And so all of our snacks are intended for kids who are over two who are often in preschool or environments in that setting where mom or dad are actually asked to send a snack with their child to school.")

**B.     Mr. Gaskin's and Mr. Weir's Methodologies Are Not Applicable to Any Purchases of At-Issue Products Made for Anyone Other than Children Under Two Years Old**

117.     While the proposed class is defined as "[a]ll persons in the State of California who purchased the [At-Issue] Products between January 26, 2018 and the present,"[95] Mr. Gaskin's conjoint survey is applicable, at best, only to people who purchased At-Issue Pouch Products *for children under the age of 2 years* during this time period.

118.     First, Mr. Gaskin's survey sample includes only consumers who purchased food "pouches" for children under the age of 2 years in the past 6 years.[96] Therefore Mr. Gaskin's sample does not reflect the behavior of consumers who purchased food pouch products for children *aged two years and over*. Second, Mr. Gaskin's conjoint survey instructed respondents to "assume that [they were] shopping for food pouches for [their] baby and/or toddler under 2 years old" while answering the survey's questions.[97] For both of these reasons, the results of Mr. Gaskin's survey cannot be applied to any purchases of At-Issue Products made for anyone other than children under 2 years old. At deposition, Mr. Gaskin acknowledged that he is not "specifically presenting evidence on the purchasing decisions of consumers who purchased [At-Issue Products] for children who were two years of age or older..."[98]

119.     Additionally, since Mr. Weir's damages methodology relies entirely on the results of Mr. Gaskin's conjoint analysis,[99] Mr. Weir's damages methodology also cannot be applied to any purchases of the At-Issue Products made for anyone other than children under 2 years old.

**C.     Many Purchases of the At-Issue Products Were Made for Children Two Years and Older**

120.     As I discuss in Section VII, the results of my Consumption Behavior Survey show that many purchases of the At-Issue Products were made for children two years and older, rather than

---

[95] Notice of Motion and Motion for Class Certification, p. i.
[96] Gaskin Report, ¶ 36.
[97] Gaskin Report, ¶ 50.
[98] Gaskin Deposition, 97:12–17. ("Q. You're not specifically presenting evidence on the purchasing decisions of consumers who purchased at-issue products for children who were two years of age or older, correct? A. Not explicitly, no. I'm focusing on purchases for children age two and under -- or under age two.")
[99] Weir Report, ¶¶ 58–60.

children under 2 years old. Specifically, the percentage of respondents who indicated that the At-Issue Products were consumed only by children 2 years and older ranged from 61 percent (for the protein puree pouches) to 70 percent (for the Organic Crunchin' Crackers).

121.     Dr. Dennis's own survey data also show that many purchases of At-Issue Products were likely made for children two years and older. Of the 389 respondents in Dr. Dennis's survey sample who indicated that they had purchased Earth's Best food products, 188 or 48.3 percent indicated that at least some of their purchases of Earth's Best products were for children two years or older.[100]

122.     Since, as I describe above, Mr. Gaskin and Mr. Weir's methodology cannot apply to purchases of the At-Issue Products for children 2 years and over, Mr. Gaskin and Mr. Weir's methodology does not apply to a portion of the putative Class.

Additionally, as I describe above, Mr. Gaskin's survey sample contains only consumers who purchased food "pouches" for children under the age of 2 years in the past 6 years. However, the results of my Consumption Behavior Survey indicate that a majority of purchasers of Earth's Best "pouch" product (protein puree pouches and fruit yogurt smoothies) indicated that the products they purchased were consumed by children two years and over. Only 39 percent and 36 percent of respondents (for protein puree pouches and fruit yogurt smoothies, respectively) indicated that the products were consumed by any children under two years.[101] Thus, Mr. Gaskin's survey sample is not representative of the purchasers of the At-Issue Pouch Products or of the putative Class.

---

[100] While Dr. Dennis's consumer perception survey screened for California residents who purchased Earth's Best *or competitor* food products for children under the age of two years, the survey also included a question asking respondents when they made their first purchase of Earth's Best food products specifically. Respondents who answered "In the past 12 months," "1 to 5 years ago," or "More than 5 years ago," were then asked to indicate "the ages of the people that [they] thought would be consuming the [Earth's Best] products." Dennis Report, Attachment C, pp. 33–34. 188 of these respondents selected at least one of "2 to 5 years," "6 to 12 years," "13 to 18 years," or "Over age 18 years" among their responses to this question. *See* Workpaper 6.
[101] See Exhibit 9.

IX.     **Mr. Gaskin's Conjoint Survey and Mr. Weir's Damages Methodology Cannot Be Used to Estimate Market Prices or Price Premia**

A.      **Mr. Gaskin's Conjoint Survey Can at Best Estimate Willingness to Pay and Cannot Be Used to Estimate Market Prices or Price Premia**

123.    Mr. Gaskin conducts a conjoint analysis which he intends to use to measure the "price premium" associated with each of the At-Issue Pouch Claims.[102] However, conjoint analysis can—at best—provide insight into consumers' willingness to pay ("WTP") for a product or product attribute but cannot be used on its own to estimate market prices or market price premia. Market prices are jointly determined by both *demand* (i.e., prices that consumers are willing to pay) and *supply* (i.e., prices that producers are willing to accept), so in order to estimate a market price in the but-for world, one needs to estimate both supply and demand in the but-for world. Conjoint analysis, however, attempts to model only the demand side of the market and does not account for supply-side factors, so it cannot be used to calculate market prices. The academic literature on conjoint analysis is clear on this point. For example, in their article on the "Economic Foundations of Conjoint Analysis," Allenby et al. state:

> "It should be emphasized that conjoint can only estimate demand. Conjoint survey data, alone, cannot be used to compute market equilibrium outcomes such as market prices... Clearly, supply assumptions and cost information must be added to conjoint data in order to compute equilibrium quantities [including prices]."[103]

124.    Since conjoint analysis can model only the demand side of the market, the estimated "price premia" reported by Mr. Gaskin are in fact more correctly interpreted as an estimate of consumers' WTP for the challenged claims—although Mr. Gaskin's methodology does not even generate a reliable estimate of WTP, as I discuss below.

125.    To illustrate the difference between willingness to pay and market price, consider a hypothetical consumer who regularly purchases a fruit yogurt smoothie pouch that costs $2, one of the price levels included in Mr. Gaskin's conjoint survey. Suppose that one day the consumer

---

[102] Gaskin Report, ¶¶ 10–11.
[103] Allenby, G. M. et al. (2019), "Economic Foundations of Conjoint Analysis," in *Handbook of Economics and Marketing, Volume 1*, J.P. H. Dubé and P. E. Rossi, eds. Amsterdam, Netherlands: North-Holland/Elsevier ("Allenby et al. (2019)"), pp. 151–192 at 153.

goes to the store intending to purchase the product at its customary price of $2, but on this day the store is running a special promotion and the fruit yogurt smoothie pouch is on sale for $1.50. In this case, the consumer is willing to pay $2 but purchases the product at the prevailing market price of $1.50, which is 50 cents lower than the consumer's WTP.

126.    Using WTP in the context of determining the market value of a product or product attribute is particularly problematic because WTP tends to *overstate* the actual market price of a feature.[104] According to standard economic theory, any consumer with a WTP greater than the price of a product will purchase the product. In other words, the actual market price of a product is the minimum of the WTP of all consumers who purchase the product. Thus, any methodology based on aggregating WTP across consumers will overstate the market price premium if no supply-side factors are taken into account.

### B.    Mr. Gaskin's and Mr. Weir's Claims That Their Methodology Accounts for Supply-Side Factors Are Incorrect

127.    Mr. Gaskin states that his conjoint methodology "accounts for appropriate market supply side factors" in two ways.

128.    First, Mr. Gaskin claims that his methodology "accounts for appropriate market supply side factors" because "the price range used in the survey reflects the actual market prices that prevailed during the Class Period."[105] However, incorporating real-world prices into the price attribute of a conjoint survey does not account for how the supply-side affects the but-for price. The "actual market prices" that Mr. Gaskin claims to have incorporated into his conjoint survey reflect only demand and supply considerations in the *actual* world (i.e., the world in which the challenged claims appear on the product packaging) and do not account for any supply-side factors in the *but-for* world. As I explain above, to estimate the but-for market price, one needs to model how quantity supplied by a firm varies according to price because market prices are determined by the intersection of both demand and supply.

129.    Second, Mr. Gaskin and Mr. Weir claim that their methodology accounts for supply-side factors on the grounds that "the quantity used (or assumed) in the damages calculations reflects

---

[104] Allenby, Greg M. et al., "Valuation of Patented Product Features," *Journal of Law & Economics* 57, no. 3, 2014, pp. 629–663 at pp. 649–650.
[105] Gaskin Report, ¶ 25.

the actual quantity of products supplied during the Class Period (the number of units sold being fixed as a matter of history)."[106] While it is true that a fixed number of products were sold in the *actual* world, what matters for the calculation of but-for prices is the quantity of products that would be sold in the *but-for* world, which is not "fixed as a matter of history."[107] It is a basic economic principle that equilibrium price and equilibrium quantity are determined simultaneously by the intersection of supply and demand. It follows that if the equilibrium price in the but-for world is different from the price in the actual world, then the equilibrium *quantity* in the but-for world may also differ from equilibrium quantity in the actual world.[108] However, Mr. Gaskin makes no attempt to account for this basic economic principle and, in arriving at his estimate for the but-for price, Mr. Gaskin merely assumes without basis that the quantity stays fixed in the but-for world.[109]

## X. Mr. Gaskin's Conjoint Survey Is Flawed Because It Does Not Distinguish Between Consumers' Willingness to Pay for Nutrient Content Claims and Consumers' Willingness to Pay for the Associated Nutrients

130.  Mr. Gaskin's conjoint survey attempts to estimate consumers' WTP for the At-Issue Pouch Claims. However, Mr. Gaskin's survey cannot distinguish between consumers' WTP for the claims themselves and consumers' WTP for the nutrients referred to by those claims.

131.  Mr. Gaskin's conjoint survey presents survey respondents with hypothetical product profiles, each of which has a different set of claims. For any given At-Issue Pouch Claim, some of the hypothetical product profiles feature the claim, while others do not. However, because Mr. Gaskin's conjoint survey presents these different product profiles (i.e., a product with a claim and a product without) side by side for respondents, survey respondents are likely to interpret the absence of a given At-Issue Pouch Claim not merely as the absence of the claim itself but also as the absence of *the corresponding nutrient*.

---

[106] Gaskin Report, ¶ 25.
[107] Gaskin Report, ¶ 25.
[108] Allenby, G. M. et al. (2019), "Economic Foundations of Conjoint Analysis," in *Handbook of Economics and Marketing, Volume 1*, J.P. H. Dubé and P. E. Rossi, eds. Amsterdam, Netherlands: North-Holland/Elsevier ("Allenby et al. (2019)"), pp. 151–192 at 153.
[109] Gaskin Report, ¶ 25.

132.    Consider the example choice task presented in Mr. Gaskin's report, reproduced in Exhibit 10 below.

**Exhibit 10 Choice Task Example from Mr. Gaskin's Conjoint Survey**



Source: Gaskin Report.

133.    The Beech-Nut product on the left in Exhibit 10 features the "4g protein per serving" while the Gerber product in the center does not. Because these two product profiles are presented side by side, respondents to Mr. Gaskin's survey are likely to view the Gerber product as *not containing* four grams of protein per serving, since it does not feature the "4g protein per serving" label, while a product alongside it in the choice task does. In other words, survey respondents are likely to respond to Mr. Gaskin's survey as if the Gerber product does not contain four grams of protein, and not just as if the Gerber product does not feature a *label claim* that advertises four grams of protein. Thus, Mr. Gaskin's estimated WTP for the "4g protein per

serving" label likely reflects consumers' WTP for four grams of protein, and not merely WTP for the "4g protein per serving" claim.

134.    However, Mr. Gaskin claims to be assessing "the difference in market value of the [At-Issue] Products with the nutrient content claims compared to the market value of the [At-Issue] Products without the nutrient content claims."[110] Therefore, the appropriate comparison is between a product with the "4g protein per serving" label claim and a product without that claim, which *may or may not* contain four grams of protein.[111] Consumers' WTP for a product that may or may not have four grams of protein may be higher than consumers' WTP for a product that they believe *does not* contain four grams of protein. Thus, because the format of Mr. Gaskin's conjoint survey is likely to make respondents assume that the absence of a label claim reflects the absence of the associated nutrients, Mr. Gaskin's conjoint survey does not appropriately distinguish between consumers' WTP for nutrient content claims and the nutrients themselves.

## XI.    Mr. Gaskin's Conjoint Survey Methodology Is Flawed Because It Produces Unrealistic and Illogical Results

### A.    Mr. Gaskin's Conjoint Survey Is Flawed Because It Makes Unrealistic Predictions About Distractor Label Claims

135.    If Mr. Gaskin's conjoint survey were reliable, it would provide reliable estimates not only of the "price premium" associated with the At-Issue Pouch Claims (which it does not), but also of the price premium associated with other product attributes included in the survey, such as the "distractor" label claims. One such "distractor" label claim included by Mr. Gaskin is the "USDA Organic" label. However, as I show below, an analysis of Mr. Gaskin's data and methodology shows that Mr. Gaskin's survey results imply "price premium" estimates for the "USDA Organic" label that are inconsistent with data from the real world, which shows that Mr. Gaskin's conjoint survey is not tethered to the real-world, is not based on real-world prices, and therefore cannot be relied upon for an accurate estimate of consumers' WTP (or "price premia") for the At-Issue Pouch Claims.

---

[110] Gaskin Report, ¶ 10. Additionally, I understand from counsel that Plaintiffs allege that it is unlawful for the Challenged Claims to appear on the packaging of the At-Issue, not that the Challenged Claims are false.
[111] The same argument holds for the other At-Issue Pouch Claims.

136.     Real-world data shows that the typical price difference between infant food pouch products with and without the "USDA Organic" label is approximately $0.20. Specifically, Gerber (one of the brands included by Mr. Gaskin in his survey) sells both a range of organic baby/toddler food pouches (with the "USDA Organic" claim on the front packaging) and an equivalent range of non-organic baby/toddler food pouches without the "USDA Organic" claim.[112] The "USDA Organic" range of pouches retails on Gerber's website for $1.89, while the non-Organic range of pouches retails on Gerber's website for $1.69 (a difference of $0.20 or 11.8 percent).[113] These two product lines feature several different flavors, but otherwise differ only with respect to their classification as "USDA Organic" or not.[114]

137.     These real-world data can be compared to the "price premium" estimate implied by Mr. Gaskin's data and methodology for the "USDA Organic" label claim. Mr. Gaskin's conjoint survey includes a product attribute that may display the "USDA Organic" label and may also be blank.[115] In the same way that Mr. Gaskin uses his methodology to estimate the WTP for a baby/toddler food pouch with one of the At-Issue Pouch Claims relative to a product without that claim, Mr. Gaskin's methodology may also be used to estimate the implied WTP for a baby/toddler food pouch with the "USDA Organic" label relative to a product without such a label. The WTP (interpreted by Mr. Gaskin as a "price premium") implied by Mr. Gaskin's methodology for a product with the "USDA Organic" label relative to a product without such a label (assuming a base price of $1.69) is $0.51,[116] equivalent to 30 percent of the price of the

---

[112] I present analysis for Gerber products only and not for Happy Tot Organics, Plum Organics, or Beech-Nut because, of those brands, only Gerber sells pouch products with and without the "USDA Organic" label.

[113] These prices were identified on the Gerber website. *See* "Fruit & Yogurt Strawberry Banana," *Gerber*, https://www.gerber.com/fruit-yogurt-strawberry-banana; "Organic Apple Mango Raspberry Avocado Oatmeal," *Gerber*, https://www.gerber.com/organic-mango-raspberry-avocado-oatmeal-baby-food. Various retailers sell these products at different prices, but my review found no instance where the price difference between USDA Organic and non-Organic was greater than $0.20: on Amazon's website, the price of both organic and non-organic Gerber baby/toddler food pouches was $1.99, implying a premium of zero. *See* "Gerber Baby Food Toddler Apple Pear Peach, 3.5 Oz Pouch," *Amazon*, https://www.amazon.com/Gerber-Purees-Apple-Toddler-Pouches/dp/B079HNP18P; "Gerber Organic Pear Spinach Baby Food, 3.5 Oz Pouch," *Amazon*, https://www.amazon.com/Gerber-Organic-Foods-Pears-Spinach/dp/B00D2PL24S. On Walmart's website, non-organic baby food pouches can be purchased for $1.62 and organic pouches for $1.78, implying a premium of $0.16. *See* "Gerber Snacks for Toddler, Fruit & Yogurt Strawberry Banana, 3.5 oz Pouch," *Walmart*, https://www.walmart.com/ip/Gerber-Snacks-for-Toddler-Fruit-Yogurt-Strawberry-Banana-3-5-oz-Pouch/565405589; "Gerber Organic for Toddler Banana Raspberry & Yogurt with Vanilla, 3.5 oz Pouch," *Walmart*, https://www.walmart.com/ip/Gerber-Organic-for-Toddler-Yogurt-Toddler-Food-Banana-Raspberry-Vanilla-3-5-oz-Pouch/268741748.

[114] As of October 27, 2023, the Gerber website listed 34 baby food pouches (excluding out-of-stock products and multi-unit packs).  Among these products, $1.69 was the most common price among non-organic products and $1.89 was the most common price among the organic products. See Workpaper 7.

[115] Gaskin Report, p. 22.

[116] To calculate this figure, I used the part-worths calculated by Mr. Gaskin and followed his market-based methodology. Specifically, I simulated a market in which there were only two products available, one with the "USDA Organic" label and the other without it. In this simulation, I fixed the price of the product without the "USDA Organic"

product without the label. This figure is *more than double* the price difference observed in the real world between Gerber products with and without the USDA Organic claim ($0.20 or 11.8 percent).

138.    These data indicate that Mr. Gaskin's methodology yields results that are not aligned with data from the real world and, thus, lacks real-world external validity. Mr. Gaskin has not sought to validate any results from his conjoint survey with any available evidence on prices, market shares, or actual transactions. This process is known as "external validation," and is used to assess the reliability of estimates generated by conjoint analysis. As described by Bryan Orme, who Mr. Gaskin cites as an authority on conjoint analysis:[117]

> "[E]xternal validity [is the] ability of a conjoint analysis model or market simulator to accurately predict some outcome outside of the realm of the survey, such as a subsequent choice or purchase by an individual, or market shares for a population."[118]

139.    In fact, Mr. Gaskin appears to claim that his model does not require external validity and that his model need not and cannot be validated on any real-world quantities.[119] However, external validity is critical if the results of an analysis are to be extrapolated beyond the context of the study itself.[120] The external validity of conjoint surveys is of particular concern because

---

label at $1.69 and used the software Sawtooth to calculate the price that the product with the "USDA Organic" label would need to have for each of these products to have a market share of 50%. I kept Labels A, B, and D as blank and set Labels E and F to "Yummy and Tasty" and "Train tiny taste buds with delightful flavors," respectively, for both products.

[117] Gaskin Report, ¶ 58.

[118] Orme, B. K. (2014), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Edition*, Manhattan Beach, CA: Research Publishers LLC ("Orme (2014)"), p. 184. *See also*, Louviere, J. T. (1988), "Conjoint Analysis Modelling of Stated Preferences: A Review Theory, Methods, Recent Developments and External Validity," *Journal of Transport Economics and Policy*, 22, 1, 93–119; Green, P. E. and V. Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5, 2, 103–123.

[119] Gaskin Deposition, 103:2–6 ("Q. Okay. But should your conjoint survey results be able to be used to estimate market shares for the brands in your survey, if you wanted to use the results for that purpose? A. No, not necessarily."); 105:16–21 ("Q. Is it your opinion that your conjoint can accurately estimate the price premia for the various brand options in your conjoint survey? A. That's not what it was designed to do. So, I haven't tested that. It's designed to do just this one thing, which is to look at the attributes at issue."); 106:11–19 ("Q. Have you done any analysis to determine whether the results of your conjoint survey align with any real-world quantities or market shares? A. Well, I'm asking a very specific question here in this survey, which is what price change would be needed to compensate for the absence of a label. And so since that doesn't exist in the actual marketplace, it's why we're doing this survey, I have not investigated any other things that the survey is not designed to do.")

[120] Kaye, D. H. and D. A. Freedman (2011), "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence, Third Edition*, Washington, D.C.: The National Academies Press, p. 222 ("External validity is about using a particular study or set of studies to reach more general conclusions. … Any study must be conducted on certain subjects, at certain times and places, and using certain treatments. To extrapolate from the conditions of a study to more general conditions raises questions of external validity."); Nock, S. L. and T. M. Guterbock (2010), "Survey Experiments," in *Handbook of Survey Research, Second Edition*, Bingley, UK: Emerald Group Publishing Limited, p.

consumers may behave differently in a survey context from how they would behave in a real-world marketplace.[121] One way to assess whether a study's findings are externally valid is to compare predictions from the study with known real-world quantities, such as prices.[122] As I have shown above, Mr. Gaskin fails this external validity test, since his methodology generates estimates for the "price premium" for "USDA Organic" that are not aligned with real-world prices.

### B. Respondents to Mr. Gaskin's Conjoint Survey Exhibit Irrational Preferences, Illustrating the Flaws in Mr. Gaskin's Survey Design

140.    If the respondents in a conjoint survey are economically rational, they should prefer a product with a lower price to an otherwise identical product with a higher price. However, many respondents in Mr. Gaskin's conjoint survey—if the results of Mr. Gaskin's survey are taken at face value—seem to prefer higher prices to lower prices, contrary to economic rationality.

141.    Mr. Gaskin uses the data from his conjoint survey to estimate respondents' preferences for the product attributes considered in the survey, including price.[123] Conjoint analysis assumes that a consumer's preference for a product is determined by the sum of her preference for the level of each of the product's attributes, often referred to as the "part-worths."[124] For each respondent, each of these possible price levels in Mr. Gaskin's survey has an associated part-worth, which represents the respondent's preference for that price level. If the respondent is economically rational regarding price, the part-worths associated with lower price levels should be higher than the part-worths associated with higher price levels because an economically rational respondents should prefer lower prices to higher prices.

---

837 ("The signal strength of a well-designed sample survey is generalizability or external validity — supporting valid generalization from characteristics of the surveyed sample to some broader population of interest.").
[121] Rogers, G. and Soopramanien, D. (2008), "The Truth is Out There! How External Validity Can Lead to Better Market Decision," *International Journal of Market Research*, 51, 2, 163–180 ("Rogers and Soopramanien (2008)"), p. 167 ("The external validity of CBC models is of concern to researchers because consumers potentially may behave differently in the marketplace than when they face stated preferences situations in conjoint experiments.").
[122] Rogers and Soopramanien (2008), p. 169 ("External validation (prediction vs market data)."), 178 ("While acknowledging that the data needed to conduct external validation are difficult for most model builders to capture, it offers the best assessment of real accuracy against its intended purpose (i.e., to predict a market outcome), and offers the best chance to learn and improve a model.").
[123] The attributes considered in Mr. Gaskin's conjoint survey are Brand, Price, and six separate "Label" attributes. *See* Gaskin Report, pp. 20–23.
[124] Allenby et al. (2019), p. 152 ("Conjoint analysis was introduced to the marketing literature by Green and Rao (1971) as an approach to take ranked input data and estimate utility part-worths for product attributes and their levels (e.g., amount of computer memory). The use of dummy-variables to represent the utility of attribute-levels provided a flexible approach to measure preferences without imposing unnecessary assumptions on the form of the utility function.").

142.     It is possible to assess the economic rationality in the responses to Mr. Gaskin's conjoint survey by analyzing survey respondents' part-worths for the different price points in the survey.[125] After implementing this procedure, I found that 242 out of the 910 respondents in Mr. Gaskin's conjoint survey (or 26.6 percent) exhibit statistically significant violations of rationality with respect to price.[126]

Given that this result is contrary to economic rationality, it is highly unlikely that such a large percentage of survey respondents *actually* prefer higher prices to lower prices. Instead, the fact that Mr. Gaskin's conjoint survey data yields these results can be considered as evidence that Mr. Gaskin's conjoint survey is unable to reliably measure respondents' preferences and it is further evidence that Mr. Gaskin's conjoint survey methodology is flawed.

### C.     Analysis of Individual Respondents' WTP Demonstrates that Mr. Gaskin's Results and Conclusions Are Unreliable

143.     A well-designed and well-executed conjoint analysis should generate realistic estimates of individual survey respondents' preferences.[127] However, my analysis of Mr. Gaskin's results show that his methodology implies implausibly high and implausibly low estimates of WTP for the at-issue claims for a large number of survey respondents.

---

[125] Note that in order to analyze survey respondents' price part-worths, I re-estimate the same Hierarchical Bayesian model used by Mr. Gaskin but without a "constraint" imposed by Mr. Gaskin on the price part-worths. Mr. Gaskin's original estimation imposed a "constraint" on the price part-worths which effectively *assumes* that all respondents have rational preferences with respect to the price levels and does not allow the estimated price part-worths to reflect irrationality. *See* Gaskin Report, ¶ 21, Exhibit O. While in some cases the imposition of this type of constraint may present certain advantages, such as increasing the precision of the estimates, it prevents the use of the estimated part-worths to analyze the respondents' preferences as they were expressed during the conjoint survey. *See* Orme, B. K. and K. Chrzan (2017), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, Orem, UT: Sawtooth Software, Inc., p. 127 ("It's commonplace to impose utility constraint on quantitative functions like price, but we caution against blindly doing this without first carefully examining the data without any constraints to ensure that a data processing error hasn't been made and then to determine that lower prices indeed are always preferred to higher prices.").

[126] In his analysis, Mr. Gaskin estimates the respondents' part-worths using Hierarchical Bayesian regression, imposing a constraint that the part-worths corresponding to lower prices *must* be lower by assumption than the part-worths corresponding to higher prices. Gaskin Report, Exhibit O. To calculate the number of respondents that exhibit violations of rationality with respect to price, I first re-estimated respondents' part-worths using Mr. Gaskin's Hierarchical Bayesian regression *without* imposing any restriction on the relative magnitude of the price part-worths. This way, my re-estimated part-worths reflect only the respondents' preferences and not any externally imposed restriction. After re-estimating the respondents' part-worths, I exported every 10th draw, out of 10,000 draws, for a total of 1,000 draws per respondent. For each of these 1,000 draws per respondent I analyze whether the respondent's price part-worths are negatively sloped (i.e., whether the respondent prefers lower prices to higher prices). I classify a respondent as exhibiting statistically significant violations of rationality with respect to price if at least 95 percent of the respondent's draws exhibit any irrationality with respect to the price part-worths (i.e., any situation in which the respondent prefers a higher price to a lower price). *See* Workpaper 8.

[127] Orme (2014), p. 184.

144.    Appendix L summarizes the WTP of individual respondents to Mr. Gaskin's conjoint survey (calculated using the part-worths estimated by Mr. Gaskin) for the At-Issue Pouch Claims.[128] Appendix L-1 shows, when the price of the baby/toddler food pouch is in the $1.50–$2.00 range (a realistic range for the At-Issue Pouch Products), survey respondents' individual WTPs for the "4g protein per Serving" claim range from negative $461.76 to positive $7,263.86. In other words, Mr. Gaskin's survey results imply that some individuals would be willing to pay as much as an additional $7,263.86 for a product with the "4g protein per Serving" claim, while other respondents would be willing to pay as much as $461.76 to *avoid* the "4g protein per Serving" label. As a point of reference, the highest price that respondents in Mr. Gaskin's survey faced in their choice tasks for a baby/toddler food pouch was $3.00, so the WTP values estimated by Mr. Gaskin are clearly implausible. Similarly, as Appendices L-2 and L-3 show, Mr. Gaskin's survey also implies equally implausibly extreme values for individual survey respondents for the "3g plant protein" claim and the "Excellent source of calcium, vitamins C & D" claim. These implausible WTP values illustrate the fact that Mr. Gaskin's flawed survey has not reliably measured individual respondents' true WTP for the At-Issue Pouch Claims.

145.    Furthermore, as Appendix L also shows, between 14.8 percent and 65.9 percent of respondents to Mr. Gaskin's survey exhibit a WTP for the At-Issue Pouch Claims that is *higher than the overall price of the product*. Indeed, 75 percent of Mr. Gaskin's respondents exhibit a WTP higher than the price of the product for at least one of the three At-Issue Pouch Claims, which is unlikely to be consistent with the respondents' true WTP.[129]

146.    Mr. Gaskin does not explain why his methodology generates implausibly extreme values for respondents' individual-level WTP for the At-Issue Pouch Claims, nor why his methodology estimates that between 14.8 percent and 65.9 percent would pay *more than the overall price of the product* an At-Issue Pouch Claim. However, one possible explanation is that consumers are indeed highly heterogeneous with respect to their valuation of the At-Issue Pouch Claims. This explanation would imply that applying a *single* measure of "price premium" to all consumers for each At-Issue Pouch Claim, as Mr. Gaskin and Mr. Weir do, is inappropriate. Another possible

---

[128] For each At-Issue Pouch Claim and each respondent, I calculated the WTP for a product with the At-Issue Pouch Claim relative to an otherwise identical product without a claim using the respondent's average part-worths for the At-Issue Pouch Claim and a linear interpolation of the respondent's average part-worths for the indicated price levels. The average price and claim part-worths for each respondent are based on every 10th draw of the 10,000 draws generated in Sawtooth using Mr. Gaskin's survey data. See Appendix K for more details.
[129] *See* Workpaper 9.

53

explanation for these implausible results is that Mr. Gaskin's survey is unreliable as a measure of respondents' preferences.

## XII.  Mr. Gaskin's Conjoint Survey Design Does Not Reflect Marketplace Realities

### A.  Mr. Gaskin's Conjoint Survey Design Is Flawed, Presenting Respondents with Unrealistic and Confusing Product Options

147.  Mr. Gaskin's conjoint survey asked respondents to select from among hypothetical "baby/toddler food pouch" products.[130] However, the design of Mr. Gaskin's survey presented respondents with unrealistic and nonsensical product options, which is likely to have confused respondents, generating unreliable responses. Specifically, Mr. Gaskin's conjoint survey presented respondents with:

  a.  Meat-based protein puree pouches implausibly labeled with "3g plant protein;"

  b.  Non-organic baby/toddler food pouches from the brands Earth's Best, Plum Organics, and Happy Tot, despite the fact that none of these brands sell any non-organic products and despite the fact that, in the case of Earth's Best, Plum Organics, and Happy Tot, the word "organic" appears in the brand's full name and logo.

148.  Mr. Gaskin's conjoint survey did not specify the flavor of the hypothetical "baby/toddler food pouch" products and instead instructed respondents to assume that the pouches were all "[their] baby's and/or toddler's favorite flavor."[131] As a result of this instruction, some survey respondents likely assumed, while they took the survey, that the products they were considering were *meat-based* pouches, such as Earth's Best Chicken Casserole, a possibility that Mr. Gaskin acknowledged at deposition.[132]

149.  However, the design of Mr. Gaskin's survey ensured that these respondents (those thinking about meat-based pouches) were presented with meat-based pouches with the label

---

[130] Gaskin Report, ¶ 28.
[131] Gaskin Report, ¶ 47, footnote 37.
[132] Gaskin Deposition, 68:3–11. ("Q. Mr. Gaskin, we just discussed that based on the instructions to consider your toddler or baby's favorite flavors in the conjoint, some respondents might have answered the survey assuming that the products they were considering were all meat-based purees, correct? A. If that's their favorite flavor. Q. So, under the scenario presented in the survey, that is a possibility, correct? A. It's possible.")

claims that are not plausible when applied to a meat-based protein pouch: "3g plant protein."[133] The presence of these implausible choice options likely confused respondents and undermines the reliability of the survey. The fact that respondents were confused is manifested in the irrational preferences and implausibly extreme WTP values observed in Mr. Gaskin's results, which I discussed in subsections XI.B and XI.C above.

150.     Respondents to Mr. Gaskin's survey were also presented with other unrealistic and confusing hypothetical pouch products. One of the label claim attributes in Mr. Gaskin's survey was an attribute with three possible options: "USDA Organic," "Non-GMO," and blank. All respondents to Mr. Gaskin's survey were presented with hypothetical pouch products *without* the "USDA Organic" label but with the brand attribute set to "Earth's Best," "Plum Organics," or "Happy Tot Organics."[134] However, all three of these brands sell *only* organic food products and thus products of this type do not exist in the real-world market.

151.     At deposition, Mr. Gaskin claimed that his criterion for the inclusion of a product in his conjoint survey was that the product be "plausible."[135] However, given that the word "organic" appears in the full names and logos of these brands("Earth's Best Organic," "Plum Organics," and "Happy Tot Organics"), and that all three brands tout the "organic" characteristic of their products in marketing materials,[136] many survey respondents are likely to have found it implausible, and therefore confusing, to see these non-organic Earth's Best, Plum Organics, and Happy Tot Organics products in the survey. Additionally, even if some respondents were not confused by these products, the fact that Mr. Gaskin's conjoint survey uses entirely unrealistic and implausible products further underlines the fact that the survey is not tethered to the real world or to any real marketplace and does not reflect any real-world preferences or outcomes.

---

[133] Gaskin Report, p. 22, ¶ 49.

[134] All versions of the Gaskin Survey included at least 10 hypothetical products without the "USDA Organic" label but with the brand attribute set to "Earth's Best," "Plum Organics," or "Happy Tot Organics" across the 12 task choices presented to respondents. *See* Mr. Gaskin's Sawtooth Production; Workpaper 10.

[135] Gaskin Deposition, 68:12–16. ("Q. Do you know if Plum Organics sells any meat-based protein puree pouches? A. I'm not quite sure, but my criterion is that it's plausible they do. And so I think I've met that criterion. People can make the tradeoff.").

[136] For Earth's Best Organic, see "Our Promise," *Earth's Best Organic*, https://www.earthsbest.com/why-earths-best/our-promise/. For Plum Organics, see "FAQs: Questions About Plum?" *Plum Organics*, https://plumorganics.com/faqs/. For Happy Tot Organics, see "Our Quality Standards & Commitment to Organic," *Happy Family Organics*, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/.

**B.    Mr. Gaskin's Surveys Fails to Account for the Fact that Many Consumers Likely Purchase the At-Issue Pouch Products Out of Habit and Therefore His Results Are Unlikely to Reflect Their Behavior in the Marketplace**

152.    Mr. Gaskin's conjoint survey fails to account for the fact that, as is the case for many consumer goods, many consumers purchase infant and toddler foods out of habit. In the real world, habitual purchasers are less likely to pay attention to the wording of claims on the product packaging:

> "In [cases of habitual buying], consumer behavior does not pass through the usual belief-attitude-behavior sequence. Consumers do not search extensively for information about the brands, evaluate brand characteristics, and make weighty decisions about which brands to buy."[137]

153.    However, Mr. Gaskin's conjoint survey forces consumers, even those who may be habitual purchasers of the At-Issue Pouch Products, to attend to specific product attributes, such as the label claims, and to make active, conscious decisions about each choice task,[138] in ways that habitual purchasers may not do in a real-world purchasing scenario. Therefore, Mr. Gaskin's results are likely to overstate the importance of various label claims and therefore respondents' WTP for the At-Issue Pouch Claims and to be unreliable.

**XIII.    Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies a Single "Price Premium" To All Purchases of a Given At-Issue Pouch Product, Despite Differences Between Products and Putative Class Members**

154.    In his calculation of "price premium damages," Mr. Weir applies a single percentage "Price Premium %" to each of the three At-Issue Pouch Claims (22.7% for "4g protein per serving," 12.6% for "3g plant protein," and 24.4% for "Excellent source of Calcium, Vitamins C&D).[139] However, Mr. Weir's assumption that each At-Issue Pouch Claim (and corresponding At-Issue Pouch Product) has a single uniform "price premium" across all putative Class Members is flawed. Mr. Weir ignores the fact that (i) consumers paid a variety of different prices

---

[137] Kotler, P., and G. Armstrong (2018), *Principles of Marketing, Seventeenth Edition*, Harlow, United Kingdom: Pearson Education Limited, p. 175.
[138] Gaskin Report, ¶¶ 47–48.
[139] Weir Report, ¶ 64, Table 3.

for the five different At-Issue Pouch Products, and Mr. Gaskin's analysis implies that the estimated price premium varies according to the price paid, and (ii) that Mr. Gaskin's results imply that consumers differ substantially in their valuation of the At-Issue Pouch Claims.

### A. Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies the Same "Price Premium" to All Purchases of a Given At-Issue Pouch Product, Irrespective of the Price Paid for that Product

155. The five At-Issue Pouch Products sell at ranges of different prices across different retailers. For example, the Earth's Best Organic Fruit Yogurt Smoothie, which features the "Excellent source of calcium, vitamins C & D" claim, sells for $1.99 at a California Whole Foods vs $1.64 on Walmart.com.[140] Similarly, the Earth's Best Organic Chicken Casserole with Vegetables and Grain Puree pouch, which features the "4g protein" claim, sells for $2.48 on Walmart.com vs $2.99 at a California Target.[141] The Earth's Best Organic Veggie Red Lentil Bake Puree, which features the "3g of plant protein" claim, sells for $2.99 at a New York Whole Foods vs $2.19 at a New York Food Bazaar.[142]

156. Mr. Gaskin's own analysis—if taken at face value—implies that the price premium for each of the three At-Issue Pouch Claims varies depending on the "base price" of the product. For example, as Mr. Gaskin's Exhibit K shows, his methodology estimates a price premium of $0.929 for the "4g protein per serving" claim when the product price is $1.50 but a price

---

[140] For instance, on Whole Food's website, when using the zip code 90230 and selecting the first store listed, the product Organic Strawberry Banana Fruit Yogurt Smoothie, is sold at $1.99.  The product Organic Pineapple Orange Banana Fruit Yogurt Smoothie, the same product in a different flavor, using the same zip code and selecting the first store listed, is sold at $1.64 on Walmart.com.  "Earth's Best Organic Strawberry Banana Fruit Yogurt Smoothie, 4.2 oz," *Whole Foods Market,* https://www.wholefoodsmarket.com/product/earths-best-organic-strawberry-banana-fruit-yogurt-smoothie-42-oz-b004mui15u; "Earth's Best Organic Fruit Yogurt Smoothie Toddler Food, Pineapple Orange Banana, 4.2 oz Pouch," *Walmart,* https://www.walmart.com/ip/Earth-s-Best-Organic-Fruit-Yogurt-Smoothie-Toddler-Food-Pineapple-Orange-Banana-4-2-oz-Pouch/34193531?from=search.

[141] For instance, on Target's website, when using the zip code 90230 and selecting the first store listed under "Select your store" the product Organic Stage 3 Baby Food, Chicken Casserole with Vegetables & Rice is offered at $2.99.  The same product, using the same zip code and selecting the first store listed, is sold at $2.48 on Walmart.com. "Earth's Best Stage 3 Organic Toddler Chicken Casserole with Vegetables & Grain Puree," *Walmart,* https://www.walmart.com/ip/Earth-s-Best-Organic-Stage-3-Baby-Food-Chicken-Casserole-with-Vegetables-Rice-4-5-oz-Pouch/144773738; "Earth's Best Organic Chicken Casserole with Vegetables and Rice Baby Food Pouch – 4.5oz," *Target,* https://www.target.com/p/earth-39-s-best-organic-chicken-casserole-with-vegetables-and-rice-baby-food-pouch-4-5oz/-/A-53134245#lnk=sametab.

[142] For instance, on Whole Food's website, when using the zip code 10022 and selecting the first store listed, the product Organic Veggie Red Lentil Bake Puree is sold at $2.99.  The same product, using the same zip code and selecting the first store listed, is sold at $2.19 at Food Bazaar (via Instacart). "Earth's Best Organic Veggie Red Lentil Bake Puree, 4.5 oz," *Whole Foods Market,* https://www.wholefoodsmarket.com/product/earths-best-organic-veggie-red-lentil-bake-puree-45-oz-b08jdt4v1w; "Earth's Best Protein Puree, Veggie Red Lentil Bake with Olive Oil, 3 Hearty Meals," *Instacart,* https://www.instacart.com/landing?product_id=21286593&postal_code=10021.

premium of $0.659 when the product price is $2.00.[143] Mr. Gaskin's Exhibit K shows that the estimated price premium differs across all At-Issue Pouch Claims and all the price points considered in Mr. Gaskin's conjoint survey.

157.    Because putative Class Members paid a range of different prices for the At-Issue Pouch Products and Mr. Gaskin's own analysis implies that the price premium varies depending on the price paid, Mr. Gaskin and Mr. Weir's assumption that a single overpayment percentage may be applied to *all* sales of each of the At-Issue Pouch Products is flawed.

> **B.      Mr. Gaskin and Mr. Weir's Methodology Is Flawed Because It Applies the Same "Price Premium" to All Purchases of At-Issue Pouch Products, Irrespective of Whether and To What Extent the Consumer Values the At-Issue Claim**

158.    Mr. Gaskin calculates a single price premium for each of the At-Issue Pouch Claims, to be applied to all putative Class Members, regardless of whether and to what extent individual putative Class Members value each At-Issue Pouch Claim. However, Mr. Gaskin's own analysis provides evidence that putative Class Members vary in the value they assign to each At-Issue Pouch Claim.

159.    First, as I explain in Section XI above, Mr. Gaskin's survey results imply that individual respondents in Mr. Gaskin's survey have widely varying value of WTP for the three At-Issue Pouch Claims. For example, respondents' WTP for the "4g protein per serving claim" on a $1.50 product ranges from negative $461.76 to positive $7,263.86 and the ranges for the other At-Issue Pouch Claims are similarly wide. Given this variation in WTP for the At-Issue Pouch Claims across consumers, it is inappropriate to assume a single price premium per At-Issue Pouch Claim for all putative Class Members.

160.    Second, Mr. Gaskin's analysis provides additional evidence that suggests that WTP varies across putative Class Members. Mr. Gaskin estimates different "price premia" for California consumers relative to "Nationwide" consumers.[144] For example, Mr. Gaskin estimates a "price premium" of 15.1% for "4g protein per serving" for "Nationwide" consumers, but estimates a corresponding "price premium" of 22.7% for California consumers.[145] At deposition,

---

[143] Gaskin Report, Exhibit K, page K-2.
[144] Gaskin Report, ¶ 62.
[145] Gaskin Report, ¶ 62.

Mr. Gaskin confirmed that it is his opinion that California consumers paid higher price premia for the At-Issue Pouch Claims than consumers in the rest of the US.[146] However, if the California price premia differ from the price premia in the rest of the country, it can also be the case that price premia differ *within* California. At deposition, Mr. Gaskin acknowledged that he merely *assumed* a uniform price premium for California as a whole and that he has no actual evidence of a uniform price premium within California.[147]

Executed on November 1st, 2023

_____
Ronald T. Wilcox, Ph.D.

---

[146] Gaskin Deposition, 78:1–6. ("Q. Do you think that California consumers paid a higher price premium as a result of the at-issue claims than consumers in the rest of the US did for the products at issue? A. That -- that's what these results would indicate, yes.")

[147] Gaskin Deposition, 79:14–23. ("Q. If California residents paid a different price premium from consumers in the rest of the US based on the at-issue claims, is it possible that there were differences in different parts of California, as -- in terms of the different price premia paid? A. I haven't analyzed that, so I don't know. I'm looking at California as a region. Q. And what is your basis for assuming a uniform price premium for the whole state of California? A. That's what I was asked to calculate.")

**Appendix A**

### Ronald T. Wilcox
Darden Graduate School of Business Administration
University of Virginia
100 Darden Blvd.
Charlottesville, VA 22906-6550
Phone (434) 243-5558  email:wilcoxR@darden.virginia.edu

**Current Positions**

NewMarket Corporation Professor of Business Administration, Darden School of Business, University of Virginia. March 2011- current.

Associate Dean for Executive Degree Programs

**Previous Positions**

Senior Associate Dean for Degree Programs, 2015-2019

Associate Dean of MBA for Executives and Chaired Professor (Darden), 2012-2015

Associate Professor - Professor of Business Administration (Darden), 2001 - 2011

Visiting Associate Professor of Business Administration, Cheung Kong Graduate School of Business, Shanghai, P.R. China, Summer 2004 and 2005.

Economist, U.S. Securities and Exchange Commission, 1999 - 2000.

Assistant Professor of Industrial Administration, Graduate School of Industrial Administration (now the Tepper School of Business), Carnegie Mellon University, 1996-2001 (on leave during Academic Year 99-00).

**Education**

Ph.D. in Business Administration, Washington University, St. Louis, Missouri, December, 1996.

M.S. in Business Administration, Washington University, 1993.

Honors A.B. in Classics and Economics, Xavier University, 1990.

**Appendix A**

**Books**

Venkatesan, Rajkumar, Paul W. Farris and Ronald T. Wilcox (2021), <u>Marketing Analytics: Essential Tools for Data Driven Decisions</u>, *University of Virginia Press.*

Venkatesan, Rajkumar, Paul W. Farris and Ronald T. Wilcox (2014), <u>Cutting Edge Marketing Analytics: Real Word Cases and Data Sets for Hands-on Learning</u>, *Pearson Education.*

Wilcox, Ronald T. (2009), "Private Enterprise's Role in Increasing Savings," in <u>Franklin's Thrift: The History of a Lost American Virtue</u>, B. Blankenhorn, B. Dafoe-Whitehead and S. Brophy Warren eds., *Templeton Press*, May 2009.

Wilcox, Ronald T. (2008), <u>Whatever Happened to Thrift? Why Americans Don't  Save and What to Do About It</u>, *Yale University Press*, May 2008. [Reviewed by *Wall Street Journal* and *Business Week*, Named "Top 5 Business Book of the Year" by Kiplinger]

**Peer-reviewed Journal Articles**

Zhang, Yi, Ronald T. Wilcox and Amar Cheema (2019), "The Effect of Student Loan Debt on Spending: The Role of Perceived Payment Difficulty, *Journal of Public Policy and Marketing*, August, 1-14.

Sun, Baohong, Ronald T. Wilcox and Ting Zhu (2007), "Ignoring Your Best Customer? An Investigation of Customer Satisfaction, Customer Retention and Their Financial Impact, *Journal of Relationship Marketing*, 6(3/4), 87-116.

Kamakura, W., et. al. (2005), "Choice Models and Customer Relationship Management," *Marketing Letters,* 16(3/4), 279-291.

 Li, S., B. Sun, and R.T. Wilcox (2005), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking Services," *Journal of Marketing Research,* May, 42, 233-239. ("Top 5" cited papers in *JMR* for 2006 – 2011 time frame)

 Wilcox, R.T. (2005), "Developing Better Fee Structures for Mutual Funds," *Journal of Investment Management*, April, 3(1), 1-17.

Wilcox, R. T. (2003), "Bargain Hunting or Star Gazing: Investors' Preferences for Stock Mutual Funds," *Journal of Business*, 76(4), 645-663.

Wilcox, R.T. (2001), "Advertising Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law," *Journal of Public Policy and Marketing,* 20(1), 1-9.

Hsu, A. and R.T. Wilcox (2000), "Stochastic Prediction in Multinomial Logit Models," *Management Science,* 46(8), 1137-1144.

Wilcox, R.T. (1999), "Experts and Amateurs: The Role of Experience in Internet Auctions," *Marketing Letters*, 11(4), 363-374

Chen Y., J.D. Hess, R.T. Wilcox, and Z. Zhang (1999), "Accounting Profits Versus Marketing Profits: A Relevant Metric for Category Management," *Marketing Science*, 18(3), 208-229.

Kim, B., K. Srinivasan, and R.T. Wilcox (1999), "Identifying Price Sensitive Consumers: The Relative Merits of Demographic Versus Purchase Pattern Information," *Journal of Retailing*, 75(2), 173-193.

Narasimhan C., and R.T. Wilcox (1998), "Private-Labels and the Channel Relationship: A Cross-Category Analysis," *Journal of Business*, 71(4), 573-600.

Chiang, J., and R.T. Wilcox (1997), "A Cross-Category Analysis of Shelf-Space Allocation, Product Variety and Retail Margins," *Marketing Letters*, 8(2), 183-191.

**Other Publications**

Reply Brief in Support of Respondents, Booking.com v. United States Patent and Trade Office. 19-United 46, 2020. *Supreme Court of the United States*.

"Pricing Strategy Optimization," (2017) with Boston Consulting Group, Four Course Specialization, *Coursera*. (https://www.coursera.org/specializations/uva-darden-bcg-pricing-strategy).

"How Heinz Got Retailers and Consumers to Accept a Larger Ketchup Bottle," *Washington Post*, April 3rd, 2015

"How the Portland Trailblazers Won Back Their Fans, *Washington Post,* July 14th, 2014.

"Should Chip Maker Nix Flavors to Up Efficiency," *Washington Post*, March 3rd, 2012.

"Why Some MBA's are Wildly Successful," *Forbes,* December, 2011.

"The Hidden Taxation of Wealthy Americans, *Forbes*, November, 2011

"The Complexity of Bidding for Government Contracts," *Washington Post*, September, 2011

"Understanding How to Value Customers," *Financial Times*, August, 2011

"How Close Can You Stand to a Software Giant?" *Washington Post*, August, 2011

**Appendix A**

"The Thrifty Gene," *Forbes,* March 24, 2009.

"Spending Won't Save Us," *Forbes*, Feb. 13, 2009.

"Increase Pay for Government Officials," *Forbes*, Dec. 10, 2008

"A Conservative for Obama," *Forbes*, Oct. 31, 2008

"American Optimists," *Forbes*, Nov. 21, 2008

"How to Save the Economy," *Forbes*, Nov. 11, 2008

"The Forgotten Issue," *Financial Week*, Nov. 20, 2008.

Laseter T., A. Taylor, and R.T. Wilcox (2003), "The Big, The Bad and the Beautiful, *Strategy + Business;* Booz, Allen, Hamilton, Winter.

"The Hidden Potential of Powerful Brands," *Batten Briefings*, The Batten Institute, Fall.

"Using Conjoint Analysis to Develop Efficient Fee Structures," *Proceedings of the Sawtooth Software Conference on Quantitative Methods in Marketing Research*.


**Non-Published Papers**

"Comfortably Numb: The Impact of Student Loan Debt on Price Sensitivity for Major Purchases (2018), with Y. Zhang, *working paper*.

"Mine Matter Most: The Self-reference Effect in Memory for Brands," (2012) with K. Sharpe and S. Kesebir. *working paper*.

Wilcox R. and Raj Venkatesan (2010), "Strategies for Customer Win Back," *working paper*.

Wilcox, R. and Kathryn Sharpe (2010), "Understanding the Decision to Consume Luxury Brands." *working paper,*

Harris, R.S. and R.T. Wilcox (2009), "The Making of Business Leaders,"

**Published Teaching Material**

66 North: Built for Life (UVA-M-1017)

Patagonia Inc. (UVA-M-0857)

Legal Aspects of Pricing (UVA-M-0856)

# Appendix A

Brand Positioning Statements (UVA-M-0827)

J.C. Penney: Think Big (Case: UVA-M-0841)

Product Line Pricing (Technical Note: UVA-M-0813)

Route 11 Chips (Field Case: UVA-M-0810; Teaching Note UVA-M-0810TN and Spreadsheet UVA-M-0810RX)

SmartOps: Forging Smart Alliances (Field Case: UVA-M-0797; Teaching Note UVA-M-0797TN; Portfolio: 0797TNF)

Parsons Brinckerhoff: The Second Avenue Subway (A) (Field Case: UVA-M-0793)

Parsons Brinckerhoff: The Second Avenue Subway (B) (Field Case: UVA-M-0794)

Parsons Brinckerhoff: The Second Avenue Subway (C) (Field Case: UVA-M-0795)

Parsons Brinckerhoff: The Second Avenue Subway (Teaching Note: UVA-M-0793TN)

The Influence of Social Media on Purchase Decisions in High Involvement Categories (Technical Note: UVA-M-0786)

Retail Relay (Field Case: UVA-M-0784; Teaching Note: UVA-M-0784-TN; Spreadsheet S-M-0784; Instructor Spreadsheet S-M-0784TN)

H. J. Heinz (Field Case: UVA-M-0777; Teaching Note: UVA-M-0777TN; Portfolio UVA-M-0777TNX)

Portland Trail Blazers (Field Case: UVA-M-0773; Teaching Note UVA-M-0773-TN)

Dragon Systems (A)  (Field Case: UVA-M-0724)

Dragon Systems (B)  (Field Case: UVA-M-0725)

Big O Tires (Field Case: UVA-M-0692)

 Big O Tires Teaching Note (UVA-M-0692TN-M) [Multimedia Teaching Note]

 XM Satellite Radio (Public Source Case: UVA-M-0708)

Fidelity Inc.: Pricing the Blue Chip Growth Fund (Field Case: UVA-M-0674) [*Wachovia Award for Pedagogical Excellence*]

Fidelity Inc.: Pricing the Blue Chip Growth Fund *Teaching Note* (Case: UVA-M-0674TN)

**Appendix A**

NorthStar Consulting (Field Case: UVA-M-0673)

Mass Mutual Inc. (Public Source Case: UVA-M-0672) [Multimedia Case]

A Practical Guide to Conjoint Analysis (Technical Note: UVA-M-0675)

Methods for Producing Perceptual Maps from Data (Technical Note: UVA-M-0665).

Marketing Economics: Break-even Analysis and Contribution Margin
(Technical Note: UVA-M-0648).

**Professional Presentations**

2012 Winter American Marketing Association, "Developing Protocols for On-line Panels"

2011 Winter American Marketing Association, "Bringing Finance into the Marketing Classroom,"

2007-2011  Speeches on Whatever Happened to Thrift? Why Americans Don't Save  and What to Do About It, *Yale University Press* for National Co-op Bank, Visa, Genworth Financial, Navy Federal Credit Union, Financial Planners Society of Virginia, AARP, United Technologies, and various chapters of the University of Virginia Alumni Association.

2008 United Technologies, "Using Conjoint Analysis to Predict the Demand for New Technologies."

2004  Investment Company Institute Symposium on Mutual Funds: Business Strategies and Public Policy, "Distribution Strategies for Mutual Funds."

2004  Marketing Science Conference (Rotterdam, The Netherlands), "Cross-selling Naturally Ordered Services: An Application to Consumer Banking."

2004  Boulder Invitational Choice Symposium, "The State of the Art in Customer Lifecycle Analysis."

2004 Wharton Mutual Fund Conference, discussant on "Advertising and Mutual Funds."

2004 Batten Institute (Northern Virginia Series), "The New Science of Behavioral Finance."

# Appendix A

2002 Kenan-Flagler School of Business, University of North Carolina, "Individual-level Utility Estimation in Reduced-rank Experimental Designs: An Application to Mutual Fund Selection"

2002 Williams School of Business, Xavier University, "Rational Choice and the Mutual Fund Selection Decision."

2002 McIntire School of Commerce, University of Virginia, "Rational Choice and the Mutual Fund Selection Decision."

2001 Darden Graduate School of Business Administration, University of Virginia, "Understanding Investors Evaluation of Mutual Fund Fees."

2001 Marketing Science Conference (Frankfurt, Germany), "Understanding Investors' Evaluation of Mutual Fund Fees."

2000 Heinz School of Public Policy, Carnegie Mellon University, "Advertising Mutual Fund Returns: A Critical Analysis of a U.S. Securities and Exchange Commission Proposal to Change Advertising Law."

1999 Darden Graduate School of Business Administration, University of Virginia, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Kellogg School of Management, Northwestern University, "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Sawtooth Software Advanced Research Forum (SanDiego), "Stochastic Prediction in Multinomial Logit Models: Applications to Conjoint Analysis."

1999 The U.S. Securities and Exchange Commission (Washington DC), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Association for Consumer Research Conference (Columbus), "Bargain Hunting or Star Gazing? How Consumers Choose Mutual Funds."

1999 Marketing Science Conference (Syracuse), "Stochastic Prediction in Multinomial Logit Models."

1998 Columbia Business School, Columbia University, "Efficient Fee Structures for Mutual Funds."

1998 Marketing Science Conference (INSEAD), "Efficient Fee Structures for Mutual Funds."

1997 Fall INFORMS Conference (Dallas), "A Cross-Category Analysis of Retailers' Promotional Strategies."

**Appendix A**

1997 Marketing Science Conference (Berkeley), "Signaling New Product Quality When Firms Have Reputations."

1996 Fall INFORMS Conference (New Orleans), "Private-Labels and the Channel Relationship: A Cross-Category Analysis."

1995 Marketing Science Conference (Tucson), "A Channel Theory of Private-Labels."


**Honors and Awards**

"Top 5 Business Books of 2008," *Kiplinger*

Wachovia Award for Excellence, Practitioner Publication (2008)
- In winning this award became only Darden faculty member to have received the faculty excellence award in three areas (peer-reviewed publication, practitioner publication and course materials)

Wachovia Award for Excellence, Publication in Peer-Reviewed Journal (2006)

Wachovia Award for Pedagogical Excellence in Course Materials,
The Darden School, University of Virginia (2003)

British Petroleum Term Chair in Management Science, Graduate School of Industrial Administration, Carnegie Mellon University (2000)

Runner-up, Davidson Award for the best paper published in the *Journal of Retailing* (1999)

Recipient of a *Marketing Science Institute* research grant. (1999)

Clayton Award, *Marketing Science Institute* (1996).


**Consulting Activity – Representative Firms**

Cornerstone Research
Jones Day, LLC
Latham & Watkins, LLC
Debevoise & Plimpton, LLC
IRS
Jenner & Block, LLC
Sidley Austin, LLC

**Appendix B**

Ronald T. Wilcox, Ph.D.                                                    October 2023

# Prior Testimony[1]

*Amazon.com, Inc. & Subsidiaries v. Commissioner of Internal Revenue*, United States Tax Court, Case No. 31197-12. Deposed, August 2014. Testified at trial, December 2014.

*Ahmed D. Hussein v. Sheldon Razin et al.*, Superior Court of the State of California for the County of Orange, Case No. 30-2013-00679600-CU-NP-CJC. Deposed, June 2015.

*Infinity Sales Group, LLC v. Valassis Communications, Inc.*, United States District Court for Southern District of Florida, West Palm Beach Division, Case No. 9:15-cv-80463-Rosenberg/Hopkins. Deposed, June 2016.

*Morales et al. v. Kraft Food Group, Inc.*, United States District Court for the Central District of California, Case No. 2:14-cv-04387-JAK-PJW. Testified at evidentiary hearing, May 2017.

*Stephen Hadley et al. v. Kellogg Sales Company*, United States District Court for the Northern District of California, Case No. 5:16-cv-04955-LHK (HRL). Deposed, June 2018 and May 2019.

*Trinidad Lopez et al. v. Liberty Mutual Insurance Company*, United States District Court for the Central District of California, Case No. 2:14-cv-05576 BRO (JCx). Deposed, July 2018.

*Joyce Walker et. al. v. Life Insurance Company of the Southwest*, United States District Court for the Central District of California, Case No. 2:10-cv-09198-JVS-JDE. Deposed, October 2018.

*Monster Energy Ltd v. The Coca-Cola Company*, International Court of Arbitration, Case No. 01-18-0004-0759. Arbitration hearing, April–May 2019.

*Dennis Macdougal et. al. v. American Honda Motor Co. Inc. and Honda North America Inc.*, United States District Court for the Central District of California, Case No. 17-cv-1079. Deposed, May 2019.

*Seegert et. al. v. Rexall Sundown, Inc.*, United States District Court for the Southern District of California, Case No. 3:17-cv-01243-JAH-JLB. Deposed, June 2019.

*Hudock et. al. v. LG Electronics U.S.A, Inc.*, United States District Court, District of Minnesota, Case No. 16-cv-01220 JRT-KMM. Deposed, July 2019.

*Braverman et. al. v. BMW of North America, LLC.*, United States District Court for the Central District of California, Western Division. Case No. 8:16-CV-00966-TJH-SS. Deposed, September 2019.

---

[1] The party I worked for is underlined.

**Appendix B**

*Paul Stockinger et. al. v. Toyota Motor Sales U.S.A Inc.*, United States District Court for the Central District of California. Case No: 17-cv-00035-VAP-KS. Deposed, November 2019.

*Patrick McMorrow et. al. v. Mondelez International, Inc.*, United States District Court for the Southern District of California. Case No: 3:17-cv-02327-BAS-JLB. Deposed, November 2019.

*Government of the United States Virgin Island v. Toyota Motor Corporation et al.*, In the Superior Court of the Virgin Islands Division of St. Thomas and St. John. Case No: ST-17-CV-218. Deposed, February 2020.

*Richard Sotelo et. al. v. Rawling Sporting Goods Company Inc.*, United States District Court for the Central District of California. Case No. 2:18-cv-09166-GW-MAA. Deposed, May 2020.

*Javier Cardenas et. al. v. Toyota Motor Corporation et al.*, United States District Court for the Southern District of Florida. Case No. 18-22798-CIV-MORENO. Deposed, November 2020. Testified at trial, March 2023.

*Asphericon GmbH v. Thorlabs Inc.*, United States District Court for the District of New Jersey, Case No. 2:15-cv-00679 (ES) (JAD). Deposed, November 2020.

*Lijie Mao v. Nissan Canada Inc. and Nissan North America Inc.*, Superior Court of Justice, Ontario, Canada. Case No. CV-19-00003730-00CP. Deposed, December 2020.

*District of Columbia v. Marriott International Inc.*, Superior Court for the District of Columbia, Case No. 2019 CA 004497 B. Deposed, March, 2021.

*Renee Cabrera et al. v. Google LLC*, United States District Court for the Northern District of California, San Jose Division. Case No. 5:11-cv-01263-EJD. Deposed, December 2021.

*Mark D. Chapman, et al. v. General Motors LLC*, United States District Court for the Eastern District of Michigan. Case No. 2:19-cv-12333-TGB-DRG. Deposed, June 2022.

*Lance Dutcher et al. v. Google LLC, d/b/a YouTube, and YouTube, LLC*, Superior Court of the State of California County of Santa Clara. Case No. 20CV366905. Deposed, July 2022.

*In re Fifth Third Early Access Cash Advance Litigation*, United States District Court for the Southern District of Ohio Western Division. Case no. 1:12-CV-00851. Deposed, July 2022.

*The People of the State of California v. HomeAdvisor, Inc. and Angi HomeServices, Inc.*, Superior Court of the State of California City and County of San Francisco. Case No.: CGC-18-565008. Deposed, October 2022.

*United States of America, et al. v. Google LLC*, United States District Court for the District of Columbia. Case No.: 1:20-cv-03010-APM. Deposed, October 2022.

**Appendix B**

*In re* <u>University of Southern California</u> *Tuition and Fees COVID-19 Refund Litigation*, United States District Court for the Central District of California, Western Division. Case No. 2:20-cv-4066-DMG-PVC. Deposed, February 2023.

*Montiqueno Corbett et al. v.* <u>PharmaCare U.S., Inc.</u>, United States District Court for the Southern District of California. Case No. 3:21-cv-00137-JES-AHG. Deposed, August 2023.

**Appendix C**

# Documents Relied Upon List

**Academic Articles**

- Allenby, Greg M. et al., "Valuation of Patented Product Features," *Journal of Law & Economics* 57, no. 3, 2014, pp. 629–663 at pp. 649–650.

- Ben-Akiva, M. et al. (2019), "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-Based Conjoint Analysis," *Foundations and Trends® in Econometrics*, 10, 1–2, 1–144

- Curran, P. G. (2016), "Methods for the Detection of Carelessly Invalid Responses in Survey Data," *Journal of Experimental Social Psychology*, 66, 4–19

- Kahneman, D. et al. (2006), "Would You Be Happier if You Were Richer? A Focusing Illusion," *Science*, 312, 1908–1910

- Green, P. E. and V. Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5, 2, 103–123

- Kendall, J. M. (2003), "Designing a Research Project: Randomised Controlled Trials and Their Principles," *Emergency Medicine Journal*, 20, 2, 164–168

- Louviere, J. T. (1988), "Conjoint Analysis Modelling of Stated Preferences: A Review of Theory, Methods, Recent Developments and External Validity," *Journal of Transport Economics and Policy*, 22, 1, 93–119

- Manski, C. F. (1996), "Learning about Treatment Effects from Experiments with Random Assignment of Treatments," *The Journal of Human Resources*, 31, 4, 709–733

- Narasimhan, C. and R. T. Wilcox (1998), "Private Labels and the Channel Relationship: A Cross-Category Analysis," *The Journal of Business*, 71, 4, 573–600

- Rogers, G. and Soopramanien, D. (2008), "The Truth is Out There! How External Validity Can Lead to Better Market Decision," *International Journal of Market Research*, 51, 2, 163–180

- Wilcox, R. T. (2003), "A Practical Guide to Conjoint Analysis," *Darden Business Publishing, University of Virginia,* UVA-M-0675, 1–8

- Wilcox, R. T. (2003), "Bargain Hunting or Star Gazing? Investors' Preferences for Stock Mutual Funds," *The Journal of Business*, 76, 4, 645–663

- Wilcox, R. T. (2009), "Portland Trail Blazers," *Darden Business Publishing, University of Virginia*, UVA-M-0773, 1–10

- Wilcox, R. T. and R. Goldberg (2009), "Heinz Ketchup: Pricing the Product Line," *Darden Business Publishing, University of Virginia*, UVA-M-0777, 1–10

**Appendix C**

## Bates Stamped Documents

- HAIN-HOWARD-00009052

## Books and Book Chapters

- Allenby, G. M. et al. (2019), "Economics Foundation of Conjoint Analysis," in *Handbook of the Economics of Marketing, Volume 1*, J.P H. Dubé and P. E. Rossi, eds. Amsterdam, Netherlands: North-Holland/Elsevier

- Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, Third Edition*, Washington, DC: The National Academies Press

- Diamond, S. S. and J. B. Swann (2022), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*, Chicago, IL: American Bar Association

- Kaye, D. H. and D. A. Freedman (2011), "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence, Third Edition*, Washington, D.C.: The National Academies Press

- Kotler, P. and G. Armstrong (2018), *Principles of Marketing, Seventeenth Edition*, Harlow, United Kingdom: Pearson Education Limited

- Nock, S. L. and T. M. Guterbock (2010), "Survey Experiments," in *Handbook of Survey Research, Second Edition*, Bingley, UK: Emerald Group Publishing Limited

- Orme, B. K. (2014), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Edition*, Manhattan Beach, CA: Research Publishers LLC

- Orme, B. K. and K. Chrzan (2017), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, Orem, UT: Sawtooth Software, Inc.

- Payne, S. L. B. (1951), "What's the Good Word?" in *The Art of Asking Questions: Studies in Public Opinion,3*, Princeton, NJ: Princeton University Press

## Data

- Modified Dennis Survey

- Consumer Behavior Survey

- Labeling Survey

**Appendix C**

## Depositions

- Deposition of J. Michael Dennis, October 16, 2023
- Deposition of Jason Ginsberg, April 4, 2023
- Deposition of Steven Gaskin, October 10, 2023, with Exhibits and Appendices

## Expert Reports

- Expert Report of Colin B. Weir, September 5, 2023
- Expert Report of J. Michael Dennis, Ph.D., September, 5, 2023, and backup materials
- Expert Report of Steven P. Gaskin, September 5, 2023

## Legal Documents

- Plaintiffs' Notice of Motion for Class Certification, *Tracy Howard et al. v. The Hain Celestial Group, Inc. d/b/a Earth's Best*, Case No. 3:22-cv-00527-VC, September 5, 2023
- Second Amended Class Action Complaint for Violation of The California Unfair Competition Law; False Advertising; and Consumers Legal Remedies Act; False Advertising; Fraud, Deceit; and/or Misrepresentation; Unfair Business Practices; and Unjust Enrichment, *Tracy Howard et al. v. The Hain Celestial Group, Inc. d/b/a Earth's Best*, November 2, 2022, with Exhibits

## Public Press Articles

- "Age and Sex Composition: 2020," *2020 Census Briefs*, May, 2023, https://www2.census.gov/library/publications/decennial/2020/census-briefs/c2020br-06.pdf

## Websites

- "Earth's Best Organic," *Earth's Best Organic,* https://www.earthsbest.com/
- "Earth's Best Organic Chicken Casserole with Vegetables and Rice Baby Food Pouch – 4.5oz," *Target*, https://www.target.com/p/earth-39-s-best-organic-chicken-casserole-with-vegetables-and-rice-baby-food-pouch-4-5oz/-/A-53134245#lnk=sametab
- "Earth's Best Organic Fruit Yogurt Smoothie Toddler Food Pineapple Orange Banana, 4.2 oz," *Walmart*, https://www.walmart.com/ip/Earth-s-Best-Organic-Fruit-Yogurt-Smoothie-Toddler-Food-Pineapple-Orange-Banana-4-2-oz-Pouch/34193531?from=/search

**Appendix C**

- "Earth's Best Organic Strawberry Banana Fruit Yogurt Smoothie, 4.2 oz," *Whole Foods Market*, https://www.wholefoodsmarket.com/product/earths-best-organic-strawberry-banana-fruit-yogurt-smoothie-42-oz-b004mui15u

- "Earth's Best Organic Veggie Red Lentil Bake Puree, 4.5 oz," *Whole Foods Market*, https://www.wholefoodsmarket.com/product/earths-best-organic-veggie-red-lentil-bake-puree-45-oz-b08jdt4v1w

- "Earth's Best Protein Puree, Veggie Red Lentil Bake with Olive Oil, 3 Hearty Meals," *Instacart.com*, https://www.instacart.com/landing?product_id=21286593&postal_code=10021

- "Earth's Best Stage 3 Organic Toddler Chicken Casserole with Vegetables & Grain Puree, 4.5 oz Pouch," *Walmart*, https://www.walmart.com/ip/Earth-s-Best-Organic-Stage-3-Baby-Food-Chicken-Casserole-with-Vegetables-Rice-4-5-oz-Pouch/144773738

- "FAQs: Questions About Plum?" *Plum Organics*, https://plumorganics.com/faqs/

- "Four Bean Feast Protein Pouch," *Earth's Best Organic*, https://www.earthsbest.com/product/four-bean-feast-organic-protein-pouch/

- "Fruit & Yogurt Strawberry Banana," *Gerber*, https://www.gerber.com/fruit-yogurt-strawberry-banana

- "GBK Collective," *GBK Collective*, https://www.gbkcollective.com/

- "Gerber Baby Food Toddler Apple Pear Peach, 3.5 Oz Pouch," *Amazon*, https://www.amazon.com/Gerber-Purees-Apple-Toddler-Pouches/dp/B079HNP18P

- "Gerber Organic for Toddler Banana Raspberry & Yogurt with Vanilla, 3.5 oz Pouch," *Walmart*, https://www.walmart.com/ip/Gerber-Organic-for-Toddler-Yogurt-Toddler-Food-Banana-Raspberry-Vanilla-3-5-oz-Pouch/268741748

- "Gerber Organic Pear Spinach Baby Food, 3.5 Oz Pouch," *Amazon*, https://www.amazon.com/Gerber-Organic-Foods-Pears-Spinach/dp/B00D2PL24S

- "Gerber Snacks for Toddler, Fruit & Yogurt Strawberry Banana, 3.5 oz Pouch," *Walmart*, https://www.walmart.com/ip/Gerber-Snacks-for-Toddler-Fruit-Yogurt-Strawberry-Banana-3-5-oz-Pouch/565405589

- "Organic Apple Mango Raspberry Avocado Oatmeal," *Gerber*, https://www.gerber.com/organic-mango-raspberry-avocado-oatmeal-baby-food

- "Our Promise," *Earth's Best Organic*, https://www.earthsbest.com/why-earths-best/our-promise/

- "Our Quality Standards & Commitment to Organic," *Happy Family Organics*, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/

**Appendix C**

- "Veggie Red Lentil Bake Organic Protein Pouch," *Earth's Best Organic*, https://www.earthsbest.com/product/veggie-red-lentil-bake-organic-protein-pouch/

- I also relied upon all materials cited in my report.

# Appendix D

# Modified Dennis Survey

### SURVEY QUESTIONNAIRE

### CONSUMER PERCEPTION SURVEY HAS THE FOLLOWING STRUCTURE

- **SCREENER INSTRUMENT – IDENTIFIES ELIGIBLE RESPONDENTS FOR THE MAIN SURVEY**

    - **MAIN SURVEY – ELIGIBLE RS ARE RANDOMLY ASSIGNED TO GROUP 1 TEST OR GROUP 2 ALT**

- **FINAL BATTERY – ALL RESPONDENTS COMPLETING THE MAIN SURVEY ARE ASSIGNED THE FINAL BATTERY.**

**Appendix D**

## SCREENER SURVEY TO IDENTIFY ELIGIBLE RESPONDENTS

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

---

[ASK ALL]
[PROMPT]P_STATE

Let's start with an easy question. Where do you live?
[Dropdown of U.S. States, including Washington DC, include a Not in USA option]

**TERMINATE IF NOT IN CALIFORNIA**

---

**Appendix D**

[ASK ALL]
D_GENDER
[SP]

What is your gender?
Male ...................................................................................... 1
Female ................................................................................... 2
Non-Binary …………………………………………………………3

**NO TERMINATIONS**

---

D_AGE
      What is your age?

             Less than 18…………1 **TERMINATE**
             18-29 ……………… 2
             30-39……………… 3
             40-49……………… 4
             50-59……………… 5
             60-69………………6
             70 AND OVER ………7

**TERMINATE IF UNDER AGE 18**

**TERMINATE IF AGE AND GENDER INFORMATION DO NOT MATCH PANELIST PROFILE DATA**

---

**Appendix D**

--------------------------------------------------------------------------------

[RECAPTCHA TEST. USE TRAFFIC LIGHT-TYPE RECAPTCHA. AFTER THREE FAILURES, TERMINATE]

--------------------------------------------------------------------------------

D_HISPAN. [SINGLE SELECT]

Are you of Hispanic, Latino, or of Spanish origin?
- o  Yes
- o  No

--------------------------------------------------------------------------------

RACE. [SINGLE SELECT]
What do you consider to be your race?
- o  White
- o  Black or African American
- o  American Indian or Alaska Native
- o  Asian
- o  Native Hawaiian or Other Pacific Islander
- o  Multi-racial
- o  Some other race
- o  Prefer not to say

--------------------------------------------------------------------------------

EDUC. What is the highest level of education that you have completed?
- o  Less than High School
- o  High School or GED
- o  Completed Technical or Trade School
- o  Some College
- o  College degree (4 year)
- o  Post-graduate course work or degree

**NO TERMINATIONS**

**Appendix D**

---

**[SINGLE SELECT]**
**PRIMARY_SHOP**
How much of the grocery shopping do you do for your household? Please select one.

- o   All of it
- o   Most of it
- o   About half
- o   Not much of it
- o   None of it

**[TERMINATE IF 'NONE OF IT' IS SELECTED]**

**Appendix D**

[MULTI-SELECT; RANDOMIZE RESPONSE LIST; ANCHOR NONE OF THESE.]
INDUSTRY.
Please indicate which types of companies you or a member of your household have worked **in the past 12 months**, if any. Please select all that apply.

- o  Marketing or market research firm **TERMINATE**
- o  Public relations firm **TERMINATE**
- o  Hair care products company
- o  Aerospace manufacturer
- o  College or university
- o  Hospital (general or specialty)
- o  Federal government agency
- o  State government agency
- o  City or county office
- o  Construction (residential or commercial)
- o  Agricultural/farm/agribusiness
- o  Computing/Information technology
- o  Financial services firm
- o  Insurance company
- o  Food service company
- o  Transportation company
- o  Real estate company
- o  None of these

**[TERMINATE IF R SELECTS** 'MARKETING OR MARKET RESEARCH FIRM'; 'PUBLIC RELATIONS FIRM']

**Appendix D**

[SELECT ALL THAT APPLY; RANDOMIZE RSPONSE LIST, BUT ANCHOR 'NONE OF THESE'. CANNOT SELECT A PRODUCT AND NONE OF THESE]
**PAST_SURVEY**
Have you taken any surveys or participated in other kinds of research **in the last 30 days** on any of these topics? Please select all that apply.

o Hair care products
o Toothpaste/Oral care
o Sporting goods or outdoor gear
o Advertisements on TV
o Beverage products
o Snack food products
o Skin care products
o Clothing
o Websites you visit
o Food products for toddlers and kids **TERMINATE**
o Video Games
o None of these

**TERMINATE IF R SELECTS 'FOOD PRODUCTS FOR TODDLERS AND KIDS'**

INSERT NEW SCREEN.
Thank you for telling us about yourself.

**Appendix D**

[ASK ALL]

**S_PROD.**

Have you purchased, or not purchased, any of these types of health products in the **past 12 months**?
Some of these are not common products, so please select **YES** only if you are absolutely sure you purchased the product. Select **NO** if you did <u>not</u> purchase the product.

[RANDOMIZE RESPONSE LIST]

|  | Yes | No |
|---|---|---|
| Protein powders | [ ] | [ ] |
| Creatine | [ ] | [ ] |
| Multivitamins | [ ] | [ ] |
| Energy bars/energy drinks | [ ] | [ ] |
| Digestive aids | [ ] | [ ] |
| Dietary supplements | [ ] | [ ] |

**NO TERMINATIONS HERE**

**Appendix D**

[MULTI-SELECT. RANDOMIZE PRODUCT TYPES. ANCHOR 'None of the above']

S_PURCHASE. Please think about food products you have purchased **since 2018** (approximately the past six years.) Please select the types of food products, if any, you purchased **since 2018** for your personal use (not for resale).

- o Beverages/shakes for weight loss/dieting
- o Food/Beverages for infants, toddlers, or other young children
- o Food/Beverage nutritional products for seniors
- o High protein snack food products
- o None of the above [ANCHOR]

[PROCEED IF R SELECTED AT S_PURCHASE = 'Food/Beverages for infants, toddlers, or other young children']

---

MULTI-SELECT
S_PURCHASE_2.

Again, please think about food and/or beverage purchases you have made **since 2018 to the present**. This time, please think about purchases, if any, made for children during this time period. We want to know about the ages of the children for whom you made any food and/or beverage purchases **since 2018.**

Please select any age ranges that apply or select "None of these."
- o Less than 24 months old (less than 2 years old)
- o 24 months to less than 5 years old
- o 5 years to less than 10 years
- o 10 to less than 18 years old
- o None of these [ANCHOR, EXCLUSIVE]

[PROCEED IF R SELECTS 'LESS THAN 24 MONTHS OLD']

---

**Appendix D**

MULTI-SELECT. RANDOMIZE RESPONSE OPTIONS, BUT KEEP 'NONE OF THESE' ANCHORED.'

S_PURCHASE_3. Again, please think about specific types of food and/or beverage purchases you have made **since 2018 to the present**. This time, please think about purchases you made for children **under the age of 2 years** (less than 24 months old).

Please select food/beverage products, if any, that you purchased since 2018 for children under the age of 2 years (less than 24 months).

- o Smoothie pouch/Food in pouch
- o Baby formula
- o Baby biscuit snack
- o Baby food purees
- o Pediatric shakes
- o Pediatric electrolytes
- o Premade meals for toddlers
- o None of these [ANCHOR, EXCLUSIVE]

**Appendix D**

MULTI-SELECT FOR ALL RESPONSE OPTIONS, BUT EXCLUSIVE FOR 'NONE OF THESE.' RANDOMIZE RESPONSE OPTIONS; BUT ANCHOR "STORE BRAND" 'SOMETHING ELSE' 'NONE OF THESE'.]

S_BRAND. Please select any **FOOD/BEVERAGE brands** you have purchased for children **under the age of 2 years** (less than 24 months old) **since 2018 to the present**. Please select all that apply or "None of these."

- o   Earth's Best
- o   Happy Family Organics
- o   Plum Organics
- o   Gerber, Beech-Nut, Sprout,
- o   Annie's Organics
- o   GoGo Squeez
- o   Gogurt
- o   Danimals
- o   HappyTot
- o   Peter Rabbit Organics
- o   Once Upon a Farm
- o   Bamba
- o   Organics by Chomet
- o   Store Brand/Private Label [ANCHOR]
- o   Something else [ANCHOR]
- o   None of these [ANCHOR, EXCLUSIVE]

**TERMINATE IF R SELECTS FICTITIOUS BRAND 'ORGANICS BY CHOMET' OR 'NONE OF THESE'**

**Appendix D**

ELIGIBILITY CHECK. PROCEED IF S_BRAND =

      EARTH'S BEST OR
      HAPPY FAMILY ORGANICS OR
      PLUM ORGANICS OR
      GERBER OR
      BEECH-NUT OR
      SPROUT OR
      ANNIE'S ORGANICS OR
      GOGO SQUEEZ OR
      GOGURT OR
      DANIMALS OR
      PETER RABBIT ORGANICS OR
      ONCE UPON A FARM OR
      BAMBA
OTHERWISE TERMINATE

**Appendix D**

---

[DISABLE BACK BUTTON]

This survey asks consumers about **food products for young children.**

---

[SINGLE SELECT. RANDOMIZE RESPONSE OPTIONS; ANCHOR DON'T KNOW AT BOTTOM. DISABLE BACK BUTTON]

**S_CONFIRM.**

Please confirm your understanding of this survey. **What is this survey about?** Please select one.

- o   Ordering groceries online
- o   Food products for young children   **PROCEED TO NEXT QUESTION**
- o   Hair care products
- o   Aspirin products
- o   Don't know

**TERMINATE IF R DOES NOT SELECT PRODUCT '**Food products for young children'

---

**Appendix D**

**W1**

You have been selected to participate in our survey project.
To participate in this survey, you must agree to these instructions.

- o Answer the questions with your honest answers and opinions. Do not guess.
- o Answer the questions by yourself and without asking anybody else for help.
- o Answer the questions without getting help from a website or other materials.
- o Answer all the questions in one sitting and not stopping in the middle.
- o

Do you agree to our instructions?
- o Yes, I agree to do this
- o No, I do not agree to do this **TERMINATE**

**TERMINATE ALL CASES THAT DO NOT AGREE**

**CREATE DOV ELIGIBLE3 = 1 WHERE W1 = YES**

**WHERE ELIGIBLE3=1, RANDOMLY ASSIGN RESPONDENTS TO EITHER:**

**GROUP = 1 TEST**
**GROUP = 2 CONTROL**

# SCREENER IS COMPLETE

## MAIN STUDY INTERVIEW

**Appendix D**

**INTRODUCTION FOR ALL GROUPS**

---

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

For this survey, we will be showing you a **FRUIT YOGURT SMOOTHIE** product package.

In answering the survey questions, please suppose you are considering purchases **for a child or children under the age of 2 years** (less than 24 months).

Because we want you to take your time, you might need to wait a few seconds before going to the next screen.

---------------------------------------------------------------------------------------------------

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

It is very important that you complete the rest of the survey in one sitting – without any interruption. We need about five minutes of your uninterrupted time.

If you cannot take our survey in one sitting, please quit the survey now and come back another time to complete the survey when you have more time.

---------------------------------------------------------------------------------------------------

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

In answering the survey questions about shopping for children under the age of two years, **it is also important that you base your answers only on the FRUIT YOGURT SMOOTHIE packaging that we show you.**

---

**Appendix D**

[NEW SCREEN. [10-SECOND SPEED BUMP. IF R CLICKS THE IMAGE, ENLARGE THE IMAGE IN A POP-UP BOX]

Here is the **front and back** of the product packaging. Please examine it like you would in a store considering a product for purchase. You can click on each image to enlarge it.

IMAGE TO SHOW ON SCREEN IS BELOW WHERE GROUP = 1 TEST FOLLOWED BY THE ENLARGED GROUP 1 = TEST IMAGE TO USE IF THE R CLICKS ON THE IMAGE]




**Appendix D**

ENLARGED IMAGE FOR GROUP =1 TEST – SHOW IN POP-UP BOX IF R CLICKS ON IMAGE





IMAGE TO SHOW ON SCREEN IS BELOW WHERE GROUP = 2 ALT; FOLLOWED BY THE
ENLARGED IMAGE TO USE IF THE R CLICKS ON THE IMAGE]




ENLARGED IMAGE FOR GROUP =2 TEST – SHOW IN POP-UP BOX IF R CLICKS ON IMAGE



**Appendix D**



**Appendix D**

---

Q_EXAMINE.

Were you able to examine the product?
- o  Yes
- o  No

**NO TERMINATIONS**

---

---

[10 SECOND SPEED BUMP]

We will show you some possible ways that people might or might not understand the meaning of the packaging we just showed you when shopping for children under the age of two years (less than 24 months).

We want you to tell us whether you think the product packaging **does communicate** that meaning or whether you think the product packaging **does not communicate that meaning**.

There are no right answers or wrong answers. We just want your honest opinions.

If you do not have an opinion, please select "Don't know / not sure."

---

**Appendix D**

---------------------------------------------------------------

NEW SCREEN
You will have 30 seconds to answer the next question.

---

**Appendix D**

- 20-SECOND SPEED BUMP FOR EACH QUESTION
- MEASURE THE LENGTH OF TIME SPENT ON SCREEN FOR EACH QUESTION
- RANDOMIZE THE ORDER OF THE RESPONSE OPTIONS AND KEEP FIXED FOR EACH RESPONDENT. THAT IS, FOR A RANDOM HALF OF THE RESPONDENTS, THE TOP REPONSE OPTION IS: <u>does</u> communicate this. FOR THE OTHER HALF OF THE RESPONSE OPTIONS, THE TOP RESPONSE OPTION IS: <u>does not</u> communicate this.
- FOLLOW INSTRUCTIONS FOR WHETHER TO SHOW GROUP 1 TESTOR GROUP 2 CONTROL PICS.

**Appendix D**

**CP_1**

IF GROUP = 1 TEST. SHOW POP-UP BOX WITH ENLARGED IMAGE IF R CLICKS ON IMAGE.




**Appendix D**

IF GROUP = 2 ALT, SHOW THE BELOW IMAGE. SHOW POP-UP BOX WITH ENLARGED IMAGE IF R CLICKS ON IMAGE.




When shopping for a child under the age of two years, the product packaging ... Please select one.

- o <u>Does</u> communicate that this product is healthy
- o <u>Does not</u> communicate that this product is healthy
- o Don't know / not sure

**Appendix D**

**FINAL QUESTIONNAIRE SECTION**

**[POST CONSUMER PERCEPTION PART OF THE SURVEY**
**SHOW THIS FINAL QUEX MODULE TO ALL RESPONDENTS COMPLETING**
**CONSUMER PERCEPTION QUESTION]**

---

NEW SCREEN:
Thanks for your answers. You are almost done!

---

[SP]

**CP_BASIS.**

When answering the question about your understanding of the packaging, did you or did you not base your answers on the packaging we showed you in the survey?
- o  Yes, my answer <u>was based</u> on the packaging shown in the survey
- o  No, my answer <u>was not based</u> on the packaging shown in the survey

---

**Appendix D**

[SP]

**P_COUNTY.**

To help us group your responses with those of others, please select the COUNTY in California where you are a resident.

DROP DOWN PICK LIST OF CALIFORNIA COUNTIES, INCLUDING A 'Don't Know' option at the bottom of the list]

---

Alameda County
Alpine County
Amador County
Butte County
Calaveras County
Colusa County
Contra Costa County
Del Norte County
El Dorado County
Fresno County
Glenn County
Humboldt County
Imperial County
Inyo County
Kern County
Kings County
Lake County
Lassen County
Los Angeles County
Madera County
Marin County
Mariposa County
Mendocino County
Merced County
Modoc County
Mono County
Monterey County
Napa County
Nevada County
Orange County
Placer County
Plumas County
Riverside County
Sacramento County
San Benito County
San Bernardino County
San Diego County
San Francisco
San Joaquin County

**Appendix D**

San Luis Obispo County
San Mateo County
Santa Barbara County
Santa Clara County
Santa Cruz County
Shasta County
Sierra County
Siskiyou County
Solano County
Sonoma County
Stanislaus County
Sutter County
Tehama County
Trinity County
Tulare County
Tuolumne County
Ventura County
Yolo County
Yuba County
DON'T KNOW

---

[SP]

**RUCA.**

Which of the descriptions below best describes the area where you live? Please select one.
- o   A large metropolitan area (over 1 million people)
- o   A large city (100,000 up to 1 million people)
- o   A small city or town (10,000 up to 100,000 people)
- o   A very small town or rural area (less than 10,000 people)
- o   Not sure

---

[SP. KEEP RESPONSE OPTIONS IN THE SHOWN ORDER.]

[ASK IF R INDICATED **S_BRAND = EARTH'S BEST**]

**FIRST_PURCH_EARTH.**

Please indicate <u>when</u> you made your <u>first purchase</u> of a **EARTH'S BEST FOOD product** or select "Don't know / not sure."
- o   In the past 12 months
- o   1 to 5 years ago
- o   More than 5 years ago
- o   Don't know / not sure [ANCHOR]

**Appendix D**

[ASK IF FIRST_PURCH_EARTH= 'In the past 12 months' OR '1 to 5 years ago' OR 'More than 5 years ago'; SP; KEEP RESPONSE LIST IN FIXED ORDER]

**HOW_PURCH_TARGET.**

Please select the age of the people for whom you purchased **EARTH'S BEST FOOD products**. We want to know the ages of the people that you thought would be consuming the products. Please select all that apply.
- o Under age 2 years
- o 2 to 5 years
- o 6 to 12 years
- o 13 to 18 years
- o Over age 18 years

[All RESPONDENTS COMPLETING THE MAIN SURVEY. SINGLE SELECT]

**HOW_FREQ_PURCH.**

In the past 12 months, how often did you purchase food marketed to be consumed by infants and toddlers? Please select "Did not purchase" if appropriate.
- o Rarely
- o Somewhat rarely
- o Somewhat frequently
- o Frequently
- o Did not purchase for infants and toddlers

**FINAL SIGN OFF SCREEN**

**Thanks for Your Help in Answering All Our Survey Questions.**

**Appendix E**

Dennis Modification Survey
**Survey Screenshots**
**October 2023**


Intro



**Appendix E**

P_STATE



**Appendix E**

D_GENDER



**Appendix E**

D_AGE



What is your age?

- Less than 18
- 18-29
- 30-39
- 40-49
- 50-59
- 60-69
- 70 and over

Continue

**Appendix E**

CAPTCHA



**Appendix E**

D_HISPAN



**Appendix E**

RACE



13%

What do you consider to be your race?

○ White
○ Black or African American
○ American Indian or Alaska Native
○ Asian
○ Native Hawaiian or Other Pacific Islander
○ Multi-racial
○ Some other race
○ Prefer not to say

Continue

**Appendix E**

EDUC



**Appendix E**

PRIMARY_SHOP



How much of the grocery shopping do you do for your household?
Please select one.

- ○ All of it
- ○ Most of it
- ○ About half
- ○ Not much of it
- ○ None of it

Continue

**Appendix E**

INDUSTRY

21%

Please indicate which types of companies you or a member of your household have worked **in the past 12 months**, if any.
Please select all that apply.

- [ ] Hospital (general or specialty)
- [ ] State government agency
- [ ] Agricultural/farm/agribusiness
- [ ] Insurance company
- [ ] Financial services firm
- [ ] Computing/Information technology
- [ ] Aerospace manufacturer
- [ ] Marketing or market research firm
- [ ] City or county office
- [ ] Public relations firm
- [ ] Hair care products company
- [ ] Food service company
- [ ] Construction (residential or commercial)
- [ ] Federal government agency
- [ ] Transportation company
- [ ] Real estate company
- [ ] College or university
- [ ] None of these

Continue

**Appendix E**

PAST_SURVEY

23%

Have you taken any surveys or participated in other kinds of research **in the last 30 days** on any of these topics?
Please select all that apply.

- Sporting goods or outdoor gear
- Skin care products
- Clothing
- Food products for toddlers and kids
- Toothpaste/Oral care
- Beverage products
- Snack food products
- Video Games
- Hair care products
- Advertisements on TV
- Websites you visit
- None of these

Continue

Case 2:22-cv-00507-VCD Document 192-9 Filed 11/12/24 Page 122 of 293

**Appendix E**



**Appendix E**

S_PROD

Have you purchased, or not purchased, any of these types of health products in the **past 12 months**?
Some of these are not common products, so please select **YES** only if you are absolutely sure you purchased the product. Select **NO** if you did <u>not</u> purchase the product.

|  | Yes | No |
|---|---|---|
| Creatine | ○ | ○ |
| Digestive aids | ○ | ○ |
| Multivitamins | ○ | ○ |
| Energy bars/energy drinks | ○ | ○ |
| Protein powders | ○ | ○ |
| Dietary supplements | ○ | ○ |

Continue

**Appendix E**

S_PURCHASE



Please think about food products you have purchased **since 2018** (approximately the past six years.) Please select the types of food products, if any, you purchased **since 2018** for your personal use (not for resale).

☐ Food/Beverage nutritional products for seniors

☐ High protein snack food products

☐ Beverages/shakes for weight loss/dieting

☐ Food/Beverages for infants, toddlers, or other young children

☐ None of the above

Continue

**Appendix E**

S_PURCHASE_2



34%

Again, please think about food and/or beverage purchases you have made **since 2018 to the present**. This time, please think about purchases, if any, made for children during this time period. We want to know about the ages of the children for whom you made any food and/or beverage purchases **since 2018**.

Please select any age ranges that apply or select "None of these."

☐ Less than 24 months old (less than 2 years old)

☐ 24 months to less than 5 years old

☐ 5 years to less than 10 years

☐ 10 to less than 18 years old

☐ None of these

Continue

**Appendix E**

S_PURCHASE_3

39%

Again, please think about specific types of food and/or beverage purchases you have made **since 2018 to the present**. This time, please think about purchases you made for children **under the age of 2 years** (less than 24 months old).

Please select food/beverage products, if any, that you purchased since 2018 for children under the age of 2 years (less than 24 months).

- [ ] Pediatric electrolytes
- [ ] Baby biscuit snack
- [ ] Pediatric shakes
- [ ] Premade meals for toddlers
- [ ] Baby food purees
- [ ] Baby formula
- [ ] Smoothie pouch/Food in pouch
- [ ] None of these

Continue

**Appendix E**

S_BRAND

44%

Please select any **FOOD/BEVERAGE brands** you have purchased for children **under the age of 2 years** (less than 24 months old) **since 2018 to the present**.

Please select all that apply or "None of these".

- ☐ Danimals
- ☐ GoGo Squeez
- ☐ Annie's Organics
- ☐ Gogurt
- ☐ Once Upon a Farm
- ☐ HappyTot
- ☐ Happy Family Organics
- ☐ Earth's Best
- ☐ Gerber, Beech-Nut, Sprout
- ☐ Organics by Chomet
- ☐ Plum Organics
- ☐ Peter Rabbit Organics
- ☐ Bamba
- ☐ Store Brand/Private Label
- ☐ Something else
- ☐ None of these

Continue

Case 3:22-cv-00507-VC Document 192-9 Filed 11/12/24 Page 128 of 293

**Appendix E**



47%

This survey asks consumers about **food products for young children**.

Continue

**Appendix E**

S_CONFIRM

**Appendix E**

W1



53%

You have been selected to participate in our survey project.
To participate in this survey, you must agree to these instructions.

- Answer the questions with your honest answers and opinions. Do not guess.
- Answer the questions by yourself and without asking anybody else for help.
- Answer the questions without getting help from a website or other materials.
- Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

○ Yes, I agree to do this
○ No, I do not agree to do this

Continue

**Appendix E**

59%

For this survey, we will be showing you a **FRUIT YOGURT SMOOTHIE** product package.

In answering the survey questions, please suppose you are considering purchases **for a child or children under the age of 2 years** (less than 24 months).

Because we want you to take your time, you might need to wait a few seconds before going to the next screen.

Continue

**Appendix E**

61%

It is very important that you complete the rest of the survey in one sitting - without any interruption. We need about five minutes of your uninterrupted time.

If you cannot take our survey in one sitting, please quit the survey now and come back another time to complete the survey when you have more time.

Continue

# Appendix E

64%

In answering the survey questions about shopping for children under the age of two years, **it is also important that you base your answers <u>only</u> on the FRUIT YOGURT SMOOTHIE packaging that we show you**.

Continue

**Appendix E**

Group 1



**Appendix E**

Group 2



**Appendix E**

Q_EXAMINE



**Appendix E**

72%

We will show you some possible ways that people might or might not understand the meaning of the packaging we just showed you when shopping for children under the age of two years (less than 24 months).

We want you to tell us whether you think the product packaging **does communicate** that meaning or whether you think the product packaging **does not communicate that meaning**.

There are no right answers or wrong answers. We just want your honest opinions.

If you do not have an opinion, please select "Don't know / not sure."

Continue

**Appendix E**



**Appendix E**

CP_1 – Group 1



**Appendix E**

CP_1 - Group 2



**Appendix E**



Thanks for your answers. You are almost done!

Continue

**Appendix E**

CP_BASIS

83%

When answering the question about your understanding of the packaging, did you or did you not base your answers on the packaging we showed you in the survey?

○ Yes, my answer was based on the packaging shown in the survey

○ No, my answer was not based on the packaging shown in the survey

Continue

**Appendix E**

P_COUNTY



**Appendix E**

RUCA

88%

**Which of the descriptions below best describes the area where you live?**
Please select one.

○ A large metropolitan area (over 1 million people)

○ A large city (100,000 up to 1 million people)

○ A small city or town (10,000 up to 100,000 people)

○ A very small town or rural area (less than 10,000 people)

○ Not sure

Continue

**Appendix E**

FIRST_PURCH_EARTH



**Appendix E**

HOW_PURCH_TARGET

91%

Please select the age of the people for whom you purchased **EARTH'S BEST FOOD products**. We want to know the ages of the people that you thought would be consuming the products.

Please select all that apply.

- [ ] Under age 2 years
- [ ] 2 to 5 years
- [ ] 6 to 12 years
- [ ] 13 to 18 years
- [ ] Over age 18 years

Continue

**Appendix E**

HOW_FREQ_PURCH



**Appendix E**

Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

# Infant and Toddler Food Labeling Survey

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**
*Notes to respondents in italics*

**[PROGRAMMER: PLACE DEVICE SNIFFER AT BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S10.]**

## Overview

- **Inbound Sample:**  Recruited from US population online panel; click balanced in-bound to US census for age/gender/region
- **Final Sample Size: 600 respondents (300 in Group A, 300 in Group B).**
- **Survey in English only**
- **Use de-duping technology to ensure unique respondents**

## Introduction

Thank you for agreeing to participate in this survey. Please take a few moments to complete our questions.

Please take the survey in one session without interruption. While taking the survey, please do <u>not</u> consult any other source of information (including websites, books or any other person). If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey. For each question, if you don't know or if you don't have an answer, please don't guess.

**[NEXT PAGE]**

S1.  So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, and then click the Continue button to continue. Please enter it exactly as it appears. Do <u>not</u> include any spaces. Type them all together.
**[PROGRAMMER: PIPE IN ONE RANDOMLY SELECTED CODE.  CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE.]**

TEXT BOX: _____

**[PROGRAMMER: TERMINATE IF THE CODE DOES NOT MATCH AFTER THE THIRD TRY.]**

**[NEXT PAGE]**

First, there are a few short questions to determine if you qualify for the study.

**[NEXT PAGE]**

**Screener**

**S10.** Which type of electronic device are you using to take this survey?

*Select one only.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT 7.**
**ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT SELECTS 5, 6, OR 7.**
**ALL OTHERS GO TO S20.]**

1. A laptop/notebook computer
2. A tablet (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3. A desktop computer
4. A smartphone (for example, Apple iPhone, Google Pixel, Samsung Galaxy, or similar)
5. A TV-based browser or video game console (for example, Apple TV, Microsoft Xbox, Sony PlayStation, or similar)
6. An eBook reading device (for example, Kindle, Kobo, Nook, or similar)
7. Other, please specify: _____

**[NEXT PAGE]**

**S20.** Which of the following includes your age?

*Select one only.*

**[PROGRAMMER: DO NOT RANDOMIZE CHOICES.**
**ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT SELECTS 1 OR 6.**
**ALL OTHERS GO TO S30.]**

1. Under 18
2. 18 - 34
3. 35 - 49
4. 50 - 64
5. 65 or older
6. Prefer not to answer

**[NEXT PAGE]**

**S30.** What is your gender?

*Select one only.*

**Appendix F**

[PROGRAMMER: RANDOMIZE CHOICES.
ALLOW ONLY ONE SELECTION.
TERMINATE IF RESPONDENT SELECTS 4. TERMINATE IF AGE AND GENDER INFORMATION DO NOT
MATCH PANELIST PROFILE DATA.
ALL OTHERS GO TO S40.]

1. Male
2. Female
3. Nonbinary
4. Prefer not to answer

S40. In which of the following states do you currently live?

*Select one only.*

[PROGRAMMER: INCLUDE DROPDOWN LIST OF STATES IN ALPHABETICAL ORDER PLUS DISTRICT OF
COLUMBIA AND "None of the above."
ALLOW ONLY ONE SELECTION.
TERMINATE IF RESPONDENT SELECTS "None of the above."
ALL OTHERS GO TO S50.]

[NEXT PAGE]

S50. Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

[PROGRAMMER: RANDOMIZE CHOICES EXCEPT 7.
ALLOW MULTIPLE SELECTIONS.
TERMINATE IF RESPONDENT SELECTS 1 OR 6.
ALL OTHERS GO TO S60.]

1. A company that makes or sells food or beverages (for example, Kroger, General Mills, or Coca-Cola)
2. A company that makes or sells automotive vehicles (for example, Toyota, GM, or Ford)
3. A company that makes or sells sport shoes (for example, Nike, New Balance, or Adidas)
4. A company that makes or sells televisions (for example, Sony, LG, or Samsung)
5. A company that provides accounting or tax preparation services (for example, Intuit, H&R Block, or Jackson Hewitt)
6. A company that provides marketing or market research services (for example, Nielsen or IQVIA)
7. None of the above **[SINGLE PUNCH]**

[NEXT PAGE]

[NEXT PAGE]

**S60.** How many children under age 10, if any, live in your household currently?

*Select one only*.

[PROGRAMMER: ALLOW ONE SELECTION ONLY.
TERMINATE IF RESPONDENT SELECTS "None" OR "Don't know / Unsure."
ALL OTHERS GO TO S70.]

1. None
2. 1
3. 2
4. 3 or more
5. Don't know / Unsure

[NEXT PAGE]

**S70.** You indicated that one or more children under age 10 live in your household currently.

Which of the following products, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

*Select all that apply*.

[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "None of the above" AND "Don't know / Unsure."
ALLOW MULTIPLE SELECTIONS EXCEPT "None of the above" AND "Don't know / Unsure."
TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("Food products").
ALL OTHERS GO TO S80.]

1. Food products
2. Diapers
3. Toys or games
4. Clothes
5. Furniture
6. None of the above **[SINGLE PUNCH]**
7. Don't know / Unsure **[SINGLE PUNCH]**

[NEXT PAGE]

**S80.** You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **brands** of food product, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

**Appendix F**

*Select all that apply.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "None of the above" AND "Don't know / Unsure".
ALLOW MULTIPLE SELECTIONS EXCEPT "None of the above" AND "Don't know / Unsure."
TERMINATE IF RESPONDENT SELECTS "Suave". IF RESPONDENT SELECTS "Earth's Best", GO TO S90;
OTHERWISE GO TO S100.]**

1. Beech-Nut
2. Earth's Best
3. Gerber
4. Happy Tot
5. Plum Organics
6. Suave
7. None of the above **[SINGLE PUNCH]**
8. Don't know / Unsure **[SINGLE PUNCH]**

**S90.** You indicated that you have purchased **Earth's Best food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **Earth's Best food products**, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

*Select all that apply.*

*You can click on each product image to make it bigger.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW / UNSURE."
ALLOW MULTIPLE SELECTIONS EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW / UNSURE."
ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.
TERMINATE IF RESPONDENT SELECTS "NONE OF THE ABOVE" OR "DON'T KNOW / UNSURE."
TERMINATE IF RESPONDENT DOES NOT SELECT AT LEAST ONE OF 1, 2, 3, 4 OR 5.
ALL OTHERS GO TO S120.]**

**Appendix F**

| (1) | Organic Fruit Yogurt Smoothies |  |
|-----|-------------------------------|----------------------|
| (2) | Organic Protein Puree Pouches |  |
| (3) | Organic Letter of the Day Cookies |  |
| (4) | Organic Crunchin' Crackers |  |
| (5) | Organic Peanut Butter Baked Corn Puffs |  |
| (6) | Organic Sunny Day Snack Bars | |



| | | |
|---|---|---|
| **(7)** | Organic Breakfast Biscuits | |
| **(8)** | Organic Garden Veggie Straws | |
| **(9)** | None of the above **[SINGLE PUNCH]** | |
| **(10)** | Don't know / Unsure **[SINGLE PUNCH]** | |

**[SKIP TO S120]**

**S100.** You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following brands of food product, if any, would you <u>consider purchasing</u> for a child or children under age 10 in your household in the next 12 months?

**Appendix F**

*Select all that apply.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "None of the above" AND "Don't know / Unsure".
ALLOW MULTIPLE SELECTIONS EXCEPT "None of the above" AND "Don't know / Unsure."
TERMINATE IF RESPONDENT SELECTS "Suave". TERMINATE IF RESPONDENT DOES NOT SELECT "Earth's
Best." ALL OTHERS GO TO S110.]**

1. Beech-Nut
2. Earth's Best
3. Gerber
4. Happy Tot
5. Plum Organics
6. Suave
7. None of the above **[SINGLE PUNCH]**
8. Don't know / Unsure **[SINGLE PUNCH]**

**S110.** You indicated that you would <u>consider purchasing</u> **Earth's Best food products** for a child or
children under age 10 in your household in the next 12 months.

Which of the following **Earth's Best food products**, if any, would you <u>consider purchasing</u> for a child or
children under age 10 in your household in the next 12 months?

*Select all that apply.*

*You can click on each product image to make it bigger.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW /
UNSURE."
ALLOW MULTIPLE SELECTIONS EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW / UNSURE."
ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES. TERMINATE IF
RESPONDENT SELECTS "NONE OF THE ABOVE" OR "DON'T KNOW / UNSURE." TERMINATE IF
RESPONDENT DOES NOT SELECT AT LEAST ONE OF 1, 2, 3, 4 OR 5.
ALL OTHERS GO TO 120.]**

**Appendix F**

| | | |
|---|---|---|
| **(1)** | Organic Fruit Yogurt Smoothies | |
| **(2)** | Organic Protein Puree Pouches | |
| **(3)** | Organic Letter of the Day Cookies | |
| **(4)** | Organic Crunchin' Crackers | |
| **(5)** | Organic Peanut Butter Baked Corn Puffs | |
| **(6)** | Organic Sunny Day Snack Bars | |



| (7) | Organic Breakfast Biscuits | |
| (8) | Organic Garden Veggie Straws | |
| (9) | None of the above **[SINGLE PUNCH]** | |
| (10) | Don't know / Unsure **[SINGLE PUNCH]** | |

**[NEXT PAGE]**

**S120.** For quality control purposes, please select the "Other" option below and type the word **[INSERT ONE OF 'quality' / 'check' / 'survey' / 'question']** into the space provided.

*Select one only.*

**[PROGRAMMER: RANDOMIZE THE FOUR QUESTION VERSIONS.**
**TERMINATE IF RESPONDENT DOES NOT SELECT "Other" AND ENTER CORRECT WORD INTO "Other" BOX (NOT CASE SENSITIVE).**

**Appendix F**

**ALL OTHERS GO TO MAIN QUESTIONNAIRE.]**

1. Strongly agree
2. Agree
3. Neither agree nor disagree
4. Disagree
5. Strongly Disagree
6. Other. Please specify **[TEXT BOX; DO NOT FORCE RESPONSE IF SELECTED]**

**Appendix F**

## MAIN QUESTIONNAIRE

**[PROGRAMMER: RANDOMLY ASSIGN QUALIFYING RESPONDENTS TO EITHER SURVEY = TEST (50%) OR SURVEY = CONTROL (50%). FOR BOTH GROUPS, BLOCK RANDOMIZE THE QUESTION PAIRS IN Q10– Q100. (IN OTHER WORDS, RANDOMIZE BUT ENSURE THAT Q20 ALWAYS COMES IMMEDIATELY AFTER Q10, Q40 ALWAYS COMES IMMEDIATELY AFTER Q30, Q60 ALWAYS COMES IMMEDIATELY AFTER Q50, Q80 ALWAYS COMES IMMEDIATELY AFTER Q70, AND Q100 ALWAYS COMES IMMEDIATELY AFTER Q90.)]**

*We will now show you the packaging for some food products for children. We want to know whether the product packaging tells you anything about the age or ages of the children these products are intended for. For each question, if you don't know or if you don't have an answer, please don't guess.*

**[NEXT PAGE]**

**Q10**. Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only*.

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_VEGGIE_PROTEIN_PUREE_FRONT AND PACKAGING_VEGGIE_PROTEIN_PUREE_BACK; IF SURVEY = CONTROL, DISPLAY PACKAGING_VEGGIE_PROTEIN_PUREE_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICK ON IMAGES.]**

PACKAGING_VEGGIE_PROTEIN_PUREE_FRONT:



PACKAGING_VEGGIE_PROTEIN_PUREE_BACK:



**Appendix F**

**[PROGRAMMER: RANDOMIZE ORDER OF 1 AND 2, KEEPING ORDER FIXED ACROSS Q10, Q30, Q50, Q70, AND Q90. ALLOW ONE SELECTION ONLY.**
**IF RESPONDENT SELECTS 1 ("Yes, this packaging tells me something..."), GO TO Q20. ALL OTHERS GO TO Q30.]**

1. Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
2. No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
3. Don't know / Unsure

**[NEXT PAGE]**

**Q20**. You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_VEGGIE_PROTEIN_PUREE_FRONT AND PACKAGING_VEGGIE_PROTEIN_PUREE_BACK; IF SURVEY = CONTROL, DISPLAY PACKAGING_VEGGIE_PROTEIN_PUREE_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES]**

**[PROGRAMMER: RANDOMIZE ORDER 1-2.**
**ALLOW  ONLY ONE SELECTION.**
**ALL GO TO Q30.]**

1. The product is intended **specifically** for children <u>under 2 years</u>
2. The product is intended **specifically** for children <u>2 years and over</u>
3. Neither of the above **[SINGLE PUNCH]**
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**Appendix F**

**Q30**. Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only*.

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_YOGURT_SMOOTHIE_FRONT AND PACKAGING_YOGURT_SMOOTHIE_BACK; IF SURVEY = CONTROL, DISPLAY PACKAGING_ YOGURT_SMOOTHIE_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

PACKAGING_YOGURT_SMOOTHIE_FRONT:



PACKAGING_YOGURT_SMOOTHIE_BACK:



**[PROGRAMMER: RANDOMIZE ORDER OF 1 AND 2, KEEPING ORDER FIXED ACROSS Q10, Q30, Q50, Q70, AND Q90. ALLOW ONE SELECTION ONLY.**
**IF RESPONDENT SELECTS 1 ("Yes, this packaging tells me something..."), GO TO Q40. ALL OTHERS GO TO Q50.]**

1. Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
2. No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
3. Don't know / Unsure

**[NEXT PAGE]**

Q40. You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_YOGURT_SMOOTHIE_FRONT AND PACKAGING_YOGURT_SMOOTHIE_BACK; IF SURVEY = CONTROL, DISPLAY PACKAGING_YOGURT_SMOOTHIE_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

**[PROGRAMMER: RANDOMIZE ORDER 1-2.**
**ALLOW  ONLY ONE SELECTION.**
**ALL GO TO Q50.]**

1. The product is intended **specifically** for children <u>under 2 years</u>
2. The product is intended **specifically** for children <u>2 years and over</u>
3. Neither of the above **[SINGLE PUNCH]**
4. Don't know / Unsure **[SINGLE PUNCH]**

**Q50**. Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only*.

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_CRUNCHIN_CRACKERS_FRONT, PACKAGING_CRUNCHIN_CRACKERS_BACK, PACKAGING_CRUNCHIN_CRACKERS_SIDE1, AND PACKAGING_CRUNCHIN_CRACKERS_SIDE2; IF SURVEY = CONTROL, PACKAGING_CRUNCHIN_CRACKERS_ FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

PACKAGING_CRUNCHIN_CRACKERS_FRONT:



**Appendix F**

PACKAGING_CRUNCHIN_CRACKERS_BACK:



**Appendix F**

PACKAGING_CRUNCHIN_CRACKERS_SIDE1:



**PACKAGING_CRUNCHIN_CRACKERS_SIDE2:**



**[PROGRAMMER: RANDOMIZE ORDER OF 1 AND 2, KEEPING ORDER FIXED ACROSS Q10, Q30, Q50, Q70, AND Q90. ALLOW ONE SELECTION ONLY.**
**IF RESPONDENT SELECTS ("Yes, this packaging tells me something..."), GO TO Q60. ALL OTHERS GO TO Q70.]**

1.  Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
2.  No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
3.  Don't know / Unsure

**[NEXT PAGE]**

**Q60.** You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_CRUNCHIN_CRACKERS_FRONT, PACKAGING_CRUNCHIN_CRACKERS_BACK, PACKAGING_CRUNCHIN_CRACKERS_SIDE1, AND PACKAGING_CRUNCHIN_CRACKERS_SIDE2; IF SURVEY = CONTROL, DISPLAY PACKAGING_CRUNCHIN_CRACKERS_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

**[PROGRAMMER: RANDOMIZE ORDER 1-2.**
**ALLOW ONLY ONE SELECTION.**
**ALL GO TO Q70.]**

1.  The product is intended **specifically** for children <u>under 2 years</u>
2.  The product is intended **specifically** for children <u>2 years and over</u>
3.  Neither of the above **[SINGLE PUNCH]**
4.  Don't know / Unsure **[SINGLE PUNCH]**

**Q70**. Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only*.

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_LOTD_FRONT, PACKAGING_LOTD_BACK, PACKAGING_LOTD_SIDE1, AND PACKAGING_LOTD_SIDE2; IF SURVEY = CONTROL, DISPLAY PACKAGING_LOTD_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

PACKAGING_LOTD_FRONT:



**PACKAGING_LOTD_BACK:**



**Appendix F**

PACKAGING_LOTD_SIDE1:

### For a fun and silly time move along and pretend with this rhyme...

Stomp your feet, wave your hand,

Let's all go to cookie land!

Walk along, follow me,

You can climb that cookie tree.

Come this way, if you will,

Run right down that cookie hill!

Now it's hot, let's get cool,

Jump into the cookie pool.

It's so late, let's all rest,

Take a nap in a cookie nest.



**Spice it up!** Fragrant herbs and spices (like cinnamon) add a burst of a new flavor to foods and help to build a more adventurous young eater by expanding their palates with new tastes.

**Feeding Information:**
This product should be fed to toddlers only when they have the ability to chew solid foods. Children should be seated and supervised.

**Appendix F**

PACKAGING_LOTD_SIDE2:



For ages 2+

# Nutrition Facts

About 8 servings per container

**Serving size**     **9 cookies (20g)**

**Amount per serving**

## Calories     90

| | % Daily Value* |
|---|---|
| **Total Fat** 3g | **8%** |
|   Saturated Fat 0g | **2%** |
|   *Trans* Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 40mg | **3%** |
| **Total Carbohydrate** 15g | **10%** |
|   Dietary Fiber 0g | **2%** |
|   Total Sugars 6g | |
|     Includes 5g Added Sugars | **19%** |
| **Protein** 1g | **4%** |

| | | | |
|---|---|---|---|
| Vitamin D 0mcg | 0% | • Calcium 0mg | 0% |
| Iron 1.5mg | 20% | • Potassium 0mg | 0% |
| Thiamin 0.2mg | 30% | • Riboflavin 0.2mg | 30% |
| Niacin 1.7mg | 30% | • Vitamin B6 0.2mg | 30% |
| Folate 70mcg DFE (20mcg folic acid) | 45% | • Vitamin B12 0.6mcg | 70% |
| Zinc 1.1mg | 35% | | |

*The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 1,000 calories a day is used for general nutrition advice.

**Appendix F**

[PROGRAMMER: RANDOMIZE ORDER OF 1 AND 2, KEEPING ORDER FIXED ACROSS Q10, Q30, Q50, Q70, AND Q90. ALLOW ONE SELECTION ONLY.
IF RESPONDENT SELECTS ("Yes, this packaging tells me something..."), GO TO Q100. ALL OTHERS GO TO Q110.]

1. Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
2. No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
3. Don't know / Unsure

[NEXT PAGE]

**Q80**. You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_LOTD_FRONT, PACKAGING_LOTD_BACK, PACKAGING_LOTD_SIDE1, AND PACKAGING_LOTD_SIDE2; IF SURVEY = CONTROL, DISPLAY PACKAGING_LOTD_FRONT ONLY.
ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]

[PROGRAMMER: RANDOMIZE ORDER 1-2.
ALLOW ONLY ONE SELECTION.
ALL GO TO Q90.]

1. The product is intended **specifically** for children <u>under 2 years</u>
2. The product is intended **specifically** for children <u>2 years and over</u>
3. Neither of the above **[SINGLE PUNCH]**
4. Don't know / Unsure **[SINGLE PUNCH]**

**Appendix F**

**Q90**. Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only*.

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_CORN_PUFFS_FRONT AND PACKAGING_CORN_PUFFS_BACK ; IF SURVEY = CONTROL, PACKAGING_CORN_PUFFS _FRONT ONLY. ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

**Appendix F**

PACKAGING_ CORN_PUFFS_FRONT:



**PACKAGING_CORN_PUFFS_BACK:**



**Appendix F**

**[PROGRAMMER: RANDOMIZE ORDER OF 1 AND 2, KEEPING ORDER FIXED ACROSS Q10, Q30, Q50, Q70, Q90, AND Q110. ALLOW ONE SELECTION ONLY.**
**IF RESPONDENT SELECTS ("Yes, this packaging tells me something..."), GO TO Q120. ALL OTHERS GO TO E10.]**

1. Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
2. No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>
3. Don't know / Unsure

**[NEXT PAGE]**

**Q100**. You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

**[PROGRAMMER: IF SURVEY = TEST, DISPLAY PACKAGING_CORN_PUFFS_FRONT  AND PACKAGING_CORN_PUFFS_BACK; IF SURVEY = CONTROL, DISPLAY PACKAGING_CORN_PUFFS_FRONT ONLY.**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.]**

**[PROGRAMMER: RANDOMIZE ORDER 1-2.**
**ALLOW  ONLY ONE SELECTION.**
**ALL GO TO E10.]**

1. The product is intended **specifically** for children <u>under 2 years</u>
2. The product is intended **specifically** for children <u>2 years and over</u>
3. Neither of the above **[SINGLE PUNCH]**
4. Don't know / Unsure **[SINGLE PUNCH]**

**Appendix F**

**[NEXT PAGE]**

**E10**. This completes the survey.  Thank you for your participation! Please click "Continue" button to submit your responses.

**Appendix G**

**Labeling Survey**
**Survey Screenshots**
**October 2023**

0%

Thank you for agreeing to participate in this survey. Please take a few moments to complete our questions.

Please take the survey in one session without interruption. While taking the survey, please do not consult any other source of information (including websites, books or any other person). If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey. For each question, if you don't know or if you don't have an answer, please don't guess.

Continue

**Appendix G**

S1



0%

So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, and then click the Continue button to continue. Please enter it exactly as it appears. Do <u>not</u> include any spaces. Type them all together.

qrSQP

Continue

**Appendix G**



**Appendix G**

S10



Which type of electronic device are you using to take this survey?

*Select one only.*

○ A smartphone (for example, Apple iPhone, Google Pixel, Samsung Galaxy, or similar)

○ A TV-based browser or video game console (for example, Apple TV, Microsoft Xbox, Sony PlayStation, or similar)

○ A desktop computer

○ An eBook reading device (for example, Kindle, Kobo, Nook, or similar)

○ A tablet (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)

○ A laptop/notebook computer

○ Other, please specify: [_____]

Continue

**Appendix G**

S20

7%

**Which of the following includes your age?**

*Select one only.*

○ Under 18

○ 18 - 34

○ 35 - 49

○ 50 - 64

○ 65 or older

○ Prefer not to answer

Continue

**Appendix G**

S30

11%

### What is your gender?
*Select one only.*

- ○ Male
- ○ Female
- ○ Nonbinary
- ○ Prefer not to answer

Continue

**Appendix G**

S40



**Appendix G**

S50

22%

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

☐ A company that makes or sells sport shoes (for example, Nike, New Balance, or Adidas)

☐ A company that makes or sells televisions (for example, Sony, LG, or Samsung)

☐ A company that provides marketing or market research services (for example, Nielsen or IQVIA)

☐ A company that provides accounting or tax preparation services (for example, Intuit, H&R Block, or Jackson Hewitt)

☐ A company that makes or sells food or beverages (for example, Kroger, General Mills, or Coca-Cola)

☐ A company that makes or sells automotive vehicles (for example, Toyota, GM, or Ford)

☐ None of the above

Continue

**Appendix G**

S60

| | 26% |

How many children under age 10, if any, live in your household currently?
*Select one only.*

○ None

○ 1

○ 2

○ 3 or more

○ Don't know / Unsure

Continue

**Appendix G**

S70



30%

You indicated that one or more children under age 10 live in your household currently.

Which of the following products, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?
*Select all that apply.*

- Diapers
- Toys or games
- Furniture
- Clothes
- Food products
- None of the above
- Don't know / Unsure

Continue

**Appendix G**

S80

34%

You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **brands** of food product, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

*Select all that apply.*

- [ ] Earth's Best
- [ ] Gerber
- [ ] Beech-Nut
- [ ] Suave
- [ ] Plum Organics
- [ ] Happy Tot
- [ ] None of the above
- [ ] Don't know / Unsure

Continue

**Appendix G**

S90



**Appendix G**

S100

43%

You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following brands of food product, if any, would you <u>consider purchasing</u> for a child or children under age 10 in your household in the next 12 months?
*Select all that apply.*

- Beech-Nut
- Plum Organics
- Suave
- Happy Tot
- Earth's Best
- Gerber
- None of the above
- Don't know / Unsure

Continue

**Appendix G**

S110



**Appendix G**

S120



49%

For quality control purposes, please select the "Other" option below and type the word **check** into the space provided.

*Select one only.*

○ Strongly agree

○ Agree

○ Neither agree nor disagree

○ Disagree

○ Strongly disagree

○ Other, please specify [                    ]

Continue

**Appendix G**

58%

*We will now show you the packaging for some food products for children. We want to know whether the product packaging tells you anything about the age or ages of the children these products are intended for. For each question, if you don't know or if you don't have an answer, please don't guess.*

Continue

**Appendix G**

Q10



**Appendix G**

Q20



**Appendix G**

Q30



**Appendix G**

Q40



**Appendix G**

Q50



73%

Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

○ Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>

○ No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>

○ Don't know / Unsure

Continue

**Appendix G**

Q60



75%

You indicated that this packaging <u>tells you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>.

Which of the following statements, if any, describes what the packaging tells you about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

○ The product is intended **specifically** for children <u>under 2 years</u>

○ The product is intended **specifically** for children <u>2 years and over</u>

○ Neither of the above

○ Don't know / Unsure

Continue

**Appendix G**

Q70



Please examine the product packaging shown below.

Does this product packaging <u>tell you something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>?

*Select one only.*

*You can click on each product image to make it bigger.*

○ Yes, this packaging <u>tells me something</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>

○ No, this packaging <u>does not tell me anything</u> about the <u>age or ages</u> of the children the product is <u>intended for</u>

○ Don't know / Unsure

Continue

**Appendix G**

Q80



**Appendix G**

Q90



**Appendix G**

Q100



# Appendix G

88%

This completes the survey. Thank you for your participation! Please click "Continue" button to submit your responses.

Continue

# Infant and Toddler Food Consumption Behavior Survey

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**
*Notes to respondents in italics*

**[PROGRAMMER: PLACE DEVICE SNIFFER AT BEGINNING OF SURVEY; ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S10.]**

**[FOR ALL PROGRAMMING INSTRUCTIONS INVOLVING REVERSE ORDERING ANSWER CHOICES ACROSS RESPONDENTS, MAINTAIN THE SAME ORDER FOR A GIVEN RESPONDENT ACROSS QUESTIONS.]**

## Overview

- **Inbound Sample:** Recruited from US population online panel; click balanced in-bound to US census for age/gender/region
- **Sample Size:**
  - **For each of the relevant product types ("Earth's Best Organic Fruit Yogurt Smoothies," "Earth's Best Organic Homestyle Protein Puree Pouches," "Earth's Best Organic Letter of the Day Cookies," "Earth's Best Organic Crunchin' Crackers," and "Earth's Best Organic Peanut Butter Baked Corn Puffs"), ensure that at least 50 respondents select each product in S90 below.**
- **Survey in English only**
- **Use de-duping technology to ensure unique respondents**

## Introduction

Thank you for agreeing to participate in this survey. Please take a few moments to complete our questions.

Please take the survey in one session without interruption. While taking the survey, please do <u>not</u> consult any other source of information (including websites, books, or any other person). If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey. For each question, if you don't know or if you don't have an answer, please don't guess.

**[NEXT PAGE]**

**S1.** So that we can confirm that you are actually a person, please enter the code exactly as it appears in the image below, and then click the Continue button to continue. Please enter it exactly as it appears. Do <u>not</u> include any spaces. Type them all together.

**Appendix H**

**[PROGRAMMER: PIPE IN ONE RANDOMLY SELECTED CODE.  CONFIRM THAT WHAT THE RESPONDENT TYPES IN MATCHES THE PIPED-IN CODE.]**

TEXT BOX: _____

**[PROGRAMMER: TERMINATE IF THE CODE DOES NOT MATCH AFTER THE THIRD TRY.]**


**[NEXT PAGE]**

First, there are a few short questions to determine if you qualify for the study.

**[NEXT PAGE]**

**Appendix H**

**S10.** Which type of electronic device are you using to take this survey?

*Select one only.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT 7.**
**ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT SELECTS 5, 6, OR 7.**
**ALL OTHERS GO TO S20.]**

1. A laptop/notebook computer
2. A tablet (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)
3. A desktop computer
4. A smartphone (for example, Apple iPhone, Google Pixel, Samsung Galaxy, or similar)
5. A TV-based browser or video game console (for example, Apple TV, Microsoft Xbox, Sony PlayStation, or similar)
6. An eBook reading device (for example, Kindle, Kobo, Nook, or similar)
7. Other, please specify: _____

**[NEXT PAGE]**

**S20.** Which of the following includes your age?

*Select one only.*

**[PROGRAMMER: DO NOT RANDOMIZE CHOICES.**
**ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT SELECTS 1 OR 6.**
**ALL OTHERS GO TO S30.]**

1. Under 18
2. 18 - 34
3. 35 - 49
4. 50 - 64
5. 65 or older
6. Prefer not to answer

**[NEXT PAGE]**

**S30.** What is your gender?

*Select one only.*

**[PROGRAMMER: RANDOMIZE CHOICES.**
**ALLOW ONLY ONE SELECTION.**

**Appendix H**

**TERMINATE IF RESPONDENT SELECTS 4. TERMINATE IF AGE AND GENDER INFORMATION DO NOT MATCH PANELIST PROFILE DATA.**
**ALL OTHERS GO TO S40.]**

1. Male
2. Female
3. Nonbinary
4. Prefer not to answer

**S40.** In which of the following states do you currently live?

*Select one only.*

**[PROGRAMMER: INCLUDE DROPDOWN LIST OF STATES IN ALPHABETICAL ORDER PLUS DISTRICT OF COLUMBIA AND "None of the above."**
**ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT SELECTS "None of the above."**
**ALL OTHERS GO TO S50.]**

**[NEXT PAGE]**

**S50.** Do you, or does any member of your household, currently work for any of the following?

*Select all that apply.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT 7.**
**ALLOW MULTIPLE SELECTIONS.**
**TERMINATE IF RESPONDENT SELECTS 1 OR 6.**
**ALL OTHERS GO TO S60.]**

1. A company that makes or sells food or beverages (for example, Kroger, General Mills, or Coca-Cola)
2. A company that makes or sells automotive vehicles (for example, Toyota, GM, or Ford)
3. A company that makes or sells sport shoes (for example, Nike, New Balance, or Adidas)
4. A company that makes or sells televisions (for example, Sony, LG, or Samsung)
5. A company that provides accounting or tax preparation services (for example, Intuit, H&R Block, or Jackson Hewitt)
6. A company that provides marketing or market research services (for example, Nielsen or IQVIA)
7. None of the above **[SINGLE PUNCH]**

**[NEXT PAGE]**

**S60.** How many children under age 10, if any, live in your household currently?

*Select one only.*

**Appendix H**

[PROGRAMMER: ALLOW ONE SELECTION ONLY.
TERMINATE IF RESPONDENT SELECTS "None" OR "None of the above."
ALL OTHERS GO TO S70.]

1. None
2. 1
3. 2
4. 3 or more
5. Don't know / Unsure

[NEXT PAGE]

**S70.** You indicated that one or more children under age 10 live in your household currently.

Which of the following products, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

*Select all that apply.*

[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "None of the above" AND "Don't know / Unsure."
ALLOW MULTIPLE SELECTIONS EXCEPT "None of the above" AND "Don't know / Unsure."
TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("Food products").
ALL OTHERS GO TO S80.]

1. Food products
2. Diapers
3. Toys or games
4. Clothes
5. Furniture
6. None of the above [SINGLE PUNCH]
7. Don't know / Unsure [SINGLE PUNCH]

[NEXT PAGE]

**S80.** You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **brands** of food product, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?

*Select all that apply.*

[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "None of the above" AND "Don't know / Unsure".
ALLOW MULTIPLE SELECTIONS EXCEPT "None of the above" AND "Don't know / Unsure."
TERMINATE IF RESPONDENT SELECTS "Suave". TERMINATE IF RESPONDENT DOES NOT SELECT "Earth's BEST".]

**Appendix H**

1. Beech-Nut
2. Earth's Best
3. Gerber
4. Happy Tot
5. Plum Organics
6. Suave
7. None of the above **[SINGLE PUNCH]**
8. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**S90.** You indicated that you have purchased **Earth's Best food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **Earth's Best food products**, if any, have you purchased in the past 12 months?

*You can click on each product image to make it bigger.*

*Select all that apply.*

**[PROGRAMMER: RANDOMIZE CHOICES EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW / UNSURE."**
**ALLOW MULTIPLE SELECTIONS EXCEPT "NONE OF THE ABOVE" AND "DON'T KNOW / UNSURE."**
**ENABLE RESPONDENT TO ENLARGE EACH IMAGE IN A POP-UP BY CLICKING ON IMAGES.**
**TERMINATE IF RESPONDENT DOES NOT SELECT AT LEAST ONE OF 1, 2, 3, 4, OR 5.**
**SET A QUOTA SO THAT, FOR EACH OPTION IN 1, 2, 3, 4, 5, AND 6, THERE ARE AT LEAST 50 RESPONDENTS WHO SELECT THAT OPTION. (THE SAME RESPONDENT CAN COUNT TOWARDS MULTIPLE OPTIONS.)**
**ALL OTHERS GO TO S100.]**

| **(1)** | Organic Fruit Yogurt Smoothies |  |
|---|---|---|

**Appendix H**

| (2) | Organic Homestyle Protein Puree Pouches |  |
|-----|------------------------------------------|-----------------------|
| (3) | Organic Letter of the Day Cookies |  |
| (4) | Organic Crunchin' Crackers |  |
| (5) | Organic Peanut Butter Baked Corn Puffs |  |
| (6) | Organic Sunny Day Snack Bars |  |
| (7) | Organic Breakfast Biscuits | |

**Appendix H**

| | | |
|---|---|---|
| | |  |
| **(8)** | Organic Garden Veggie Straws |  |
| **(9)** | None of the above **[SINGLE PUNCH]** | |
| **(10)** | Don't know / Unsure **[SINGLE PUNCH]** | |

**[NEXT PAGE]**

**S100.** For quality control purposes, please select the "Other" option below and type the word **[INSERT ONE OF 'quality' / 'check' / 'survey' / 'question']** into the space provided.

*Select one only.*

**[PROGRAMMER: RANDOMIZE THE FOUR QUESTION VERSIONS.**
**TERMINATE IF RESPONDENT DOES NOT SELECT "Other" AND ENTER CORRECT WORD INTO "Other" BOX (NOT CASE SENSITIVE).**
**ALL OTHERS GO TO MAIN QUESTIONNAIRE.]**

1. Strongly agree
2. Agree
3. Neither agree nor disagree
4. Disagree
5. Strongly Disagree
6. Other. Please specify **[TEXT BOX; DO NOT FORCE RESPONSE IF SELECTED]**

**Appendix H**

**[IF RESPONDENT SELECTED "Organic Fruit Yogurt Smoothies" IN S90, SHOW Q10. OTHERWISE, SKIP TO Q20.]**

**Q10.** You indicated that you have purchased **Earth's Best Organic Fruit Yogurt Smoothies** in the past 12 months.



Please think about the last time you purchased **Earth's Best Organic Fruit Yogurt Smoothies**.

Thinking about the last time you last purchased **Earth's Best Organic Fruit Yogurt Smoothies**, please indicate the age(s) of the child or children who ate or drank the **Earth's Best Organic Fruit Yogurt Smoothies** you purchased.

*Select all that apply.*

**[DO NOT RANDOMIZE.
ALLOW MULTIPLE SELECTIONS EXCEPT 4.]**

1. Less than 2 years
2. 2–4 years
3. 5+ years
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**[IF RESPONDENT SELECTED "Organic Homestyle Protein Puree Pouches" IN S90, SHOW Q20. OTHERWISE, SKIP TO Q30.]**

**Q20.** You indicated that you have purchased **Earth's Best Organic Homestyle Protein Puree Pouches** in the past 12 months.

**Appendix H**

 

Please think about the last time you purchased **Earth's Best Organic Homestyle Protein Puree Pouches**.

Thinking about the last time you last purchased **Earth's Best Organic Homestyle Protein Puree Pouches**, please indicate the age(s) of the child or children who ate or drank the **Earth's Best Organic Homestyle Protein Puree Pouches** you purchased.

*Select all that apply.*

**[DO NOT RANDOMIZE.
ALLOW MULTIPLE SELECTIONS EXCEPT 4.]**

1. Less than 2 years
2. 2–4 years
3. 5+ years
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**[IF RESPONDENT SELECTED "Organic Crunchin' Crackers" IN S90, SHOW Q30. OTHERWISE, SKIP TO Q40.]**

**Q30.** You indicated that you have purchased **Earth's Best Organic Crunchin' Crackers** in the past 12 months.



Please think about the last time you purchased **Earth's Best Organic Crunchin' Crackers**.

Thinking about the last time you last purchased **Earth's Best Organic Crunchin' Crackers**, please indicate the age(s) of the child or children who ate the **Earth's Best Organic Crunchin' Crackers** you purchased.

**[PROGRAMMER: DO NOT RANDOMIZE.
ALLOW MULTIPLE SELECTIONS EXCEPT 4.]**

*Select all that apply.*

**Appendix H**

1. Less than 2 years
2. 2–4 years
3. 5+ years
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**[IF RESPONDENT SELECTED "Organic Letter of the Day Cookies" IN S90, SHOW Q40. OTHERWISE, SKIP TO Q50.]**

**Q40.** You indicated that you have purchased **Earth's Best Organic Letter of the Day Cookies** in the past 12 months.

 

Please think about the last time you purchased **Earth's Best Organic Letter of the Day Cookies**.

Thinking about the last time you last purchased **Earth's Best Organic Letter of the Day Cookies**, please indicate the age(s) of the child or children who ate the **Earth's Best Organic Letter of the Day Cookies** you purchased.

**[PROGRAMMER: DO NOT RANDOMIZE.
ALLOW MULTIPLE SELECTIONS EXCEPT 4.]**

*Select all that apply.*

1. Less than 2 years
2. 2–4 years
3. 5+ years
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**[IF RESPONDENT SELECTED "Organic Peanut Butter Baked Corn Puffs" IN S90, SHOW Q50. OTHERWISE, SKIP TO E10.]**

**Q50.** You indicated that you have purchased **Earth's Best Organic Peanut Butter Baked Corn Puffs** in the past 12 months.

**Appendix H**



Please think about the last time you purchased **Earth's Best Organic Peanut Butter Baked Corn Puffs**.

Thinking about the last time you last purchased **Earth's Best Organic Peanut Butter Baked Corn Puffs**, please indicate the age(s) of the child or all the children who ate the **Earth's Best Organic Peanut Butter Baked Corn Puffs** you purchased.

**[PROGRAMMER: DO NOT RANDOMIZE.
ALLOW MULTIPLE SELECTIONS EXCEPT 4.
ALL GO TO E10.]**

*Select all that apply.*

1. Less than 2 years
2. 2–4 years
3. 5+ years
4. Don't know / Unsure **[SINGLE PUNCH]**

**[NEXT PAGE]**

E10. This completes the survey.  Thank you for your participation! Please click "Continue" button to submit your responses.

**Appendix I**

Consumption Behavior Survey
**Survey Screenshots**
**October 2023**

0%

Thank you for agreeing to participate in this survey. Please take a few moments to complete our questions.

Please take the survey in one session without interruption. While taking the survey, please do <u>not</u> consult any other source of information (including websites, books, or any other person). If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey. For each question, if you don't know or if you don't have an answer, please don't guess.

Continue

**Appendix I**

S1

Case 3:22-cv-00507-VC  Document 192-9  Filed 11/11/24  Page 226 of 293

**Appendix I**



First, there are a few short questions to determine if you qualify for the study.

Continue

**Appendix I**

S10



Which type of electronic device are you using to take this survey?
*Select one only.*

○ An eBook reading device (for example, Kindle, Kobo, Nook, or similar)

○ A TV-based browser or video game console (for example, Apple TV, Microsoft Xbox, Sony PlayStation, or similar)

○ A tablet (for example, Apple iPad, Samsung Galaxy Tab, Amazon Fire, or similar)

○ A desktop computer

○ A smartphone (for example, Apple iPhone, Google Pixel, Samsung Galaxy, or similar)

○ A laptop/notebook computer

○ Other, please specify: [                    ]

Continue

**Appendix I**

S20

**Appendix I**

S30

**Appendix I**

S40



**Appendix I**

S50

27%

Do you, or does any member of your household, currently work for any of the following?
*Select all that apply.*

- [ ] A company that makes or sells automotive vehicles (for example, Toyota, GM, or Ford)
- [ ] A company that makes or sells televisions (for example, Sony, LG, or Samsung)
- [ ] A company that makes or sells food or beverages (for example, Kroger, General Mills, or Coca-Cola)
- [ ] A company that provides accounting or tax preparation services (for example, Intuit, H&R Block, or Jackson Hewitt)
- [ ] A company that provides marketing or market research services (for example, Nielsen or IQVIA)
- [ ] A company that makes or sells sport shoes (for example, Nike, New Balance, or Adidas)
- [ ] None of the above

Continue

**Appendix I**

S60



How many children under age 10, if any, live in your household currently?
*Select one only.*

- None
- 1
- 2
- 3 or more
- Don't know / Unsure

Continue

**Appendix I**

S70

38%

You indicated that one or more children under age 10 live in your household currently.

Which of the following products, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?
*Select all that apply.*

- [ ] Furniture
- [ ] Diapers
- [ ] Clothes
- [ ] Toys or games
- [ ] Food products
- [ ] None of the above
- [ ] Don't know / Unsure

Continue

**Appendix I**

S80

43%

You indicated that you have purchased **Food products** for a child or children under age 10 in your household in the past 12 months.

Which of the following **brands** of food product, if any, have you purchased for a child or children under age 10 in your household in the past 12 months?
*Select all that apply.*

- [ ] Earth's Best
- [ ] Happy Tot
- [ ] Plum Organics
- [ ] Suave
- [ ] Gerber
- [ ] Beech-Nut
- [ ] None of the above
- [ ] Don't know / Unsure

Continue

**Appendix I**

S90



**Appendix I**

S100


For quality control purposes, please select the "Other" option below and type the word **check** into the space provided.

*Select one only.*

- Strongly agree
- Agree
- Neither agree nor disagree
- Disagree
- Strongly Disagree
- Other, please specify

Continue

**Appendix I**

Q10



**Appendix I**

Q20



82%

You indicated that you have purchased **Earth's Best Organic Homestyle Protein Puree Pouches** in the past 12 months.

Thinking about the last time you purchased **Earth's Best Organic Homestyle Protein Puree Pouches**, please indicate the age(s) of the child or children who ate or drank the **Earth's Best Organic Homestyle Protein Puree Pouches** you purchased.
*Select all that apply.*

☐ Less than 2 years

☐ 2-4 years

☐ 5+ years

☐ Don't know / Unsure

Continue

**Appendix I**

Q30



**Appendix I**

Q40



**Appendix I**

Q50



**Appendix I**

E10



**Appendix J**

# Pretest Moderator Instructions for GBK

1.      Did you have any problems while taking the survey?

2.      Did you think any questions were unclear? If so, which ones and why?

3.      Did you think any answer options were unclear? If so, which ones and why?

4.      Did you find the survey to be too difficult or too long?

5.      What do you think might be the purpose for conducting this survey? What makes you think so?

6.      Is there anything else you would like to say about the survey?

## Methodology for Willingness to Pay Calculations in Appendix L

1.      This appendix describes the steps followed to calculate the WTP figures in Appendix L.

2.      First, for a given respondent, I calculated the average part-worth for the relevant at-issue claims, for blank levels of the corresponding product attributes, and for the price levels over every 10th draw of the 10,000 draws generated in Sawtooth using Mr. Gaskin's survey data. The part-worths associated with the "4g protein per serving" and "3g plant protein" correspond to part-worths of levels of the attribute that Mr. Gaskin calls "Label A." The part-worth associated with the "Excellent source of Calcium, Vitamins C & D" claim corresponds to the part-worth of one of the levels of the attribute that Mr. Gaskin calls "Label B."

3.      Second, after calculating each respondent's average part-worths, I calculated each respondents' WTP for a specific claim in a given price range $p_1 - p_2$ as follows:

$$WTP = \frac{\$0.50}{U_{p_1} - U_{p_2}}(\text{U}_{claim} - \text{U}_{blank})$$

In this formula:

      a.   $U_{p1}$ and $U_{p2}$ are the part-worths associated with price levels $p_1$ and $p_2$, respectively.

      b.   $U_{claim}$ is the part-worth associated with the relevant at-issue claim.

      c.   $U_{blank}$ is the part-worth associated with the blank level of the product attribute that includes the at-issue claim as one of its levels.

4.      Third, for each at-issue claim and each price range, after calculating each respondent's WTP, I sorted the respondents' WTP and identified the minimum, maximum, and the percentiles reported in Appendix L.

# Distribution of Respondent-Level Willingness to Pay for "4g Protein per Serving" Claim[1]

| Price of Product with "4g Protein per Serving" | Respondent-Level Willingness to Pay | | | |
|---|---|---|---|---|
| | $1.00 – $1.50 | $1.50 – $2.00 | $2.00 – $2.50 | $2.50 – $3.00 |
| Minimum | -$772.73 | -$461.76 | -$102.30 | -$253.10 |
| 5th Percentile | -$18.32 | -$19.34 | -$5.72 | -$4.08 |
| 10th Percentile | -$3.53 | -$2.27 | -$0.98 | -$0.62 |
| 25th Percentile | $0.38 | $0.25 | $0.23 | $0.15 |
| Median | $6.50 | $2.39 | $1.14 | $0.56 |
| 75th Percentile | $72.49 | $24.65 | $6.98 | $2.40 |
| 90th Percentile | $684.31 | $106.96 | $27.37 | $7.03 |
| 95th Percentile | $2,618.59 | $279.01 | $58.52 | $12.79 |
| Maximum | $33,028.40 | $7,263.86 | $881.45 | $148.55 |
| Percentage of Respondents with Negative WTP[2] | 14.95% | 14.95% | 14.95% | 14.95% |
| Percentage of Respondents Willing to Pay More Than Product Cost[3] | 64.07% | 51.32% | 39.23% | 21.43% |
| Total Number of Respondents | 910 | 910 | 910 | 910 |

Source: Dr. Gaskin's Sawtooth Production
Note:
[1] The respondent-level willingness to pay is an estimate of that respondent's willingness to pay for a product with the challenged "4g Protein per Serving" claim, compared to a product with a blank description. For each respondent in the survey, the respondent-level willingness to pay is calculated using the respondent's average part-worths for the "4g Protein per Serving" and "Blank" claims and a linear interpolation of the respondent's average part-worths for the indicated price levels. Average price and claim part-worths for each respondent are based on every 10th draw of the 10,000 draws generated in Sawtooth using Mr. Gaskin's survey data. A positive value of willingness to pay implies that the respondent would be willing to pay more for a product with the challenged "4g Protein per Serving" claim than one without the claim.
[2] Number of respondents who are willing to pay more for a product without the challenged "4g Protein per Serving" claim than with the challenged claim.
[3] Number of respondents who are willing to pay more than the total price of the product (i.e. more than $2.00 for the $1.50 - $2.00 price range) solely for the challenged claim.

**Appendix L-2**

# Distribution of Respondent-Level Willingness to Pay for "3g Plant Protein" Claim[1]

| Price of Product with "3g Plant Protein" Claim | Respondent-Level Willingness to Pay | | | |
|---|---|---|---|---|
| | $1.00 – $1.50 | $1.50 – $2.00 | $2.00 – $2.50 | $2.50 – $3.00 |
| Minimum | -$4,502.87 | -$1,034.84 | -$416.48 | -$221.78 |
| 5th Percentile | -$20.86 | -$26.52 | -$8.51 | -$5.44 |
| 10th Percentile | -$6.55 | -$5.05 | -$1.49 | -$0.78 |
| 25th Percentile | $0.17 | $0.12 | $0.12 | $0.08 |
| Median | $3.97 | $1.31 | $0.65 | $0.32 |
| 75th Percentile | $42.09 | $14.54 | $4.59 | $1.55 |
| 90th Percentile | $377.48 | $72.43 | $17.10 | $4.41 |
| 95th Percentile | $2,262.96 | $179.24 | $34.03 | $7.71 |
| Maximum | $23,299.01 | $7,201.34 | $494.06 | $111.25 |
| Percentage of Respondents with Negative WTP[2] | 17.14% | 17.14% | 17.14% | 17.14% |
| Percentage of Respondents Willing to Pay More Than Product Cost[3] | 59.01% | 46.04% | 30.99% | 14.84% |
| Total Number of Respondents | 910 | 910 | 910 | 910 |

Source: Dr. Gaskin's Sawtooth Production
Note:
[1] The respondent-level willingness to pay is an estimate of that respondent's willingness to pay for a product with the challenged "3g Plant Protein" claim, compared to a product with a blank description. For each respondent in the survey, the respondent-level willingness to pay is calculated using the respondent's average part-worths for the "3g Plant Protein" and "Blank" claims and a linear interpolation of the respondent's average part-worths for the indicated price levels. Average price and claim part-worths for each respondent are based on every 10th draw of the 10,000 draws generated in Sawtooth using Mr. Gaskin's survey data. A positive value of willingness to pay implies that the respondent would be willing to pay more for a product with the challenged "3g Plant Protein" claim than one without the claim.
[2] Number of respondents who are willing to pay more for a product without the challenged "3g Plant Protein" claim than with the challenged claim.
[3] Number of respondents who are willing to pay more than the total price of the product (i.e. more than $2.00 for the $1.50 - $2.00 price range) solely for the challenged claim.

# Distribution of Respondent-Level Willingness to Pay for "Excellent Source of Calcium and Vitamins C and D" Claim[1]

| Price of Product with Excellent Source of Calcium and Vitamins C & D" Claim | Respondent-Level Willingness to Pay | | | |
|---|---|---|---|---|
| | **$1.00 – $1.50** | **$1.50 – $2.00** | **$2.00 – $2.50** | **$2.50 – $3.00** |
| **Minimum** | -$4,354.29 | -$464.05 | -$569.80 | -$323.73 |
| **5th Percentile** | -$6.76 | -$10.39 | -$2.31 | -$1.24 |
| **10th Percentile** | -$0.16 | -$0.12 | -$0.08 | -$0.06 |
| **25th Percentile** | $0.48 | $0.25 | $0.23 | $0.14 |
| **Median** | $8.56 | $2.95 | $1.29 | $0.62 |
| **75th Percentile** | $84.50 | $26.49 | $8.50 | $2.63 |
| **90th Percentile** | $637.79 | $144.77 | $26.81 | $7.81 |
| **95th Percentile** | $3,672.45 | $348.04 | $54.97 | $15.89 |
| **Maximum** | $27,281.67 | $7,033.84 | $853.54 | $239.27 |
| **Percentage of Respondents with Negative WTP[2]** | 11.76% | 11.76% | 11.76% | 11.76% |
| **Percentage of Respondents Willing to Pay More Than Product Cost[3]** | 65.93% | 54.51% | 39.78% | 23.19% |
| **Total Number of Respondents** | 910 | 910 | 910 | 910 |

Source: Dr. Gaskin's Sawtooth Production
Note:
[1] The respondent-level willingness to pay is an estimate of that respondent's willingness to pay for a product with the challenged "Excellent Source of Calcium and Vitamins C & D" claim, compared to a product with a blank description. For each respondent in the survey, the respondent-level willingness to pay is calculated using the respondent's average part-worths for the "Excellent Source of Calcium and Vitamins C & D" and "Blank" claims and a linear interpolation of the respondent's average part-worths for the indicated price levels. Average price and claim part-worths for each respondent are based on every 10th draw of the 10,000 draws generated in Sawtooth using Mr. Gaskin's survey data. A positive value of willingness to pay implies that the respondent would be willing to pay more for a product with the challenged "Excellent Source of Calcium and Vitamins C & D" claim than one without the claim.
[2] Number of respondents who are willing to pay more for a product without the challenged "Excellent Source of Calcium & Vitamins C and D" claim than with the challenged claim.
[3] Number of respondents who are willing to pay more than the total price of the product (i.e. more than $2.00 for the $1.50 - $2.00 price range) solely for the challenged claim.



**Panel Quality: Our Values**

Answers to ESOMAR's
37 Questions

**Appendix M**

# Contents

Purpose and Scope      02

Company Profile      05

Sample Sources and Recruitment      08

Sampling and Project management      16

Data Quality and Validation      24

Policies and Compliance      30

Metrics      37

Project Team & Sounding Board      40

Glossary      42



# Purpose and Scope

> This set of questions offers a framework for buyers to use when evaluating the offerings of different online sample providers. It updates and replaces the 2012 ESOMAR publication, 28 Questions to Help Buyers of Online Samples.

The questions identify the key issues to consider, introduce consistent terminology, explain why each question should be asked, and note the issues buyers should expect to be covered in an answer. The intended use of these questions is that they form a basis for a conversation between buyer and sample provider, rather than simply being used as a checklist to compare offerings across providers.

The questions do not cover B2B samples, nor do they attempt to cover specific requirements for different types of research such as pricing, new product development, ad testing etc.

When online access panels were first introduced in the 1990s, the model was relatively simple: a buyer provided sampling specifications to a panel owner who drew a sample (from that panel). Over the intervening 25 years, online sample selection has changed in two fundamental ways. First, buyers can now access a a broader set of sources that now includes participants in loyalty programmes and rewards communities within "Get Paid To'sites, customer lists, intercepts from offer walls, affiliate networks, social media, and other platforms, as well as traditional panels that may or may not be owned by the provider. Second, buyers have the option to access these sources directly via self-service tools, rather than relying on a sample provider to generate the sample on their behalf.

There have been other important changes as well. Online research has become truly global and mobile devices have become a common data collection platform.

The use of online samples has broadened beyond surveys to include qual/quant applications, communities, passive data collection, and so on. Concerns about privacy and data protection have led to a much-changed regulatory environment that imposes new requirements on both sample buyers and sample providers. Quality assurance techniques have become increasingly sophisticated. As a consequence, the number of issues that buyers must consider when choosing a sample provider has increased substantially.

Finally, sample quality is an essential component of all research but it alone does not guarantee reliable, actionable results. While not covered in this document, we note that a well thought out research design, a clear definition of the target population, a questionnaire that is both easy for participants to complete and accurately measures key variables, and a well-designed analysis plan are also essential.

## Company Profile

ESOMAR RSP | Company Profile

# Appendix M

**1.** **What experience does your company have in providing online samples for market research?** How long have you been providing this service? Do you also provide similar services for other uses such as direct marketing? If so, what proportion of your work is for market research?

With 45 years of leadership experience and innovation, Dynata is uniquely positioned to deliver world-class market research sample and data services.  We are the largest provider of first-party, fully-permissioned respondents in the market research space, with nearly 70 million online consumer and business respondents across 90 countries.  We have been providing respondents for market research since 1977, and online respondents since the advent of online research in the 1990s.  We are solely a supplier of solutions and services for research purposes; we do not sell Dynata sample for direct marketing purposes.



This answer might help you to form an opinion about the relevant experience of the sample provider as well as potential biases that might result from other uses such as being paid to watch ads or receiving a high volume of marketing messages.

**2.** **Do you have staff with responsibility for developing and monitoring the performance of the sampling algorithms and related automated functions who also have knowledge and experience in this area?** What sort of training in sampling techniques do you provide to your frontline staff?

Dynata has multiple teams who develop, administer, monitor, train, consult, and conduct research-on-research on sampling and sampling-related aspects.  Sound, rigorous methodology is a key component of all work Dynata performs, and we have structured our business organization to ensure methodological principles are built into all aspects of sample/sampling, from panel recruitment, engagement, the survey router, screening and targeting questions, quota designs and more.  Dynata's Panel team senior managers are industry-leading methodologists, often consulted on aspects of data quality and fraud by companies in other verticals.

We also have a dedicated Research Science team for online sampling methodology, whose methodologists have over 20 years' experience in sampling for marketing research, while the voice services sample team includes a number of experts with over 25 years of experience in sampling methodology.

Frontline staff receive ongoing training in methodology and how to use Dynata's systems to deliver to client specifications. Training covers practical knowledge as well as probability and sampling theory.  In addition, many frontline staff across the globe have market research backgrounds.



It is important to know if the provider's offerings have been designed by and are monitored by staff with knowledge of basic principles of sampling. This may be useful at the sample design stage as well as during fulfilment when quotas become difficult to fill or when weighting may be required. Ditto for any frontline staff who may serve as your main point of contact with the sample provider.

**Appendix M**



## 3.

**What other services do you offer?** Do you cover sample-only, or do you offer a broad range of data collection and analysis services?

In addition to sample-only, Dynata offers end-to-end market research service on the Dynata Insights Platform, including questionnaire design and programing, sample, advanced analytics, fielding, data processing, tables, charts, and reports. Our services can be accessed on a DIY basis, full service, or via a combination of the two. Other services include data appends, ad tracking via Ad and Audience, questionnaire templates and insights platforms to tie research projects and data together seamlessly. Descriptions of Dynata offerings can be found on our company website or by contacting the Dynata Sales team.



Depending on your company's capabilities, you may wish to work with a one-stop shop that can host your survey, produce basic tabulations, code open ends, and so on. There may be time and cost savings with this approach

**Appendix M**



# Sample Sources and Recruitment

> Answers to the questions in this section will help you understand the types of sample available from different sample providers in the market and the sources they rely on.

This will help you evaluate the quality of the sample being offered, whether it is suitable for measuring change over time, and whether there are any specific constraints you need to consider when using it. It will also allow you to understand whether the sample provider is drawing the sample from its own sources or aggregating sources from other providers. We recommend that you first identify the sample types being offered and then ask the relevant questions for all sources.

Broadly speaking, there are two models of sample sources and recruitment:

## PANELS

These are databases of potential participants who declare that they will cooperate for future data collection if selected, generally in exchange for a reward/incentive. This includes traditional access panels, co-branded panels, or opt-in databases of individuals who agreed to complete research projects and also undertake other non- market research activities (watch ads, download an app, complete marketing offers, etc, also known as loyalty programmes, or rewards communities within GPT (Get paid to) sites.) Loyalty card and subscription databases are included here if there is a continuous relationship with members who understand the commitment asked of them.

## INTERCEPTS

This includes intercepts from offer walls, affiliate networks, social media or other platforms to drive traffic to a survey. Intercept is an approach where potential participants are asked to take a survey for a reward while they are engaged in another activity such as playing an online game, reading news, or some other online activity. Intercepted participants may be previously unknown to the sample provider or may have been pre-identified and profiled through a prior survey experience.

## 4.

**Using the broad classifications above, from what sources of online sample do you derive participants?**

Dynata uses both types of respondents, although the vast majority of our respondents are part of our own proprietary panels.  We have the largest proprietary source of online sample in the industry, and we recruit more broadly (online coverage) into our proprietary panels than any other sample provider. Many of our intercept respondents are re-contactable, known sources. We believe that using both panels and intercept respondents contributes to a sample that is more diverse and representative.  Dynata also has access to the industry's inventory to further increase capacity and diversity. All respondents, regardless of source, go through multiple quality controls



Sample providers may deliver sample from a single source, such as their own proprietary panel, or other panels. Or they may leverage a range of technologies and platforms to aggregate/blend participants from a combination of sample sources. Some providers may do both. Clarity about the sources being used will help you to understand what type of sample is being offered. This answer might differ from country to country and from project to project

# 5.

## Which of these sources are proprietary or exclusive and what is the percent share of each in the total sample provided to a buyer? (Assume proprietary to mean that the sample provider owns the asset. Assume exclusive to mean that the sample provider has an exclusive agreement to manage/provide access to sample originally collected by another entity.)

Dynata has a proprietary/exclusive relationship with nearly 70 million consumers and businesses. The majority of our total completes come from proprietary/exclusive sources, although this could differ at a specific project level depending on the target audience and project needs. Our non-proprietary sources add diversity to the sample, especially by bringing in minority demographics and younger ages.



This question will help you to understand whether the vendor is 'running' the source or 'marketing' the source. Running the source implies a closer relationship with panellists and a deeper knowledge of recruitment techniques. This may also help you to understand whether the sample is exclusively available from this provider.



# 6.

## What recruitment channels are you using for each of the sources you have described? Is the recruitment process 'open to all' or by invitation only? Are you using probabilistic methods? Are you using affiliate networks and referral programs and in what proportions? How does your use of these channels vary by geography?

Dynata recruits more broadly than any other provider, using multiple approaches to cover the online landscape. We're firm believers that including people using different types of approaches and methods ensures the highest quality, most diverse sample. We run both "open enrollment" and "by-invitation-only"* recruitment campaigns, via direct email and through online marketing channels, using hundreds of diverse, online affiliate partners and targeted websites. As are most online panels, recruitment methods are non-probabilistic (although they do provide broad general population coverage).

**Dynata recruitment falls into three broad types or "channels":**

• **Loyalty:** Dynata uses its relationship with dozens of large national brands across retail, travel, hospitality, entertainment and more to build proprietary Loyalty panels. Members must be invited to join the panel. Loyalty panelists take part in research in exchange for rewards in the branded currency of the loyalty program. This creates a group of people who stay with us for a long time and who have a clear value exchange in the form of a reward that's very relevant to them. Since they have already signed up with the program with accurate e-mail, address and even credit card information in order to obtain loyalty rewards, we know that these are current, registered members of the loyalty program. These people tend to be older and more affluent than the general population.

• **Open:** Recruited across the web and beyond via mobile app panels, social media influencers, billboards, online and in-app advertising, paid search, and more. This group generally mirrors the broad, general population well, with diverse income and education levels. It provides strong population coverage across the most countries globally.

• **Integrated:** People coming from partnerships with publishers, social networks, additional websites and more. These people tend to be younger, can add additional coverage of minority groups and are often more interested in technology.

Capacity by channel varies by country and we can discuss this in the context of a specific project.



Understanding the method of recruitment and whether the recruitment is by invitation only will help you to understand the quality of the sample and how it may be used.

## 7. What form of validation do you use in recruitment to ensure that participants are real, unique, and are who they say they are?

Describe this both in terms of the practical steps you take within your own organisation and the technologies you are using. Please try to be as specific and quantify as much as you can.

Dynata brings an array of solutions to fraud control, using traditional techniques, but increasingly leveraging AI and Machine Learning. Dynata's ownership of the industry-wide fraud experts Imperium allows us to co-create a roadmap that joins Imperium's tools, metrics, technology and controls and Dynata's strategy for recruitment, panel management and the participant experience. Dynata's strategy is to collect data at each touchpoint, gathering 100+ data points at every interaction and to use that data to manage participant reputation:

**Dynata recruitment falls into three broad types or "channels":**

- **At enrollment:** – new Imperium tool RegGuard®, along with Real Mail™, Verity® and RelevantID® controls, device and IP anomaly and reputation checks, open-end engagement tests, analyzed via machine learning. These tools use multiple data points to confirm identity, identify duplicates, and look for unlikely patterns (indicative of fraud).

- **In the survey router** –digital fingerprinting, geo location clues and a second round of the checks used at enrollment confirm identity and identify suspicious behavior.

In addition, Dynata can employ advanced confirmation techniques for rare targets (such as B2B).

You may want to read the March 2021 article in Greenbook "The New Dynamics of Online Sample Quality", which Greenbook describes as Dynata's quality manifesto.



Understanding the level of recruitment validation undertaken by the sample provider will help you to mitigate effects of fraud in your projects. Working with providers who have fully developed strategies and are using up to date detection technologies is recommended.



## 8.

**What brand (domain) and/or app are you using with proprietary sources?** Summarise, by source, the proportion of sample accessing surveys by mobile app, email or other specified means.

Dynata has dozens of brands. Examples include Opinion Outpost, OpinionWorld, Miles For Thoughts, Valued Opinions, and E-Rewards. More than two-thirds of people arrive at our system via non-email means (such as their panel portal), and about a quarter by a general email invitation. Project-specific ("direct") e-mail invitations are rarely used. Currently a small number of respondents arrive via mobile app, but this is growing. Note: proportions vary by target audience/project type.



By understanding the domain/app and method the sample provider is using with members, you will gain an indication of the extent of activity with those members and the quality of their relationship with the sample.

## 9.

**Which model(s) do you offer to deliver sample? Managed service, self-serve, or API integration?**

Dynata's Insights Platform offers clients all three options.



Sample provision is offered through three main channels: managed service, self-serve, and API (Application Planning Interface) integrations. In a self-serve model, buyers are given access to a platform which they can use to specify the audience they want to access, and manage all the steps of a research project, from sample design to launch to fieldwork management to closing. In a managed service model, sample providers will provide that service. API integrations are the mechanics which allow sample providers, buyers and data collection platforms to automate some aspects of the process.

**Appendix M**



## 10.

**If offering intercepts, or providing access to more than one source, what level of transparency do you offer over the composition of your sample (sample sources, sample providers included in the blend).** Do you let buyers control which sources of sample to include in their projects, and if so how? Do you have any integration mechanisms with third-party sources offered?

We organize our sourcing into three channels: Loyalty, Open, and Integrated. These three channels are then combined as part of our Dynata Blend. For studies which require consistency (such as trackers), we impose quota controls by channel within the Dynata Blend. Buyers can request a certain channel only, but this will usually impact feasibility, so we don't recommend it. Sources within channels cannot be selected, as this will impact overall channel composition. However, we can consult with our clients if there is a potential conflict based on the topic of the questionnaire.

While we cannot share a list of specific recruitment sources, we are happy to share examples of sources within a channel. Some examples include:

- Loyalty channel (American Airlines, Hilton, Greyhound)
- Open channel (Opinion Outpost, Valued Opinions, One Opinion)
- Integrated channel (Peanut Labs, Vindale Research, social networks)

In rare cases we utilize sample outside of our three recruitment channels. These third-party sources are chosen among our preferred partners and full transparency of the source being used is given.



It is well documented that different sources can produce different results. Consistency in source blending can be vital for tracking studies or other inter- survey comparisons. The use of a single, narrow source, such as a single supermarket's loyalty scheme, may result in unintended bias.

**11.** **Of the sample sources you have available, how would you describe the suitability of each for different research applications?** For example, Is there sample suitable for product testing or other recruit/recall situations where the buyer may need to go back again to the same sample? Is the sample suitable for shorter or longer questionnaires? For mobile-only or desktop-only questionnaires? Is it suitable to recruit for communities? For online focus groups?

Dynata sources support all of the cases described above, although some channels may match a certain need better than others (e.g., Loyalty for B2B and high income studies). While we recommend using the Dynata channel blend for your project for best coverage and representivity, if you have a particularly challenging project, your Sales team will choose the best sources for your particular project needs.

All Open and Loyalty sources are recontactable, and many of the Integrated sources are as well. We allow respondents to choose how they will access a survey (mobile, PC), but we do not allow mobile respondents to take non-mobile-friendly surveys, as this will be a bad experience for them. We strongly encourage all questionnaires are designed to be device-agnostic. We supply online respondents for diaries, focus groups, and other qualitative exercises, and also offer live telephone interviewer recruitment to online research. And, while Dynata sample has successfully supported surveys of almost any length, we note that our research-on-research, conducted several times over many years, clearly demonstrates that fatigue generally sets in after 15-20 minutes and the quality of the data will not be as good after that point.



By understanding the constraints of the sample being offered, you can understand if the actual sample available from the provider meets your particular research needs and changes any of the answers given previously to this section.



**Appendix M**



Sampling and
Project Management

> Answers to the questions in this section will help you understand the processes and procedures that are undertaken to provide you with a sample of participants for your survey. You should understand what biases may be inherent in, or as a result of, the approaches taken and the likely severity of those biases.

## 12.

**Briefly describe your overall process from invitation to survey completion. What steps do you take to achieve a sample that "looks like" the target population? What demographic quota controls, if any, do you recommend?**

People may respond to a general email invitation inviting them to take part in an unspecified survey – or they may choose to visit their panel portal and enter the router from there. Once they click to begin their session, the system identifies which surveys someone cannot quality for (e.g., quota is closed for their age group) and removes them from the selection set. They are then asked a series of screening questions to help us match them more accurately with a survey they may be eligible for. Based on their answers and what we know about them already from their profile, they are then offered a survey. If they choose to take this survey and pass any further qualifying information, they will then complete the survey. If not, they either answer additional screening questions and then are offered another survey, or they are done with that session.

Quotas are always discussed before fielding. Dynata's operations team are trained in understanding how to manage quotas efficiently (such as filling the more difficult quotas first so field is not delayed waiting for those quotas).

As is commonly done in the industry, we recommend quotas on age and gender to manage response bias. Other quotas are used after discussion with the client. Dynata has published research advising on how to be more inclusive in sampling and how to manage quotas for certain groups (e.g., non-binary gender identity).



The sampling process (i.e., how individuals are selected or allocated from the sample sources) may affect how random the sample is from within the sources proposed. Quota controls are commonly used to make samples look like the target population and, if done without thought, may be less than optimal for your particular project.

**Appendix M**



**13.** **What profiling information do you hold on at least 80% of your panel members plus any intercepts known to you through prior contact?** How does this differ by the sources you offer? How often is each of those data points updated? Can you supply these data points as appends to the data set? Do you collect this profiling information directly or is it supplied by a third party?

We have age, gender, and region information for all our proprietary panelists, have at least 80% on over 100 other variables (varies by country), and have less than 80% on many other variables. In addition, we also have this information on many of our integrated sources. We collect this information directly, building profiles on panelists over time through their multiple contacts with us. Each profile variable has an update timing attached to it, depending on factors such as changeability (e.g., intention to buy a car in the next 6 months). If we don't have a required target in our database, we can gather the information in real time immediately before someone comes into your study. By gathering information in real time, we eliminate potential bias that exists from sampling only a subset of our universe. This real-time information is then added back to the database so it is available for the next use of that target. In addition, our dynamic profiling allows us to set custom expiration dates per question being asked, so information remains accurate. All profiling information can be appended to a survey data set. This information is collected directly, but we may use a third party if needed.



Targeting samples based on pre-existing profiles increases efficiency. Some bias may result depending on the precise questions asked, when they were asked, and to how many people. Appending existing information reduces the burden on the panellists in the survey itself.

## 14.

### What information do you need about a project in order to provide an estimate of feasibility? What, if anything, do you do to give upper or lower boundaries around these estimates?

The most accurate feasibilities require any and all information that may impact sample selection or field timing. The minimum information we require to provide an estimate is:

- Precise population being targeted (especially for lower incidence targets)
- Number of completes required
- Estimated incidence
- Survey length
- Time available to field
- Quotas and how they will be managed (and any flexibility here)
- Quality controls to be used within the survey
- Device-agnostic: whether the survey is open to mobile as well as PC participants

Certain factors (e.g., interview length) will not have as much weight as others (e.g., incidence). We can discuss risk level, caveats, and factors to consider in the feasibility estimate we give you.

We don't generally give ranges on feasibility estimates. However, clients can work with Dynata Sales teams to understand various options to complete challenging projects.



A sample provider failing to meet your sample requirements may require use of additional sample providers, adding time and complexity to the project. Trackers should be assessed in the light of any exclusion periods you may want to introduce that will reduce the available sample for subsequent waves.



**Appendix M**



**15.** **What do you do if the project proves impossible for you to complete in field?** Do you inform the sample buyer as to who you would use to complete the project? In such circumstances, how do you maintain and certify third party sources/sub-contractors?

If a project is struggling in field, we would first discuss other options with clients, such as:

- Review survey specs to see if adjustments can be made (e.g., loosen quotas)
- Examine drop rates to see if we're losing people unnecessarily
- Review incidence and see where we can add efficiency via targeting
- If the study can close even though all completes have not been met

After we make agreed-upon adjustments, we will reach out to third party sample providers if necessary.  When the project is a tracker we seek to exhaust every option in field management before considering additional sourcing, as that can cause risk of trend breaks
.
We have an on-boarding process for third party providers, reviewing how and where they recruit, their quality control procedures and responsiveness, among other things.  Once we have accepted a partner, we constantly monitor performance and have a feedback loop with actions taken if there are supply or quality problems.

Depending on the type of study and client desire, we may inform the sample buyer as to the additional sourcing.  Of course, we adhere to all client-specific disclosure agreements.



There may be good reasons why certain sample providers should not be used. For example; the provider may not have experience of operating in the geography relevant to your project.

## 16. Do you employ a survey router or any yield management techniques? If yes, please describe how you go about allocating participants to surveys. How are potential participants asked to participate in a study? Please specify how this is done for each of the sources you offer.

As is common with most (if not all) sample providers, Dynata uses a router to allocate respondents to surveys. Our router is considered a parallel router. People may respond to a general email invitation inviting them to take part in a survey – or they may choose to visit their panel portal and enter the router from there. Once they click to begin, the system excludes any survey for which the person could not qualify based on what is already known about the person, then seeks to match them to a remaining survey, using further questions to make the match.

If they do not qualify for the first survey they are offered, the router reassesses their eligibility for open projects, and again may display screening questions and select another survey to send them to.



Biases of varying severity may arise from prioritization in the order in which surveys are presented to participants or the methods used to allocate a participant to one of the various surveys for which they may appear to qualify.

## 17. Do you set limits on the amount of time a participant can be in the router before they qualify for a survey?

While we have no pre-set limit on time, the average time spent in our router pre-screening is relatively short. We monitor this length and can make adjustments if necessary.



An excessive amount of time spent in a router answering screening questions may cause a participant to be become fatigued, potentially impacting data quality.

## 18. What information about a project is given to potential participants before they choose whether to take the survey or not? How does this differ by the sources you offer?

All proprietary panelists are shown the length in minutes and the reward amount in the currency of the panel they belong to. Some panelists will also see a generic topic. For Integrated (intercept sources), respondents are shown the length in minutes.



The information about the survey (and associated rewards) may influence the type of people who agree to take part, creating the potential for bias.

**19.** **Do you allow participants to choose a survey from a selection of available surveys?** If so, what are they told about each survey that helps them to make that choice?

No, they are not allowed to choose from a selection of surveys.



The level of detail and the nature of the information given about a project may influence who responds, creating the potential for bias.

**20.** **What ability do you have to increase (or decrease) incentives being offered to potential participants (or sub-groups of participants) during the course of a survey?** If so, can this be flagged at the participant level in the dataset?

Due to the way Dynata samples (via channel blend) and the different types of incentives offered, changing a reward in the middle of field may not be practical (or possible). In any Dynata sample of 1,000 people there could be dozens of ways individuals are being rewarded, and dozens of different amounts the rewards translate into. We may be able to adjust a reward for some sources and not for others (for contractual or other reasons). Therefore, flagging who saw a changed reward and who didn't becomes complex. We will aim to give the best information possible if this information is required.

For some people the extrinsic reward is very important and for them, there may be a benefit in increasing the reward, but in general, we don't believe changes in reward amounts make much difference to outcomes. We would first discuss with you other options if a project is struggling in field.



The reward or incentive system may have an impact on the reasons people participate in a specific project and these effects can result in bias in the sample.

## 21.

### Do you measure participant satisfaction at the individual project level?
### If so, can you provide normative data for similar projects
### (by length, by type, by subject, by target group)?

The majority of our business involves sending respondents to non-Dynata surveys, so at this point we don't measure satisfaction at the individual survey level (although we do encourage our clients to ask this on their surveys and share this information back with us). We measure our respondents' satisfaction through meta variables: frequency of participation, abandon rates, and other similar metrics. With this information, we are planning to develop individual client and project scores, although this is not yet available. We do conduct research on the overall panel member experience and how to improve that experience.



Participant satisfaction may be an indicator of willingness to take future surveys. Participant reactions to your survey from self-reported feedback or from an analysis of the points where participants drop out of the survey may enhance your understanding of the survey results and lead to improvements in questionnaire design for future surveys.

## 22.

### Do you provide a debrief report about a project after it has completed?
### If yes, can you provide an example?

We don't commonly (across all studies) provide a debrief report about a project. However, we can provide survey/sample information if desired for a particular project.



You should expect a full sample debrief report. Sample providers should be able to list the standard reports and metrics that they make available.



Data Quality
& Validation

This section focuses on the quality of the in-survey data. In-survey data quality includes project level data validity and representativeness, survey-taking behaviours, sample blends, participant characteristics, and project level data health and audit practices.

## 23.

**How often can the same individual participate in a survey? How does this vary across your sample sources?** What is the mean and maximum amount of time a person may have already been taking surveys before they entered this survey? How do you manage this?

We do not set an overall time limit on participation in surveys, as we believe it is unfair to participants to ask them to take a survey and then repeatedly screen them out and end their sessions. However, we do control the number of surveys anyone can take in a session. We may also have contractual agreements which limit participation for some sources.

We don't calculate screening time separately from main survey time. Respondents typically screen for around 10 questions before they are selected for a survey. While there are a multitude of different survey experiences and different session lengths, on average people complete only one survey per session.



Answers to this question may alert you to about the potential for bias due to the participation of professional participants, simply survey fatigue, or category bias.

## 24.

**What data do you maintain on individual participants such as recent participation history, date(s) of entry, source/channel, etc?** Are you able to supply buyers with a project analysis of such individual level data? Are you able to append such data points to your participant records?

We maintain many points of information on our respondents, with some variation due to which channel the respondent is entering the survey on. All of the items mentioned are available, and most data points can be appended. Some items are considered proprietary and as such we do not supply buyers/clients with this information.

However, as this is not a standard metric report, there may be additional time and costs involved to supply this.



You may wish to append data that enables you to analyse and trend data to look for potential biases based on participation levels, sources, tenure, and other data the provider may hold.



# 25.

## Please describe your procedures for confirmation of participant identity at the project level. Please describe these procedures as they are implemented at the point of entry to a survey or router.

Dynata brings an array of solutions to fraud control, using both traditional techniques and new techniques (such as AI/Machine Learning). Dynata's ownership of the industry-wide fraud experts Imperium allows us to join Imperium's tools, metrics, technology, and controls with Dynata's strategy for recruitment, panel management, and the participant experience. This unique relationship allows us to monitor behavior within the survey itself, even if we are not hosting the study on our platform.

Dynata's strategy is to collect data at each touchpoint, gathering 100+ data points at every interaction and to use that data to manage participant reputation within the survey. Our current focus is on collecting and acting on real-time and predictive data about how people will interact before and within a survey (e.g., the new Imperium Quality Score, which uses Machine Learning to score respondents based on multiple survey behavior items known to indicate unengagement and fraud, creating a quality score for each and every participant). After a project, these scores are fed back into the panel database and used in ongoing quality assessment of a respondent.



Given the widely acknowledged risk of fraud in online research, buyers should understand identity and fraud controls, not just at recruitment, but at the point of survey entry. It is essential that there be measures in place to ensure that participants are who they say they are and that the member or email account has not been hacked, is not a duplicate with other accounts from other channels or panels, and whether or not the account is shared by other members of the household.

**Appendix M**



## 26. How do you manage source consistency and blend at the project level? With regard to trackers, how do you ensure that the nature and composition of sample sources remain the same over time? Do you have reports on blends and sources that can be provided to buyers? Can source be appended to the participant data records?

Dynata's three-channel approach is designed to provide the best feasibility coverage and consistency for trackers. Each of the three channels (see Question 6 above) are different, but the many, many underlying sources within each channel allow us to deliver consistent data at the channel level. Having so many underlying sources in each channel means we can make adjustments over time (adding new sources or reducing/eliminating one) without impacting consistency. Therefore, for trackers, we maintain a consistent proportion of each of the three channels in every wave.

Just as panel companies don't list all the sources they use to create an individual panel, we don't list the individual sources within each channel, but can give examples if needed. We can also append the overall channel name to participant data records if requested.



Participant source is a known contributor to data representativeness. Knowing all the sources used for the project, especially for tracking and longitudinal research, and that the proportions from each source are known and reportable over time, will allow you to understand any population biases that might exist.

## 27.

**Please describe your participant/member quality tracking, along with any health metrics you maintain on members/participants, and how those metrics are used to invite, track, quarantine, and block people from entering the platform, router, or a survey.** What processes do you have in place to compare profiled and known data to in-survey responses?

The Imperium Quality Score is our key survey-level health metric. We also monitor many other metrics at recruitment, when entering the router and surveys, and over a respondent's survey-taking lifetime with us, such as:

- Digital fingerprint & Geographic location
- Device speed movement & Keystroke patterns
- Speeding & Straight-lining
- Participation rates
- Client-reported quality issues
- Performance on our own quality screeners, including open-end screeners
- Participation and performance by source
- Time of day survey is taken
- Multiple other metrics including speeding, keystroke patterns
- Customer concern feedback links
- AI for rare target verification

Based on responses to these metrics, we can remove (from panel or router) or quarantine respondents. We don't explicitly compare profiled/known data to in-survey responses for quality purposes, although we may add this in the future.



Buyers and providers often work together to track individual survey response quality, so buyers should understand what data the provider uses to confirm survey answers, block or remove a member, and how to enable that information exchange.



**Appendix M**

## 28.

**For work where you program, host, and deliver the survey data, what processes do you have in place to reduce or eliminate undesired in-survey behaviours, such as (a) random responding, (b) Illogical or inconsistent responding, (c) overuse of item non- response (e.g.,"Don't Know") (d) inaccurate or inconsistent responding, (e) incomplete responding, or (f) too rapid survey completion?**

Dynata's Imperium Quality Score detects and flags many types of undesirable survey behavior, and this is implemented on all surveys we program/host. Through development of this AI/ML algorithm, and years of experience testing all the most commonly used in-survey quality controls, we've determined which are the ones that result in fewest false positives and remove the most poor quality performers. Currently, we don't remove anyone for quality (only flag them for further review), except in cases of obvious profanity.

If we are sending sample to non-Dynata-programmed surveys which do not employ Quality Score, in addition to detection of speeding and straight-lining, we suggest including three quality control questions and ONLY removing people who fail at least two of the total number of checks. Obvious traps (such as fake brands and text paragraphs with misdirects) should be avoided, as research shows they are not effective and can be counter-productive (i.e., putting bias into the results). Our recommended quality control questions are similar to those noted in the question.

A powerful defense against the problems listed in the question are within questionnaire design. Dynata teams can consult on how to design questions to support the best quality response.



Data cleansing methods are often built into survey programs and platforms. Some of those methods are set up to automatically remove responses, while others are optional or manual. Understanding what tools will be used will aid buyers in understanding how much cleaning they should plan to do once they receive the final dataset, and what biases might be introduced by automated cleaning practices.

> Sample providers, buyers, and their clients are subject to data protection and related information security requirements imposed by data protection laws and regulations. In addition, they may be subject to laws and regulations that may impact incentives paid to participants.

These laws and regulations vary by jurisdiction with different laws and regulations applying in different countries or states within countries, and are generally interpreted based on where the participant resides.

Applicable data protection laws and regulations include, but are not limited to: the Act on the Protection of Personal Information or APPI (Japan); the Australian Privacy Act (Australia); the California Consumer Protection Act or CCPA (state of California in the United States); the Children's Online Privacy Protection Act or COPPA (United States); the Data Protection Act (United Kingdom); amendments regarding data localisation requirements to the Data Protection Act (Russian Federation); the General Data Protection Law (Brazil); the EU General Data Protection Regulation or EU-GDPR (EU/ EEA); the Health Insurance Portability and Accountability Act or HIPAA (United States); the Graham-Leach Bliley Act or GLBA (United States); and PIPEDA (Canada). AB 2257 (the state of California in the United States) is an example of law and regulation related to employment which may impact incentives paid to participants.

Information security frameworks and standards include, but are not limited to COBIT, HITRUST, ISO 27001, the NIST Cybersecurity Framework and SOC 2.

Answers to the questions in this section can help you understand the data protection, information security and compliance policies, procedures and practices that a sample provider has implemented.

# Appendix M

## 29.

**Please provide the link to your participant privacy notice (sometimes referred to as a privacy policy) as well as a summary of the key concepts it addresses.** (Note: If your company uses different privacy notices for different products or services, please provide an example relevant to the products or services covered in your response to this question).

Our privacy notice addresses our collection, use and processing of personal data as well as sharing with third parties and storage/retention.

UK/EU/GDPR: https://www.opinionoutpost.co.uk/privacy

US/Rest of world: https://www.opinionoutpost.com/privacy



A privacy notice is required by various data protection laws and regulations as well as other laws and regulations as well some market research industry codes.

A privacy notice discloses information about the personal data that a sample provider collects and processes and the way that that personal data is used, disclosed, and managed. A review of a sample provider's privacy notice can help you understand their procedures and practices related to personal data and the degree to which they comply with applicable laws, regulations, and industry codes.



## 30.

**How do you comply with key data protection laws and regulations that apply in the various jurisdictions in which you operate? How do you address requirements regarding consent or other legal bases for the processing of personal data?** How do you address requirements for data breach response, cross-border transfer, and data retention? Have you appointed a data protection officer?

We have dedicated internal and external resources to support our personal data protection obligations and legal compliance. We typically rely on consent from the data subject as our legal basis for processing, but for certain fraud tools, we rely on legitimate interest. We have implemented an incident response program and have an assigned internal team to address unauthorized access to personal data and/or breach. We use the standard contractual clauses for any export of personal data from the EEA to a country not deemed to provide adequate protection. We have appointed a Data Protection Officer.



As noted above, buyers and sample providers are subject to data protection and related information security requirements imposed by data protection laws and regulations, other laws and regulations as well as clients. Understanding a sample provider's compliance position with these laws and regulations is essential.



## 31. How can participants provide, manage and revise consent for the processing of their personal data? What support channels do you provide for participants? In your response, please address the sample sources you wholly own, as well as those owned by other parties to whom you provide access.

Our research participants are presented an opportunity to review and agree to our privacy notice prior to joining our panels. If they elect to withdraw consent or seek to review the personal data we collect and store about them, our member support team is available via electronic mail to assist. We do not monitor how our integrated sample sources or our third-party sample partners manage their consent process. We review their process as disclosed in their diligence responses and privacy policy; however, we do not audit that process nor do we conduct ongoing reviews.



Consent for the collection and processing of personal data has long been required by market research industry codes. It is also explicitly required by some data protection laws and regulations. Some data protection laws and regulations, including EU-GDPR and CCPA as examples, also provide for access rights for participants to correct, update, or delete their data. Implementation of a participant support channel is also required by ISO 20252 (ISO 20252:2019: Market, Opinion and Social Research, Including Insights and Data Analytics - Vocabulary and Service Requirements).

## 32. How do you track and comply with other applicable laws and regulations, such as those that might impact the incentives paid to participants?

We have dedicated internal and external legal resources assigned to monitor all applicable laws and regulations that apply to our business, including but not limited to incentive payments.



As stated above, buyers and sample providers are subject to laws and regulations such as those that may impact incentives paid to participants.

**33.** **What is your approach to collecting and processing the personal data of children and young people?** Do you adhere to standards and guidelines provided by ESOMAR or GRBN member associations? How do you comply with applicable data protection laws and regulations?

We do not collect personal data from individuals under 13 in the United States or under 16 for the rest of the world. We do adhere to standards and guidelines of ESOMAR and GRBN member associations. We have dedicated internal and external legal resources assigned to monitor all applicable laws and regulations that apply to our business.



Some data protection laws and regulations (for example COPPA and EU-GDPR) impose specific requirements with the respect to the collection and processing of the personal data of children and young people. These requirements include specific age definitions as well as a requirement for verifiable parental consent. See the ESOMAR & GRBN Guideline on Research and Data Analytics with Children, Young People, and Other Vulnerable Individuals for further discussion.

**34.** **Do you implement "data protection by design" (sometimes referred to as "privacy by design") in your systems and processes?** If so, please describe how.

We have implemented privacy by design into our product development lifecycle, ensuring that personal data collection and use is assessed as part of the products and services we provide.



"Data protection by design" (which may also be referred to as "privacy by design") is an approach that requires the consideration of privacy and data protection issues at the design phase of any system, service, product or process and then throughout the lifecycle. Understanding a sample providers use or lack of use of "data protection by design"can help you understand its data protection compliance posture.

## 35.

**What are the key elements of your information security compliance program?** Please specify the framework(s) or auditing procedure(s) you comply with or certify to. Does your program include an asset-based risk assessment and internal audit process?

To provide assurance to our clients, Dynata maintains SOC2 Type II compliance.

Dynata recognizes the importance of data privacy and data security and has established an Information Security program to manage data privacy and security requirements and constantly monitor developing trends and threats. The program is led by qualified Information Security professionals who closely collaborate with Dynata's General Counsel to ensure that any contractual or regulatory data protection requirements are integrated into the Information Security program. The Information Security team leverages all the necessary departments and staff at Dynata to address security issues as they arise.

Dynata's information security program includes internal risk assessments and audits.



Information security frameworks such as ISO 27001 or SOC 2 are accepted and recognized frameworks for information security compliance. Understanding which framework(s) a sample provider uses or if a sample provider doesn't use such a framework can help you understand the sample provider's information security compliance posture.

## 36.

**Do you certify to or comply with a quality framework such as ISO 20252?**

We comply with the industry management system standard requirements, including certifying to ISO 20252 and the Research Society Fair Data Accreditation.



ISO 20252 is an international quality standard recognised by many market research industry associations. In addition to requirement for a system to manage research processes, it explicitly addresses requirements for data protection and information security compliance.



# Metrics

This section lists common sample and data health metrics. Reviewing metrics periodically can serve as the basis for a conversation with sample providers about consistency and reliability, as well as whether the sample is appropriate for the population and business question being examined. Unexpected or unexplained shifts in metrics may also indicate the potential for bias or error. While not all of these metrics are required and there are no benchmarks on the "right answers," providing transparency over time will create a meaningful dialogue about quality and utility.

# 37.

**Which of the following are you able to provide to buyers, in aggregate and by country and source?** Please include a link or attach a file of a sample report for each of the metrics you use.

1. Qualifying or completion rate, trended by month
2. Percent of paid completes rejected per month/project, trended by month
3. Percent of members/accounts removed/quarantined, trended by month
4. Percent of paid completes from 0-3 months tenure, trended by month
5. Percent of paid completes from smartphones, trended by month
6. Percent of paid completes from owned/branded member relationships versus intercept participants, trended by month
7. Average number of dispositions (survey attempts, screenouts, and completes) per member, trended by month (potentially by cohort)
8. Average number of paid completes per member, trended by month (potentially by cohort)
9. Active unique participants in the last 30 days
10. Active unique 18-24 male participants in the last 30 days
11. Maximum feasibility in a specific country with nat rep quotas, seven days in field, 100% incidence, 10-minute interview
12. Percent of quotas that reached full quota at time of delivery, trended by month

| We CAN provide the following metrics (with some tailoring to conform to Dynata's systems) | | |
|---|---|---|
| 11 | Maximum feasibility in a specific country with nat rep quotas, seven days in field, 100% incidence, 10-minute interview | Provided upon request |
| 05 | % of Paid Completes from smartphones, trended by month | Across all Starts (not completes), and compared to PC/Tablet |
| 09 | Active unique participants in the last 30 days | across all Starts |
| 10 | Active unique 18-24 male participants in the last 30 days | across all Starts |
| 12 | % of quotas that reached full quota at time of delivery, trended by month | % of projects (not individual quotas) that complete successfully |
| **We CAN provide the following metrics, but only for a client's own studies** | | |
| 01 | Qualifying or Completion Rate, trended by month | Conversion Rate and elements of non-conversion (Drop/Abandon rate, Screenouts, OverQuota rate) |
| 02 | % of Paid Completes rejected per month / project, trended by month | Based on invoicing to the client |
| **We CANNOT provide the following metrics -- we don't release the information externally as it is proprietary to Dynata's business** | | |
| 04 | % of Paid Completes from 0-3 months tenure, trended by month | |
| 06 | % of Paid Completes from owned/branded member relationships versus intercept participants, trended by month | |
| 07 | Average number of dispositions (survey attempts, screenouts, and completes) per member, trended by month (potentially by cohort) | |
| 08 | Average number of paid completes per member, trended by month (potentially by cohort) | |
| **We CANNOT provide the following metric as numbers can only be interpreted in context of knowledge about quality program actions over time** | | |
| 03 | % of members/accounts removed / quarantined, trended by month | |

**Appendix M**



Project team and
Sounding board

# Appendix M



**Project team and**

**Sounding board Project Team:**

Reg Baker, ESOMAR

Pete Cape, Dynata

Melanie Courtright, Insights Association

Peter Milla, Peter Milla Consulting

Judith Passingham, ESOMAR

**Administrative Support:**

Joke Ruwen-Stuursma, ESOMAR

**Sounding Board:**

Rob Berger, Maru/Blu

Adam Birss, Rakutan Insight

Mike Cooke, ESOMAR

Olivier de Gaudemar, Consultant

Jonathan Deitch, Cint

Philippe Guilbert, Syntec Conseil

Jon Puleston, Kantar

Efrain Ribeiro, Consultant

Mary Beth Weber, CASE



# Glossary

## For the purpose of this document these terms have the following specific meanings:

**Affiliate partner** (or Affiliate network) means a network of communities with which a sample provider has a relationship to direct intercept traffic to their surveys.

**API** (application programming interface) means a set of definitions and protocols for building software applications capable of accessing and exchanging data.

**Blending** means the practice of combining multiple, heterogeneous sample sources with the aim of achieving a more consistent or more representative sample.

**Children** means individuals for whom permission to participate in research must be obtained from a parent, legal guardian, or responsible adult. Definitions of the age of a child vary substantially and are set by national laws and self-regulatory codes. In the absence of a national definition, a child is defined as being 12 and under and a "young person" as aged 13 to 17.

**Completion rate** means the number of participants who fully complete the survey divided by the number of participants who start the survey.

**Consent** means freely given and informed indication of agreement by a person to the collection and processing of his/her personal data. Note that the specific requirements for consent will vary by jurisdiction.

**Exclusion** means excluding a potential participant from a research project based on their previous participation in a research project involving the same or similar product/service category and/or methodology.

**Fraudulent participant** means a participant who deliberately misrepresents their identity, profiling information, or responses, including organisations that use bots to impersonate participants.

**Health metrics** means measures of quantitative assessment commonly used for comparing and tracking performance or production over time. In this context, health metrics refers to quantitative data used to track stability or changes in the sample a provider offers, and the metrics suggested are based on data that has been previously known to impact quality over time.

**Loyalty programme** means an arrangement in which customers of a company (or group of companies) are rewarded for purchases made with these companies. Rewards are normally given in a currency that can be spent at those companies (or their chosen partners).

**Paid completes** means interviews/surveys that are delivered and accepted by a client, are included in the final dataset, and for which the sample provider receives payment.

# Appendix M

**Panel member** (or simply member) means an individual recruited from a documented source who has provided profile data and appropriate information for validation of identity, given explicit consent to participate in research according to the terms and conditions of panel membership, and has not opted out.

**Participant** (sometimes called a participant or data subject) means a person or organisation from whom or about whom data is collected for research.

**Personal data** (sometimes referred to as personally identifiable information or PII) means any information relating to a natural living person that can be used to identify an individual, for example by reference to direct identifiers (such as a name, specific geographic location, telephone number, picture, sound, or video recording) or indirectly by reference to an individual's physical, physiological, mental, economic, cultural or social characteristics.

**Profiling information** means descriptive characteristics of a panel member.

**Quarantined members** means individuals who have broken some set of quality assessment protocols that result in them being either temporarily or permanently suspended from participating in future research activities with the company that quarantines them.

**Referral program** means a process whereby a panel offers its existing panellists the opportunity to gain rewards by referring family, friends and colleagues (or visitors of their site) to join the panel.

**Representativeness** means the degree to which a sample reflects the target population being studied. A representative sample is one in which the distribution of important characteristics is approximately the same as in the target population.

**Rewards community** (within Get Paid To (or GPT) sites) means databases or panels of individuals who may undertake non-research activities (watch ads, download an app, complete marketing offers etc) usually in exchange for a reward, but who also agree to take part in research projects.

**Router** means an online software application that screens incoming research participants and then uses those results to assign participants to one of multiple available research projects. A router can also offer participants additional screeners and surveys after screener qualification failure or survey completion.

**Sample provider** means a service provider responsible for the provision and management of online samples from relevant sources including panels, intercepts, email lists, etc.

**Survey attempts** means the number of times the same individual clicked a link or entered into a survey environment in an attempt to complete a survey.

**Third Party Sources** means sources that the sample provider does not directly run or control.

**Yield management** means a variable allocation strategy through which outcomes are maximised by matching supply with demand.

**Appendix N-1**

| Modified Dennis  - Termination Report Summary | |
|---|---|
| Completes | 630 |
| Total Incomplete | 359 |
| Total Terminates | 5977 |
| Total Overquota | 6 |
| **Total** | **6972** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 3 |
| INCOMPLETE_SCR | 356 |
| Overquota | |
| Overquota: Total number of completes | 6 |
| Terminates | |
| P_State: Not in California | 313 |
| D_AGE: Under the age of 18 | 29 |
| Age or Gender Mismatch | 382 |
| PRIMARY_SHOP: Selected None of it | 68 |
| INDUSTRY: Selected Sensitive Industry | 188 |
| PAST_SURVEY: Past Participation in a survey about Food Products for To | 339 |
| S_PURCHASE: Did not select food or beverage for Infant,Toddlers, or oth | 3440 |
| S_PURCHASE_2: Did not select less than 24 months | 1048 |
| S_BRAND: Selected Organics by Chomet | 117 |
| S_BRAND: Did not select an elgible brand | 22 |
| S_CONFIRM: Did not select Food Products for Young Children | 31 |

**Appendix N-2**

| Labeling  - Termination Report Summary | |
|---|---|
| Completes | 604 |
| Total Incomplete | 165 |
| Total Terminates | 4548 |
| Total Overquota | 3 |
| **Total** | **5320** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 2 |
| INCOMPLETE_SCR | 163 |
| **Overquota** | |
| Overquota: Total number of completes | 3 |
| **Terminates** | |
| S1: Failed Captcha | 40 |
| S10: Not on an Approved Device | 67 |
| S20: Under the age of 18 | 29 |
| S20: Did not provide Age | 3 |
| S30: Did not provide Gender | 5 |
| S20/S30: Age and or Gender Mismatch | 304 |
| S40: Not in US | 1 |
| S50: Sensitive Industry | 221 |
| S60: Did not have children or did not provide answer | 2541 |
| S70: Did not shop for food products for child(ren) under 10 in past 12 mc | 152 |
| S80: Selected 'Suave' | 440 |
| S90: Did not select specific Earth's Best Products | 47 |
| S100: Selected 'Suave' | 116 |
| S100: Did not select Earth's Best | 464 |
| S110: Did not select specific Earth's Best Products | 17 |
| S120: Failed Attention Check | 101 |

**Appendix N-3**

| Consumption Behavior  - Termination Report Summary | |
|---|---|
| Completes | 560 |
| Total Incomplete | 189 |
| Total Terminates | 6458 |
| **Total** | **7207** |

| Incompletes | |
|---|---|
| INCOMPLETE_MAIN | 0 |
| INCOMPLETE_SCR | 189 |
| **Terminates** | |
| S1: Failed Captcha | 66 |
| S10: Not on an Approved Device | 129 |
| S20: Under the age of 18 | 40 |
| S20: Did not provide Age | 8 |
| S30: Did not provide Gender | 3 |
| S20/S30: Age and or Gender Mismatch | 439 |
| S40: Not in US | 1 |
| S50: Sensitive Industry | 293 |
| S60: Did not have children or did not provide answer | 3563 |
| S70: Did not shop for food products for child(ren) under 10 in past 12 mo | 217 |
| S80: Selected 'Suave' | 613 |
| S80: Did not select Earth's Best | 973 |
| S90: Did not select specific Earth's Best Products | 39 |
| S120: Failed Attention Check | 74 |